ACCEPTED
07-15-00327-CV
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
11/20/2015 4:46:55 PM
Vivian Long, Clerk

**No. 07-15-00327-CV**

IN THE COURT OF APPEALS
SEVENTH JUDICIAL DISTRICT OF TEXAS
AMARILLO, TEXAS

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
11/20/2015 4:46:55 PM
VIVIAN LONG
CLERK

HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS

v.

JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust,

*On Appeal from the 46th Judicial District Court,*
*Wilbarger County, Texas*
*Trial Court No. 24,955*

# BRIEF OF APPELLANTS

Cornell D. Curtis
State Bar No. 24007069
CORNELL D. CURTIS, P.C.
1716 Main Street
Vernon, Texas 76384
940.552.9100
940.552.2655 (facsimile)
vernonlaw@sbcglobal.net

Thomas S. Leatherbury
State Bar No. 12095275
Manuel G. Berrelez
State Bar No. 24057760
Stephen S. Gilstrap
State Bar No. 24078563
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
214.220.7700
214.999.7792 (facsimile)
tleatherbury@velaw.com
mberrelez@velaw.com
sgilstrap@velaw.com

*Attorneys for Appellants Herring Bancorp, Inc.;*
*C.C. Burgess; and C. Campbell Burgess*

Oral Argument Requested

November 20, 2015

## IDENTITY OF PARTIES AND COUNSEL

**Appellants/Cross-Appellees Herring Bancorp, Inc.; C.C. Burgess; and C. Campbell Burgess**

Cornell D. Curtis
State Bar No. 24007069
CORNELL D. CURTIS, P.C.
1716 Main Street
Vernon, Texas 76384
940.552.9100
940.552.2655 (facsimile)
vernonlaw@sbcglobal.net

Thomas S. Leatherbury
State Bar No. 12095275
Manuel G. Berrelez
State Bar No. 24057760
Stephen S. Gilstrap
State Bar No. 24078563
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
214.220.7700
214.999.7792 (facsimile)
tleatherbury@velaw.com
mberrelez@velaw.com
sgilstrap@velaw.com

**Appellee/Cross-Appellant John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust**

Lee F. Christie
Michael L. Atchley, II
POPE, HARDWICKE, CHRISTIE, SCHELL, KELLY & RAY, LLP
500 West 7th Street, Suite 600
Fort Worth, Texas 76102
817.332.3245
817.877.4781 (facsimile)
lfchristie@popehardwicke.com
matchley@popehardwicke.com

## TABLE OF CONTENTS

Identity of Parties and Counsel ........ i

Table of Contents ........ ii

Index of Authorities ........ v

Record References ........ ix

Statement of the Case ........ x

Statement Regarding Oral Argument ........ xii

Issues Presented ........ xiii

Statement of Facts ........ 1

I. Mikkelsen's Prior Involvement at Herring Bancorp. ........ 1

II. The 2006 Conversion and Redemption. ........ 2

III. The 2013 Redemption and Tender. ........ 4

IV. Pre-Trial Proceedings/Partial Summary Judgment for Mikkelsen. ........ 7

V. The Trial. ........ 8

VI. The Final Judgment and Post-Judgment Proceedings. ........ 10

Summary of the Argument ........ 11

Standards of Review ........ 14

Argument ........ 16

I. Defendants Are Entitled to Judgment on Mikkelsen's Minority-Oppression Claims. ........ 16

A. *Ritchie v. Rupe* Held That Minority Oppression Is Not a Viable Cause of Action Under Texas Law. ........ 17

B. The Trial Court Erred in Concluding That the Relevant Holding in *Ritchie v. Rupe* Was *Dicta*. ........ 18

C. Alternatively, the Evidence at Trial Was Not Legally or Factually Sufficient to Constitute Minority Oppression. ........ 20

II. Mikkelsen Cannot Recover on His Breach of Contract Claim or on His Declaratory Judgment Claim, and Defendants Should Prevail on Their Declaratory Judgment Claim. ........ 22

A. The 2006 Redemption Was Valid. ........ 22

B. Defendants Are Entitled to Prevail on Their Declaratory Judgment Claim Because the 2013 Redemption and Tender Were Valid. ....26

C. Regardless of the Validity of the Two Redemptions, Mikkelsen Cannot Show Any Damages Resulting from Defendants' Actions. ....37

D. Even Assuming a Breach, Mikkelsen Is Not Entitled to Remain a Shareholder in Perpetuity; He Only Is Entitled to the Par Value of His Preferred Shares Plus Unpaid Dividends. ....38

III. Defendants Are Entitled to Judgment on Mikkelsen's Breach of Fiduciary Duty Claim Against C.C. Burgess for an Additional Reason Than the One Found by the Jury. ....39

A. C.C. Burgess Owes No Fiduciary Duties to Mikkelsen Under Texas Law. ....40

B. Alternatively, the Evidence Was Not Legally or Factually Sufficient to Show That C.C. Burgess Violated Any Purported Fiduciary Duties. ....42

IV. The $127,442 Fee Award Should Be Reversed. ....43

A. Because Mikkelsen Cannot Prevail on His Breach of Contract Claim, He Is Not Entitled to an Attorneys' Fee Award. ....43

B. Alternatively, if Mikkelsen Is Entitled to Some of His Fees, the $127,442 Award Cannot Stand Because It Is Unsupported and Because Mikkelsen Did Not Segregate His Attorneys' Fees Properly. ....44

C. Defendants Are Entitled to Their Reasonable Attorneys' Fees Spent Pursuing Their Declaratory Judgment Claim. ....47

V. To the Extent the Court Does Not Render Judgment in Favor of Defendants, a New Trial Also Is Warranted Because the Trial Court Impermissibly Commented on the Weight of the Evidence When It Instructed the Jury That Herring Bancorp Had Breached its Articles of Incorporation as a Matter of Law. ....48

Conclusion and Prayer ....52

Certificate of Compliance ....53

Certificate of Service ....54

Index of Appendix Materials ..........................................................................55

(1) Final Judgment (June 16, 2015) (2CR472-507)

(2) Jury Verdict (January 30, 2015) (2CR228-58)

(3) Orders Denying Defendants Post-Judgment Motions (August 19, 2015) (2CR409-10)

(4) Order Granting Plaintiff's Motion for Partial Summary Judgment (August 4, 2011) (1CR306-07)

(5) Herring Bancorp Articles of Incorporation (13RR, DX-1)

(6) October 31, 2006 Notice of Redemption (13RR, DX-18)

(7) Acceptance of Subchapter S Status by IRS (13RR, DX-31)

(8) October 30, 2013 Notice of Redemption (13RR, DX-33)

(9) November 22, 2013 Tender (13RR, DX-35)

(10) Refused Jury Instructions Related to 2013 Redemption/Tender (January 30, 2015) (2CR260-61, 2CR267)

(11) *Cent. Austin Apartments, LLC v. UP Austin Holdings, LP*, No. 03-13-00080-CV (Tex. App.—Austin Dec. 8, 2014) (op. withdrawn on February 6, 2015 based on settlement of parties)

## INDEX OF AUTHORITIES

**Cases**

*7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*,
245 S.W.3d 488 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) .............46

*A.G. Edwards & Sons, Inc. v. Beyer*,
235 S.W.3d 704 (Tex. 2007) .............46

*American Bankers Ins. Co. v. Caruth*,
786 S.W.2d 427 (Tex. App.—Dallas 1990, no writ) .............50

*Arcadia Fin., Ltd. v. Sw.-Tex. Leasing Co.*,
78 S.W.3d 619 (Tex. App.—Austin 2002, pet. denied) .............14

*Associated Indemnity Corp. v. CAT Contracting, Inc.*,
964 S.W.2d 276 (Tex. 1998) .............41

*Bair Chase Prop. Co., LLC v. S&K Dev. Co., Inc.*,
260 S.W.3d 133 (Tex. App.—Austin 2008, pet. denied) .............16

*Bd. of Regents v. Denton Constr.*,
652 S.W.2d 588 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.) .............50

*Bocquet v. Herring*,
972 S.W.2d 19 (Tex. 1998) .............15

*BP Am. Prod. Co. v. Red Deer Res., LLC*,
466 S.W.3d 335 (Tex. App.—Amarillo 2015, pet. filed) .............16

*Cardiac Perfusion Servs., Inc. v. Hughes*,
436 S.W.3d 790 (Tex. 2014) ............. 17, 18

*Cent. Austin Apartments, LLC v. UP Austin Holdings, LP*,
No. 03-13-00080-CV (Tex. App.—Austin Dec. 8, 2014) (op. withdrawn on February 6, 2015 based on settlement of parties) .............19

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) .............15

*Cotten v. Weatherford Bancshares, Inc.*,
187 S.W.3d 687 (Tex. App.—Fort Worth 2006, pet. denied), *overruled by Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014) .............30

*Davis v. Sheerin*,
754 S.W.2d 375 (Tex. App.—Houston [1st Dist.] 1988, writ denied), *overruled by Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014) ............. 17, 21

*Dilling v. Nationsbank, N.A.*,
897 S.W.2d 451 (Tex. App.—Waco 1995),
*rev'd on other grounds*, 922 S.W.2d 950 (Tex. 1996)........................................31

*Dow Chem. Co. v. Francis*,
46 S.W.3d 237 (Tex. 2001)...........................................................................15

*Enzo Invs., LP v. White*,
468 S.W.3d 635 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).............45

*Ex parte Ellis*,
279 S.W.3d 1 (Tex. App.—Austin 2008),
*aff'd*, 309 S.W.3d 71 (Tex. Crim. App. 2010)..................................................32

*First Nat'l Bank of Amarillo v. Jarnigan*,
794 S.W.2d 54 (Tex. App.—Amarillo 1990, writ denied)..................................50

*Grinnell v. Munson*,
137 S.W.3d 706 (Tex. App.—San Antonio 2004, pet. denied)...........................40

*Guerra v. Guerra*,
No. 04-10-00271-CV, 2011 WL 3715051 (Tex. App.—San Antonio 2011,
no pet.)...............................................................................................21

*Hagedorn v. Tisdale*,
73 S.W.3d 341 (Tex. App.—Amarillo 2002, no pet.) ........................................15

*Harrison v. Williams Dental Grp., P.C.*,
140 S.W.3d 912 (Tex. App.—Dallas 2004, no pet.)...........................................44

*Holland v. Wal-Mart Stores, Inc.*,
1 S.W.3d 91 (Tex. 1999)...............................................................................14

*Iliff v. Iliff*,
339 S.W.3d 74 (Tex. 2011)...........................................................................15

*In re Mandel*,
578 F. App'x 376 (5th Cir. 2014) ..................................................................19

*Indian Beach Prop. Owners' Ass'n v. Linden*,
222 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2007, no pet.).......................16

*Jensen v. Covington*,
234 S.W.3d 198 (Tex. App.—Waco 2007, pet. denied)......................................32

*Jones v. Thompson*,
338 S.W.3d 573 (Tex. App.—El Paso 2010, pet. denied)..................................41

*Long v. Griffin*,
442 S.W.3d 253 (Tex. 2014)....................................................................45

*Mader v. Aetna Casualty & Surety Co.*,
683 S.W.2d 731 (Tex. App.—Corpus Christi 1984, no writ)..............................50

*MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*,
995 S.W.2d 647 (Tex. 1999)....................................................................29

*Opperman v. Opperman*,
No. 07-12-00033-CV, 2013 WL 6529228 (Tex. App.—Amarillo Dec. 9, 2013, no pet.)....................................................................40

*Pabich v. Kellar*,
71 S.W.3d 500 (Tex. App.—Fort Worth 2002, pet. denied) ...............................40

*Pool v. Ford Motor Co.*,
715 S.W.2d 629 (Tex. 1986)....................................................................15

*Quick v. City of Austin*,
7 S.W.3d 109 (Tex. 1998)....................................................................14

*Rauch v. RCA Corp.*,
861 F.2d 29 (2d Cir. 1988)....................................................................24

*Redwine v. AAA Life Ins. Co.*,
852 S.W.2d 10 (Tex. App.—Dallas 1993, no writ)...................................... 49, 50

*Ritchie v. Rupe*,
443 S.W.3d 856 (Tex. 2014).................................................................... passim

*S. Tex. Water Auth. v. Lomas*,
223 S.W.3d 304 (Tex. 2007)....................................................................29

*Schlumberger Technology Corp. v. Swanson*,
959 S.W.2d 171 (Tex. 1997)....................................................................41

*Seymore v. Dorsett*,
No. 07-03-0175-CV, 2005 WL 2849061 (Tex. App.—Amarillo Oct. 31, 2005, no pet.)....................................................................49

*Somers ex rel. EGL, Inc. v. Crane*,
295 S.W.3d 5 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ...........................40

*Staff Indus., Inc. v. Hallmark Contracting, Inc.*,
846 S.W.2d 542 (Tex. App.—Corpus Christi 1993, no writ)..............................32

*Tex. Beef Cattle Co. v. Green*,
921 S.W.2d 203 (Tex. 1996)....................................................................21

*Tex. Dep't of Human Servs. v. E.B.*,
802 S.W.2d 647 (Tex. 1990) ........................................................ 16

*Tex. Ear Nose & Throat Consultants, PLLC v. Jones*,
--- S.W.3d ----, 2015 WL 3918130 (Tex. App.—Houston [14th Dist.] June 25, 2015, no pet.) ........................................................ 19

*Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 911 (Tex. 2000) ........................................................ 36

*Tilton v. Marshall*,
925 S.W.2d 672 (Tex. 1996) ........................................................ 12

*Tony Gullo Motors I, L.P. v. Chapa*,
212 S.W.3d 299 (Tex. 2006) ........................................................ 44, 46, 47

*White Point Minerals, Inc. v. Swantner*,
464 S.W.3d 884 (Tex. App.—Corpus Christi 2015, no pet.) .............................. 19

**Statutes**

Tex. Bus. Orgs. Code § 11.404 ........................................................ 18

Tex. Civ. Prac. & Rem. Code § 37.009 ........................................................ 47

**Rules**

Tex. R. App. P. 44(a)(1) ........................................................ 16, 37

Tex. R. Civ. P. 277 ........................................................ 49

**Other Authorities**

James Dawson, *Ritchie v. Rupe and the Future of Shareholder Oppression*,
124 YALE L.J. FORUM 89 (2014) ........................................................ 20

Lyndon Bittle & Kelli Hinson, *Texas Turns a Corner: Resolving Shareholder Disputes in Closely Held Businesses After Ritchie v. Rupe*,
67 BAYLOR L. REV. 339 (2015) ........................................................ 19

Todd A. Murray, *The Texas Courts' Ongoing Struggle to Harmonize the Texas Business Organizations Code with the Texas Rules of Civil Procedure in Derivative Shareholder Litigation*,
47 TEX. TECH L. REV. 245 (2015) ........................................................ 20

## RECORD REFERENCES

Citations to the record will be formatted as follows:

| | | |
|---|---|---|
| (1) | Clerk's Record | ***Vol. No.*** CR ***Page No.*** |
| (2) | Reporter's Record from February 5, 2009 Hearing | 2RR ***Page:Line Nos.*** |
| (3) | Reporter's Record from April 18, 2011 Hearing | 3RR ***Page:Line Nos.*** |
| (4) | Reporter's Record from May 19, 2014 Hearing | 4RR ***Page:Line Nos.*** |
| (5) | Reporter's Record from November 12, 2014 Hearing | 5RR ***Page:Line Nos.*** |
| (6) | Reporter's Record from January 26, 2015 Hearing on Motions in Limine & Voir Dire | 6RR ***Page:Line Nos.*** |
| (7) | Reporter's Record from January 26, 2015 | 7RR ***Page:Line Nos.*** |
| (8) | Reporter's Record from January 27, 2015 | 8RR ***Page:Line Nos.*** |
| (9) | Reporter's Record from January 28, 2015 | 9RR ***Page:Line Nos.*** |
| (10) | Reporter's Record from January 29, 2015 | 10RR ***Page:Line Nos.*** |
| (11) | Reporter's Record from January 30, 2015 | 11RR ***Page:Line Nos.*** |
| (12) | Plaintiff's Trial Exhibits | 12RR, PX-***Exhibit No.*** |
| (13) | Defendants' Trial Exhibits | 13RR, DX-***Exhibit No.*** |
| (14) | Reporter's Record from April 27, 2015 Hearing on Motion to Enter Judgment | 14RR ***Page:Line Nos.*** |
| (15) | Reporter's Record from August 19, 2015 Hearing on Post-Judgment Motions | 15RR ***Page:Line Nos.*** |

## STATEMENT OF THE CASE

| | |
|---|---|
| **Nature of the Case** | This dispute raises the issue of whether Herring Bancorp, Inc. ("Herring Bancorp"), as part of its conversion into a Subchapter "S" Corporation, properly redeemed the small number of Herring Bancorp preferred shares that John Mikkelsen (and his brother, Mallory) inherited. This dispute also raises questions about (1) whether minority oppression is a valid cause of action following the Texas Supreme Court's decision in *Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014), and (2) whether C.C. Burgess, as an officer, director, and majority shareholder of Herring Bancorp, owed any fiduciary duties to Mikkelsen, as a minority shareholder.<br><br>In 2011, the trial court granted Mikkelsen's motion for partial summary judgment on his breach of contract claim, holding that the 2006 redemption of Mikkelsen's shares was invalid. In light of that ruling, Defendants again redeemed Mikkelsen's preferred shares in 2013 by giving him a tender (in the form of a cashier's check) for more than he was owed under the Articles of Incorporation.<br><br>In 2015, after a three-day jury trial, the trial court entered Final Judgment, which (1) held that Herring Bancorp breached its Articles of Incorporation in redeeming Mikkelsen's preferred shares; (2) declared that the 2006 redemption and subsequent 2013 redemption were void as to Mikkelsen and that Mikkelsen remains a preferred shareholder of Herring Bancorp with the right to inspect its books and records; and (3) held that C.C. Burgess and C. Campbell Burgess ("Burgess Defendants") engaged in oppressive conduct toward Mikkelsen. The Final Judgment awarded Mikkelsen $23,112.00 in compensatory damages (representing the par value and unpaid dividends on his preferred shares from October 31, 2006 to December 31, 2014), $5,222.25 in prejudgment interest, $127,442.00 in attorneys' fees through trial, conditional appellate attorneys' fees, costs, and postjudgment interest. Ex. 1. |
| **Trial Court** | Honorable Dan Mike Bird, 46th Judicial District Court, Wilbarger County, Texas |

| **Trial Court Disposition** | Order Granting Motion for Partial Summary Judgment, signed on August 4, 2011<br><br>Final Judgment, signed on June 16, 2015<br><br>Motion for Judgment Notwithstanding the Verdict, Motion to Disregard Jury Findings, and Conditional Motion for Judgment, denied by Order signed on August 19, 2015<br><br>Additional Motion for Judgment Notwithstanding the Verdict, denied by Order signed on August 19, 2015<br><br>Motion for New Trial, for Remittitur, and to Modify, Correct and/or Reform the Judgment, denied by Order signed on August 19, 2015 |
|---|---|

## STATEMENT REGARDING ORAL ARGUMENT

Defendants respectfully request that the Court hold oral argument. This appeal presents an important question about the effect of *Ritchie v. Rupe* on minority-oppression claims. It also presents novel questions about whether a preferred shareholder can hold his shares in perpetuity—based on the allegation that a prior redemption was ineffective as to him—even though the Articles of Incorporation permit the Corporation to purchase and/or redeem preferred shares at any time and even though a shareholder is only entitled to receive the par value of his shares plus any unpaid dividends.

Defendants believe that oral argument will aid the Court in understanding these complex issues and the factual record.

## ISSUES PRESENTED

1.      In 2014, the Texas Supreme Court held that no common-law cause of action for minority oppression exists under Texas law. *See Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014). In light of *Ritchie*, did the trial court err by not granting judgment as a matter of law in favor of Defendants on the minority oppression claims, and alternatively, does legally and/or factually sufficient evidence support the jury's findings on Mikkelsen's minority-oppression claims?

2.      Did the trial court err by concluding, as a matter of law, that the 2006 redemption violated the Articles of Incorporation as to Mikkelsen because it was not done "by lot, or pro rata" when undisputed evidence shows that all outstanding preferred shares were redeemed on November 20, 2006, meaning that the "by lot, or pro rata" language—which only applies to partial redemptions—is inapplicable?

3.      Were Defendants entitled to judgment as a matter of law on the breach of contract claim relating to the 2006 redemption, or alternatively, did the trial court err in denying Defendants' motion for a new trial on this claim?

4.      Did the trial court err by holding, as a matter of law and/or fact, that the 2013 redemption and tender were invalid when (a) there is no dispute that the Mikkelsens were the only remaining shareholders in 2013 (assuming the 2006 redemption was invalid as to them), and (b) the tender more than covered any amounts due under the Articles of Incorporation?

5. Were Defendants entitled to judgment as a matter of law on their declaratory judgment claim relating to the 2013 redemption and tender, or alternatively, did the trial court err in failing to submit these issues for the jury to decide, thus warranting a new trial?

6. The jury found "$0.00" damages proximately caused by any breach of fiduciary duty and denied relief on Mikkelsen's breach of fiduciary duty claims. Given that officers, directors, and majority shareholders of a corporation do not owe fiduciary duties to other shareholders under Texas law, did the trial court further err by not granting judgment as a matter of law in favor of Defendants on the breach of fiduciary duty claims, and alternatively, does legally and/or factually sufficient evidence support the jury's finding that C.C. Burgess breached his alleged fiduciary duties to Mikkelsen?

7. Can the fee awards be upheld on legal/factual sufficiency review where (a) the trial evidence showed that, to the extent Mikkelsen is entitled to any attorneys' fees, they are limited to at most $39,545.87, (b) Mikkelsen failed to segregate his fees properly, and (c) the trial court did not ask the jury whether Defendants were entitled to attorneys' fees based on their declaratory judgment claim?

8. Should this Court render a fee award in favor of Defendants based on their declaratory judgment claim because undisputed trial evidence showed that

Defendants incurred $5,500 in reasonable and necessary attorneys' fees pursuing that claim through trial plus $12,500 in conditional appellate fees? Alternatively, are Defendants entitled to a new trial on their request for attorneys' fees?

9. Even though the trial focused on whether Herring Bancorp breached its Articles of Incorporation, the trial court instructed the jury that the 2006 redemption breached the Articles of Incorporation as a matter of law. Is this instruction an impermissible comment on the weight of the evidence that further requires a new trial to the extent there are any remaining fact issues for the trial court to resolve?

## STATEMENT OF FACTS

### I. Mikkelsen's Prior Involvement at Herring Bancorp.

Herring National Bank became a chartered bank in 1903. 8RR 22:22-25. Mikkelsen became Chairman of Herring National Bank in 1982 and served in that position until 1997. 8RR 22:10-15. About ten years before Mikkelsen became Chairman, C.C. Burgess purchased stock in Herring National Bank and was elected to its Board shortly thereafter. 8RR 26:13-27:8. In 1984, Herring Bancorp, Inc. ("Herring Bancorp"), a bank holding company for Herring National Bank, was formed. 8RR 22:16-21. Mikkelsen served as Chairman of Herring Bancorp from its formation in 1984 until 1992. 8RR 27:21-24.

In 1992, Herring Bancorp held a special shareholder meeting, and the Burgess Defendants were elected as directors, such that control of Herring Bancorp and Herring National Bank shifted away from Mikkelsen and in favor of the Burgess Defendants. *See* 8RR 33:7-22. Afterwards, Mikkelsen participated in a lawsuit against the Burgess Defendants. That lawsuit resulted in a settlement through which the Burgess Defendants purchased 10,000 Herring Bancorp shares from Mikkelsen and his family. 8RR 35:10-22. Mikkelsen then sold his remaining 280 Herring Bancorp shares in January 1998. 8RR 35:23-36:9. As of January 1998, Mikkelsen owned no shares in Herring Bancorp and "was completely out of the bank." 8RR 36:10-37:3.

In 2005, Mikkelsen and his brother, Mallory, inherited a total of 300 Herring Bancorp preferred shares from their late mother. 8RR 46:9-47:5. Of those 300 shares, 150 shares were issued to the John Mikkelsen Trust and 150 shares were issued to Mallory Mikkelsen. 8RR 47:16-48:17; 12RR, PX-4; 12RR, PX-5.[1]

## II.    The 2006 Conversion and Redemption.

The year after Mikkelsen inherited this small number of preferred shares from his late mother, Herring Bancorp decided to convert into a Subchapter "S" Corporation. *See, e.g.*, 12RR, PX-34 at 3. As relevant here, a Subchapter "S" Corporation is different from a traditional corporation because a Subchapter "S" Corporation (1) can have only one class of stock, (2) cannot have more than 100 shareholders, and (3) avoids double taxation of dividends. *See* 8RR 56:7-24, 61:18-24; 9RR 29:24-30:5; 13RR, DX-10. Mikkelsen has never questioned the Herring Bancorp Board's business judgment to convert into a Subchapter "S" Corporation, and testified during trial that being a Subchapter "S" Corporation offers a "better, more effective utilization of the income of the corporation." 8RR 56:23-24.

---

[1] In 2008, after the 2006 redemption, Mallory Mikkelsen purportedly assigned his 150 shares to the John Mikkelsen Trust. *See* 8RR 48:21-49:23; 12RR, PX-6. This purported assignment was not effective (or otherwise is irrelevant) for at least three reasons. First, this assignment was not effective because it was not done in accordance with Herring Bancorp's Bylaws regarding the transfer or assignment of shares. *See infra* Section II.B.2. Second, given that the 2006 redemption was valid, these shares no longer were Mallory Mikkelsen's to assign in 2008. Third, because the 2013 tender more than compensated both John and Mallory Mikkelsen for the value of their preferred shares, the tender was effective. *See infra* Section II.B.2.

Because Subchapter "S" Corporations are limited to 100 shareholders, the Herring Bancorp Board decided to implement neutral criteria to restrict which preferred shares could be converted into common stock so the number of shareholders would not exceed the maximum 100-shareholder cap. These criteria were implemented to ensure that Herring Bancorp would preserve its ability to attract new investment and shareholders in the future. *See* 9RR 29:10-30:5 (testifying that the purpose of these criteria was to ensure that, as the Bank grew, it would be able to attract new shareholders without sacrificing its Subchapter "S" status). The two neutral criteria selected by the Herring Bancorp Board were that the preferred shareholder: (1) had a banking relationship with Herring Bank; and (2) would own at least 50 shares of common stock in the Subchapter "S" Corporation after the conversion.[2] Ex. 6 at 1. If preferred shareholders met these two criteria, they had the opportunity to exchange their preferred shares for common stock in the new Subchapter "S" Corporation. *Id.* If preferred shareholders did not satisfy these criteria, their shares were redeemed on November 20, 2006. *Id.* All preferred shareholders were given notice of these criteria and notice of both the conversion and redemption deadlines on October 31, 2006. Ex. 6; 13RR, DX-20.

---

[2] The conversion ratio for converting preferred shares into common stock was approximately 7.8 to 1, meaning that a preferred shareholder was required to have about 390 preferred shares to be eligible to convert those shares into common stock. *See* 8RR 65:23-66:22. As noted, Mikkelsen only inherited 150 preferred shares, as did his brother. Mikkelsen and his brother thus did not satisfy the 50-share criterion for conversion.

Between the October 31, 2006 notice and the November 20, 2006 redemption, preferred shareholders that met the criteria and wanted to convert their preferred shares into common stock had to make that election. *See* 13RR, DX-20 at 3 ("If you elect to exchange your shares of Preferred Stock of the Company, please return an executed copy of the Stock Exchange Agreement as soon as possible, but no later than 5:00 p.m. on November 20, 2006.") (emphasis omitted). No shareholder (other than Mikkelsen) complained about this process, and all preferred shares not exchanged for common stock (*i.e.*, all outstanding preferred shares as of November 20, 2006) were redeemed on that date. *Id.* at 3-4.

On November 20, 2006, Herring Bancorp redeemed Mikkelsen's preferred shares by placing sufficient funds to cover the par value of his shares and any unpaid dividends in an escrow/deposit account in Mikkelsen's name.[3] 13RR, DX-26 at 2. On July 30, 2007, Herring Bancorp's status as a Subchapter "S" Corporation was accepted by the IRS. Ex. 7.

## III. The 2013 Redemption and Tender.

Mikkelsen claimed that the 2006 redemption was invalid and that he continued to be a preferred shareholder in Herring Bancorp. *See* 13RR, DX-26 at 1.

[3] This same procedure was followed for Mallory Mikkelsen and any other preferred shareholders who elected not to convert their preferred shares into common stock.

Specifically, Mikkelsen asserted that, even though Herring Bancorp's Articles of Incorporation allow the Corporation to redeem and/or repurchase preferred shares at any time, *see* Ex. 5, art. IV, XII, the redemption was invalid because it was not done "by lot, or pro rata," Ex. 5, art. IV(c). Because only partial redemptions are subject to the "by lot, or pro rata" restriction, Mikkelsen's argument necessarily (and incorrectly) assumes that the 2006 redemption was a partial redemption. Ex. 5, art. IV(c). Mikkelsen ignores that, on November 20, 2006, Herring Bancorp completed a "whole" redemption because it redeemed all outstanding preferred shares on that date. *See supra* Facts Section II.

Ultimately, Mikkelsen filed this lawsuit in 2008, alleging a breach of contract claim, tort claims for breach of fiduciary duty, minority oppression, and conspiracy, and a demand to inspect Herring Bancorp's books and records. 1CR5-13. In 2011, the trial court—apparently accepting Mikkelsen's incorrect argument about the 2006 redemption being a "partial" redemption—granted Mikkelsen's partial summary judgment motion, finding that the 2006 redemption as to Mikkelsen was invalid as a matter of law. Ex. 4.

After that ruling, Defendants sought to remove any doubt about Mikkelsen's purported ownership of Herring Bancorp's preferred stock, especially considering that a Subchapter "S" Corporation can have only one type of outstanding stock. *See* 1CR344 ("The Herring Board's decision to redeem the Preferred Stock in 2013 was

consistent with the Board's decision in 2006 but also sought to correct any issues that led to this Court's August 4, 2011 Order on partial summary judgment, and pay the Mikkelsens everything they could be owed."). Accordingly, in 2013, Defendants sent the Mikkelsens a tender—in the form of a cashier's check—for $115,548.24, an amount greater than the Mikkelsens were owed under Herring Bancorp's Articles of Incorporation. *Compare* Ex. 9 (unconditional tender included $28,500 for redeeming 300 shares at $95 per share (par value), $21,070.48 in unpaid dividends, $15,977.76 in interest, and $50,000 in attorneys' fees), *with* Ex. 5, art. IV (stating that a preferred shareholder is only entitled to the $95 par value per share plus dividends).

Despite receiving a larger payment than he was entitled to under the Articles of Incorporation, Mikkelsen pressed forward with this lawsuit and never cashed the cashier's check. *See* 8RR 137:4-5. And while Mikkelsen claimed that the 2006 redemption was invalid because it was a partial redemption that was not done "by lot, or pro rata," Mikkelsen concedes that, when the 2013 redemption took place, the Mikkelsens were the only preferred shareholders of Herring Bancorp. *See* 8RR 151:2-5 ("So after the 2006 adventure that you and Herring Bank had, you and Mallory [Mikkelsen] were the only shareholders of preferred stock, right? A. Yes."); *see also infra* Section II.B.1. The 2013 redemption thus was a "whole" redemption not subject to the "by lot, or pro rata" requirement, which means that—even

assuming that the 2006 redemption was invalid—the 2013 redemption complied with the Articles of Incorporation and redeemed Mikkelsen's preferred shares such that he no longer is a preferred shareholder in Herring Bancorp.

## IV. Pre-Trial Proceedings/Partial Summary Judgment for Mikkelsen.

As noted, Mikkelsen originally filed this action in 2008, claiming that the 2006 redemption breached his contractual rights under the Articles of Incorporation and constituted (1) a breach of the Burgess Defendants' fiduciary duties, (2) minority oppression, and (3) a civil conspiracy. 1CR5-13. In March 2011, Mikkelsen moved for partial summary judgment as to whether the 2006 redemption was valid. 1CR58-103. Defendants responded to that motion and filed a cross-motion for partial summary judgment on all of Mikkelsen's claims. 1CR105-45. On August 4, 2011, the trial court granted Mikkelsen's motion for partial summary judgment and denied Defendants' cross-motion. Ex. 4. In deciding the cross-motions for summary judgment, the trial court found as a matter of law that the 2006 redemption was invalid as to Mikkelsen and that Mikkelsen continued to be a preferred shareholder in Herring Bancorp. 1CR307.

In December 2013, after Herring Bancorp had undertaken the 2013 redemption and tendered to Mikkelsen more than he was owed under the Articles of Incorporation, *see supra* Facts Section III, Defendants filed their Original Counterclaim, seeking a declaratory judgment that the 2013 redemption was valid,

1CR389-92. Defendants also filed a second traditional motion for partial summary judgment on their newly asserted counterclaim, 1CR338-81, as well as a no-evidence summary judgment motion on causation and damages, 1CR382-85. The Court denied both of Defendants' summary judgment motions on August 1, 2014. 1CR432-35.

In September 2014, Defendants filed their third traditional motion for partial summary judgment. 2Supp.CR3-8. This motion was based largely on the Texas Supreme Court's decision in *Ritchie v. Rupe*, and sought summary judgment on Mikkelsen's minority oppression, breach of fiduciary duty, and conspiracy tort claims. The trial court denied that motion on December 23, 2014. 2CR148-49.

Finally, less than two weeks before trial began in January 2015, Mikkelsen added a cross-declaratory judgment claim related to the validity of the 2013 redemption and tender. 2CR158.

## V.    The Trial.

The case was tried to a jury beginning on January 26, 2015. During three days of testimony, the jury heard argument and evidence about whether the 2006 and 2013 redemptions were valid. *See, e.g.*, 8RR 151:15-22; 8RR 156:21-157:2; 10RR 37:1-25. Indeed, Mikkelsen's counsel began his opening and closing statements by claiming that "this case is about the breach of a covenant" in the Articles of

Incorporation and by asserting that “the evidence” showed that a covenant had been breached. 7RR 16:12-14; 11RR 32:23-33:17.

But when the jury received its instructions, instead of being asked to decide whether the redemptions were valid, the trial court: (1) instructed the jury that it “previously determined, as a matter of law, that Defendant Herring failed to comply with the Articles of Incorporation . . . when it purported to involuntarily redeem Mikkelsen’s preferred shares in 2006”; and (2) did not ask the jury to decide whether the 2013 redemption was valid. *See* Ex. 2. Thus, even though Mikkelsen’s attorney had previewed the case as being “about the breach of a covenant” and asserted that “the evidence” showed that such a breach occurred, the only question the jury was instructed to answer related to Mikkelsen’s breach of contract claim was the amount of attorneys’ fees associated with that claim. Ex. 2 at 8-9. The only other questions the jury was instructed to answer related to Mikkelsen’s tort claims. *See* Ex. 2 at 10-30.

Ultimately, the jury awarded Mikkelsen $23,314.80 in compensatory damages based on its findings that the Burgess Defendants engaged in oppressive conduct, and it awarded Mikkelsen $127,442.00 in attorneys’ fees through trial plus $50,000.00 in conditional appellate fees based on Mikkelsen’s breach of contract claim that had been determined as a matter of law almost four years earlier. *See* Ex. 2 at 8-12.

## VI. The Final Judgment and Post-Judgment Proceedings.

After the jury verdict, Defendants filed a Motion for Judgment Notwithstanding the Verdict, Motion to Disregard Jury Findings, and Conditional Motion for Judgment. 2CR268-91. Mikkelsen then filed a Motion for Judgment, and the trial court heard argument on those motions on April 27, 2015. 2CR292-332.

On May 14, 2015, the trial court granted Mikkelsen's Motion for Judgment in all respects, except that it slightly adjusted the damages award given that a portion of the calculated unpaid dividend amount was "not yet due." 2CR333. The trial court entered Final Judgment on June 16, 2015. Ex. 1.

On July 16, 2015, Defendants timely filed: (1) an Additional Motion for Judgment Notwithstanding the Verdict, *see* 2CR344-52, and (2) a Motion for New Trial, for Remittitur, and to Modify, Correct, and/or Reform the Judgment, *see* 2CR353-407. The Court denied these motions, as well as Defendants' previously filed Motion for Judgment Notwithstanding the Verdict, by Orders signed on August 19, 2015 after hearing argument. Ex. 3.

Defendants timely filed a Joint Notice of Appeal on September 3, 2015. 2CR411-61. Mikkelsen timely filed a Notice of Cross-Appeal on September 17, 2015. *See* 2CR468-517.

## SUMMARY OF THE ARGUMENT

This lawsuit is the most recent instance where Mikkelsen has attempted to use his purported shareholder status in Herring Bancorp to extract money and other concessions from the Burgess Defendants. Mikkelsen sold his interest in Herring Bancorp to the Burgess Defendants almost 20 years ago and only became involved with Herring Bancorp again by inheriting a handful of shares from his late mother. Through this lawsuit, Mikkelsen is attempting to use his purported shareholder status to call into question Herring Bancorp's Subchapter "S" Corporation status and otherwise to disrupt the Burgess Defendants' ability to run the Corporation efficiently. The Court should reject Mikkelsen's thinly veiled efforts because Herring Bancorp validly redeemed Mikkelsen's shares in 2006 (and again in 2013[4]), and because Mikkelsen's tort claims are based on invalid legal theories. Moreover, Mikkelsen's claim that he is entitled to hold preferred shares in Herring Bancorp in perpetuity is wrong because Mikkelsen only is entitled to the par value of his preferred shares plus any unpaid dividends, which he already received both in 2006 and 2013.

All of Mikkelsen's tort claims should have been dismissed before trial as a matter of law, and the trial court misapprehended binding precedent in allowing

---

[4] Out of an abundance of caution, Defendants redeemed Mikkelsen's shares again in 2013 because the trial court held, incorrectly, that the 2006 redemption was invalid as to Mikkelsen as a matter of law. *See supra* Facts Section III.

Mikkelsen's minority oppression, breach of fiduciary duty, and conspiracy claims to reach the jury. Texas does not recognize a common-law cause of action for minority oppression. Moreover, corporate officers/directors only owe fiduciary duties to the corporation itself, and majority shareholders do not owe fiduciary duties to minority shareholders.[5] The trial court should have dismissed these claims and, if it had done so, the only claims left for the jury would have been the cross-declaratory judgment claims regarding the 2013 redemption.[6] *See* 1CR390; 2CR158.

On the breach of contract and declaratory judgment claims, under Herring Bancorp's Articles of Incorporation, Herring Bancorp had the absolute right to redeem ***all*** of its preferred shares at any time, and it also had the absolute right to purchase its shares "without submitting such purchase to a vote of the shareholders of the Corporation." Ex. 5, art. IV, XII. On two occasions—first in 2006 and then in 2013—Herring Bancorp redeemed ***all*** outstanding preferred shares, including Mikkelsen's, and both of these redemptions complied with the Articles of Incorporation. The trial court held, however, that the 2006 redemption was invalid as to Mikkelsen and—while it denied Defendants' summary judgment motion on the

[5] The jury found that C.C. Burgess breached his alleged fiduciary duties to Mikkelsen, but awarded no damages. Ex. 2 at 17, 19-22. The Final Judgment addresses this claim only by denying Mikkelsen relief in the "Mother Hubbard" clause. Ex. 1.

[6] If the substantive tort claims had been dismissed before trial, the derivative conspiracy claim necessarily would have been dismissed as well. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

validity of the 2013 redemption and tender—it refused to ask the jury about that redemption and tender. Ex. 10; 11RR 16:20-17:8. Rather, the trial court held, as a matter of law and/or fact, that the 2013 redemption and tender were also invalid. Ex. 1 at 2. The trial court should have determined that the 2006 redemption was valid, or alternatively, that the 2013 redemption was valid. At the very least, it should have submitted these questions to the jury.

All of Mikkelsen's claims should have been decided as a matter of law in Defendants' favor. The 2006 redemption was valid, and all of Mikkelsen's tort claims fail as a matter of law. Alternatively, to the extent the 2006 redemption was invalid as to Mikkelsen, the trial court should have held, as a matter of law, that the 2013 redemption and tender were valid and that they compensated Mikkelsen for all amounts owed under the Articles of Incorporation. While all of these claims should have been decided as a matter of law, the trial court's failure to follow binding precedent led to a confusing trial where evidence relating to Mikkelsen's breach of contract claim (which the trial court already had decided, albeit wrongly) was presented, giving the jury the false impression that it would decide that disputed issue. Then, in instructing the jury, the trial court committed reversible error by commenting on the weight of the evidence and telling the jury that it already had decided that Defendants breached Herring Bancorp's Articles of Incorporation in

2006. This improper instruction was prejudicial and also requires a new trial to the extent the Court does not render judgment in favor of Defendants.

To the extent the Court does not reverse the trial court's finding on the 2006 redemption, it must reverse the attorneys' fee award and remand for a new trial on attorneys' fees. If the Court reverses the trial court's holding on the 2013 redemption and renders judgment for Defendants on that claim, the Court should also render judgment on Defendants' claim for attorneys' fees or at least grant a new trial on Defendants' fee request.

Finally, if the Final Judgment is reversed, the awards of interest and costs in favor of Mikkelsen should be reversed as well.

## STANDARDS OF REVIEW

Texas appellate courts review questions of law *de novo*, "exercis[ing] [their] own judgment and redetermin[ing] each issue," while affording the lower courts' decisions "absolutely no deference." *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998). When reviewing questions of law, an appellate court independently evaluates the trial court's conclusions of law to determine whether the trial court drew the correct legal conclusions from the facts. *See Arcadia Fin., Ltd. v. Sw.-Tex. Leasing Co.*, 78 S.W.3d 619, 623 (Tex. App.—Austin 2002, pet. denied); *see also Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999).

Appellate courts must sustain legal sufficiency challenges when the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) that rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a scintilla; or (4) that the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). For factual sufficiency challenges, appellate courts must examine, consider, and weigh all of the evidence that supports or contradicts the jury's determinations, and set aside the verdict if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

An award of attorneys' fees generally is reviewed for an abuse of discretion, while the amount of such an award also is reviewable for legal and factual sufficiency. *See Bocquet v. Herring*, 972 S.W.2d 19, 20-21 (Tex. 1998); *Hagedorn v. Tisdale*, 73 S.W.3d 341, 353 (Tex. App.—Amarillo 2002, no pet.); *see also Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011) ("A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules or principles.") (citations omitted). The need to segregate fees is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and

fact. *See Bair Chase Prop. Co., LLC v. S&K Dev. Co., Inc.*, 260 S.W.3d 133, 128 (Tex. App.—Austin 2008, pet. denied).

Complaints of jury charge error are reviewed for an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *see BP Am. Prod. Co. v. Red Deer Res., LLC*, 466 S.W.3d 335, 341 (Tex. App.—Amarillo 2015, pet. filed). A jury charge error warrants reversal when the improper instruction probably caused the rendition of an improper judgment. *See Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 703 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also* Tex. R. App. P. 44(a)(1).

## ARGUMENT

### I. Defendants Are Entitled to Judgment on Mikkelsen's Minority-Oppression Claims.

Clear error underlies the trial court's Final Judgment in favor of Mikkelsen on the minority-oppression claims. Minority oppression does not exist as a common-law cause of action in Texas, and the Texas Supreme Court recently clarified that this cause of action ***never existed***. *See Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014). Instead of submitting questions on minority oppression to the jury and entering judgment for Mikkelsen on its findings, the trial court was required to dismiss these claims as a matter of law.

A. *Ritchie v. Rupe* Held That Minority Oppression Is Not a Viable Cause of Action Under Texas Law.

For decades, Texas intermediate appellate courts recognized a common-law cause of action known as minority shareholder oppression. *See, e.g.*, *Davis v. Sheerin*, 754 S.W.2d 375 (Tex. App.—Houston [1st Dist.] 1988, writ denied), *overruled by Ritchie*, 443 S.W.3d 856. The Texas Supreme Court, however, never recognized that common-law cause of action and, more than a year ago, it explicitly held that no such cause of action exists in Texas. *See Ritchie*, 443 S.W.3d at 860 ("Moving beyond the statutory claims, we decline to recognize or create a Texas common-law cause of action for 'minority shareholder oppression.'"); *see id.* at 877-91 (outlining the Court's reasoning and concluding that "[w]e . . . therefore decline to recognize a common-law cause of action for 'shareholder oppression'"); *id.* at 904-05 (Guzman, J., dissenting) ("[T]he Court acknowledges that its . . . failure to impose a common-law remedy for oppression leaves a 'gap' in the protection that the law affords to individual minority shareholders when the harm to the minority shareholders does not harm the corporation." (citation omitted)). The Texas Supreme Court also has made clear that *Ritchie* applies retroactively to minority-oppression claims pleaded or decided prior to *Ritchie*. *See, e.g.*, *Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 792 (Tex. 2014) (applying *Ritchie*'s holding to a minority-oppression claim decided before *Ritchie* was decided).

B. <u>The Trial Court Erred in Concluding That the Relevant Holding in *Ritchie v. Rupe* Was *Dicta*.</u>

Defendants brought the *Ritchie* decision to the trial court's attention and filed a summary judgment motion asserting that *Ritchie* was "fatal" to Mikkelsen's minority-oppression claim and other tort claims. *See* 2Supp.CR3. In response to that motion, Mikkelsen argued that one of *Ritchie*'s holdings—*i.e.*, that Texas did not recognize a common-law cause of action for minority oppression—was *dicta*. 2CR118-20 (asserting that "[t]he discussion in *Ritchie* of common law oppression claims is *dictum* and not binding"); *see also* 5RR 36:18-19 ("On the oppression issue this *Ritchie* case is not binding on anybody because it is *dicta*."). The trial court—despite the unmistakable language in *Ritchie*, *see supra* Section I.A.—allowed the minority-oppression claims against the Burgess Defendants to go to the jury. *See* Ex. 2 at 10-16.

The trial court's decision was error. It cannot be squared with the plain language in *Ritchie*, and it ***runs counter to every single Texas appellate court*** that has considered the vitality of common-law minority-oppression claims since *Ritchie*. *See, e.g.*, *Cardiac Perfusion Servs.*, 436 S.W.3d at 792 ("In *Ritchie*, we clarified that a claim for shareholder oppression is only available under section 11.404 of the Texas Business Organizations Code, and that the only remedy available under that statute is a rehabilitative receivership."); *Tex. Ear Nose & Throat Consultants, PLLC v. Jones*, --- S.W.3d ----, 2015 WL 3918130, at *16 (Tex.

App.—Houston [14th Dist.] June 25, 2015, no pet.) (noting that *Ritchie* was a "sea change" and that, "[i]n *Ritchie*, the Texas Supreme Court held that there is no common law cause of action for shareholder oppression"); *White Point Minerals, Inc. v. Swantner*, 464 S.W.3d 884, 890 (Tex. App.—Corpus Christi 2015, no pet.) (noting that *Ritchie* "held that Texas does not recognize a common law action for minority shareholder oppression"); *Cent. Austin Apartments, LLC v. UP Austin Holdings, LP*, No. 03-13-00080-CV (Tex. App.—Austin Dec. 8, 2014) (op. withdrawn on Feb. 6, 2015 based on settlement of parties) (Ex. 11 at 25-26) (holding that, "[i]n *Ritchie v. Rupe*, the Texas Supreme Court . . . held that there is no common law cause of action for minority oppression in Texas," and rendering judgment in favor of defendants on the minority-oppression claim). In addition to these state-law authorities, the Fifth Circuit, applying Texas law, has concluded that *Ritchie*'s statements on common-law minority-oppression claims were binding and more than mere *dicta*. *See In re Mandel*, 578 F. App'x 376, 387 (5th Cir. 2014) ("[T]he Supreme Court of Texas ***held*** that there is no common law cause of action for shareholder oppression.") (emphasis added).[7]

[7] In addition to this undisputed appellate authority, Mikkelsen's argument that the relevant language in *Ritchie* is nothing more than *dicta* is contradicted by scholars and commentators. *See, e.g.*, Lyndon Bittle & Kelli Hinson, *Texas Turns a Corner: Resolving Shareholder Disputes in Closely Held Businesses After Ritchie v. Rupe*, 67 BAYLOR L. REV. 339, 383 (2015) ("Based on [the Supreme Court's] consideration of [factors], [it] determined it would not 'recognize a common-law cause of action for 'shareholder oppression.''") (quoting *Ritchie*, 443 S.W.3d at 891); Todd A. Murray, *The Texas Courts' Ongoing Struggle to Harmonize the Texas Business Organizations Code with the Texas Rules of Civil Procedure in Derivative Shareholder Litigation*,

Defendants are not aware of any case law that either supports Mikkelsen's reading of *Ritchie* or stands for the proposition that a common-law claim for minority oppression remains viable in Texas. The Final Judgment must be reversed insofar as it holds the Burgess Defendants liable based on a cause of action that does not exist, and judgment must be rendered in favor of the Burgess Defendants on the minority-oppression claims.

C.    Alternatively, the Evidence at Trial Was Not Legally or Factually Sufficient to Constitute Minority Oppression.

Because common-law minority oppression is not a valid cause of action in Texas, Defendants only briefly address why the alleged evidence of minority oppression at trial was not legally or factually sufficient to sustain the jury's findings even under the now-defunct test for minority oppression. Under the trial court's instructions on minority oppression, Mikkelsen was required to show that the majority member's conduct constituted:

> burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

---

47 TEX. TECH L. REV. 245, 261 (2015) (noting that *Ritchie* "foreclosed" a common-law remedy for shareholder oppression). Even commentators who disagree with *Ritchie* acknowledge that, in that case, the Texas Supreme Court held that no common-law cause of action for minority oppression exists under Texas law. James Dawson, *Ritchie v. Rupe and the Future of Shareholder Oppression*, 124 YALE L.J. FORUM 89, 90, 92 (2014) (stating that *Ritchie* "gutted the cause of action for shareholder oppression in Texas" and that, "[u]nder *Ritchie*, majority shareholders are not liable for oppression unless their conduct is irrational and harmful to the corporation").

Ex. 2 at 10-11; *see also Davis*, 754 S.W.2d at 381-82. Mikkelsen failed to present sufficient evidence to satisfy this "definition" of minority oppression.

The Herring Bancorp Board's decision to institute two neutral criteria for determining which preferred shares could be converted into common stock did not constitute "burdensome," "harsh," or "wrongful" conduct. In fact, the evidence at trial demonstrated that this decision was based on the Herring Bancorp Board's business judgment and was made to ensure that Herring Bancorp would remain a Subchapter "S" Corporation. *See* 9RR 29:10-30:5 (testifying that the purpose of implementing the two criteria was to ensure that, as the Bank grew, it would be able to attract new shareholders without sacrificing its Subchapter "S" status). Such conduct does not constitute minority oppression, especially considering that both the 2006 and 2013 redemptions complied with the Articles of Incorporation. *See infra* Sections II.A.-B.; *Guerra v. Guerra*, No. 04-10-00271-CV, 2011 WL 3715051, at *6-7 (Tex. App.—San Antonio 2011, no pet.) (noting that conduct is not wrongful when the defendant has followed corporate procedure and exercised business judgment); *see also Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996) ("Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right.") (citation omitted).

Further, there was no legally or factually sufficient evidence of damages "that proximately resulted" from any minority oppression. Ex. 2 at 12. As explained below, *see infra* Sections II.C.-D., Mikkelsen has received everything that he was entitled to under the Articles of Incorporation, and thus any alleged minority oppression did not harm him.

In sum, common-law minority oppression is not a valid cause of action in Texas but, even if it were, Mikkelsen failed to present legally or factually sufficient evidence at trial to support a finding of minority oppression by either of the Burgess Defendants here. The Final Judgment should be reversed and judgment should be rendered in favor of Defendants on Mikkelsen's minority-oppression claims. Alternatively, to the extent the Court finds that a fact issue prevents the rendition of judgment in Defendants' favor, a new trial is warranted on the minority oppression claims.

## II. Mikkelsen Cannot Recover on His Breach of Contract Claim or on His Declaratory Judgment Claim, and Defendants Should Prevail on Their Declaratory Judgment Claim.

### A. The 2006 Redemption Was Valid.

Mikkelsen does not contest that Herring Bancorp had the right to redeem his preferred shares; he only attacks the procedure Herring Bancorp used. According to Mikkelsen, the 2006 redemption was invalid because only some of the preferred shares were redeemed, and thus, under the Articles of Incorporation, that redemption

had to be done "by lot, or pro rata." Ex. 5, art. IV(c). Mikkelsen, like the trial court, misunderstands the structure of the 2006 redemption.

Under the Articles of Incorporation, there is no restriction on Herring Bancorp's ability to redeem all outstanding preferred shares, except that it must pay preferred shareholders the par value and accrued dividends associated with their preferred shares. Ex. 5, art. IV. The record shows that Mikkelsen's (and his brother's) preferred shares were redeemed on November 20, 2006, and that this redemption covered ***all*** outstanding preferred shares. *See* 9RR 214:10-20 ("[A]s of 5:01 p.m. [on November 20, 2006], John Mikkelsen and Mallory Mikkelsen, they were the only ones that had preferred stock because all the others had elected to convert. A. Yes."). All other preferred shares had been converted into common stock in the new Subchapter "S" Corporation prior to the redemption. Mikkelsen cannot cite a provision in the Articles of Incorporation restricting Herring Bancorp's ability to convert preferred shares into common stock and, because the 2006 redemption involved "the whole . . . of the preferred shares outstanding," that redemption was not required to be done "by lot, or pro rata." Ex. 5, art. IV(c).

Despite the fact that Herring Bancorp followed the Articles of Incorporation in conducting the 2006 redemption, Mikkelsen convinced the trial court that all of the preferred shares were not redeemed because the 2006 conversion of preferred

shares into common stock constituted a partial redemption. Mikkelsen's argument is wrong.

There is no provision in the Articles of Incorporation addressing the conversion of preferred shares, restricting Herring Bancorp's ability to convert some or all of its shares, or outlining the criteria that must be used in making such a conversion. In fact, the provision most closely related to converting shares is Article XII, which allows Herring Bancorp "to purchase, directly ***or indirectly***, its own shares . . . without submitting such purchase to a vote of the shareholders of the Corporation." Ex. 5, art. XII (emphasis added). The language in Article XII suggests no restriction on Herring Bancorp's ability to "indirectly" purchase its own stock,[8] and Mikkelsen cannot point to any such restriction. Once the other shares were converted, Herring Bancorp redeemed all outstanding shares in accordance with Article IV.

Mikkelsen's argument boils down to the insupportable assertion that he was entitled to convert his preferred shares into common stock. *See* 8RR 163:16-23 ("Q. Okay. So, you're not complaining about what happened to anybody else [during the 2006 redemption], are you? A. No. Q. Only what happened to yours and Mallory's? A. Yes. Q. And the only complaint is that you wanted common stock. A. Yes."). But,

---

[8] Mikkelsen's attempt to treat the conversion as a redemption is misguided. *See Rauch v. RCA Corp.*, 861 F.2d 29, 30-32 (2d Cir. 1988) (holding that a conversion of shares as part of a corporate restructuring is legally distinct from a redemption).

as noted, the Articles of Incorporation gave Mikkelsen no such right. Accordingly, the Herring Bancorp Board was permitted to allow preferred shareholders that met certain criteria to convert their preferred shares into common stock in the new Subchapter "S" Corporation, while not providing that right to every preferred shareholder. In fact, the Articles of Incorporation explicitly provide that Mikkelsen, as a preferred shareholder, has no preferential right to purchase stock. *See* Ex. 5, art. V. Mikkelsen thus fails to show how the Board's actions breached the Articles of Incorporation.[9]

Because Herring Bancorp redeemed every outstanding preferred share on November 20, 2006, the 2006 redemption complied with the Articles of Incorporation. There is no restriction on Herring Bancorp's ability to convert its preferred shares, and it is permitted to purchase those shares (directly or indirectly) at any time and for any reason. Mikkelsen's attempt to turn a conversion of shares into a redemption of shares is without merit. The Final Judgment should be reversed on this issue, and this Court should render judgment in favor of Defendants. Alternatively, to the extent the Court finds that a fact issue prevents the rendition of

[9] Mikkelsen's argument about the 2006 redemption also elevates form over substance. Herring Bancorp could have redeemed all of its preferred shares before any conversion, and then allowed certain former preferred shareholders to purchase common stock in the new Subchapter "S" Corporation. If Herring Bancorp had proceeded in that manner, Mikkelsen's contract claim would be baseless. While Herring Bancorp ultimately chose to convert certain preferred shareholders before the November 2006 redemption simply "to save time," the record is clear that Herring Bancorp "just as easily [could have] paid everybody out and then had them buy the [common] stock, had they wanted to . . . ." 9RR 215:5-12.

judgment in Defendants' favor, a new trial is warranted so a jury can decide whether Defendants' actions complied with the Articles of Incorporation.

### B. Defendants Are Entitled to Prevail on Their Declaratory Judgment Claim Because the 2013 Redemption and Tender Were Valid.

The 2006 redemption was valid and complied with the Articles of Incorporation. *See supra* Section II.A. But, to the extent the Court disagrees, it should hold that the 2013 redemption and tender were valid, that Defendants prevail on their declaratory judgment claim, and that Mikkelsen is not entitled to any additional damages or attorneys' fees.

The trial court denied Defendants' summary judgment motion on their declaratory judgment claim about the validity of the 2013 redemption and tender, 1CR434-35, and denied Defendants' motions for directed verdict on that claim, 10RR 76:12-77:22, 85:8-10; 239:3-240:18, 245:19:24. The trial court appears to have granted a directed verdict in favor of Mikkelsen on this claim, 11RR 16:20-17:8; 2CR294, but the record reveals no motion or request by Mikkelsen for any such relief and no order or ruling during trial granting any such ruling. The trial court also denied Defendants' relevant post-judgment motions on this claim. Ex. 3. In any event, the trial court took this issue away from the jury, and refused to include Defendants' requested instructions and questions on this claim in the jury charge. This error warrants a new trial should the Court not render judgment in favor of Defendants about the validity of the 2013 redemption and tender.

*1. The 2013 Redemption Was Valid.*

Mikkelsen made several admissions at trial that demonstrate the validity and effectiveness of the 2013 redemption:

- Mikkelsen admitted that he and his brother were the only preferred shareholders in Herring Bancorp when the (alternative) 2013 redemption took place. *See* 8RR 151:2-5 ("So after the 2006 adventure that you and Herring Bank had, you and Mallory [Mikkelsen] were the only shareholders of preferred stock, right? A. Yes.").[10]
- Mikkelsen admitted that Herring Bancorp had the right to redeem his shares in November 2013 if he was the only shareholder (or if he and his brother were shareholders and they both were redeemed). *See* 8RR 171:2-4 ("Q. If you were the only shareholder, [Herring Bancorp] had the right to redeem you, correct? A. If I was the only shareholder.").
- Mikkelsen admitted that he is entitled to receive only money for his preferred shares under the Articles of Incorporation. *See* 8RR 171:9-12.

In addition to these admissions, there is no dispute that Mikkelsen was given proper notice of the 2013 redemption. Ex. 8. And there is no dispute that the 2013 tender that accompanied the redemption more than covered the amounts owed to

[10] After testifying to this point, Mikkelsen attempted to walk back his admission based on his argument that the conversion of other preferred shareholders was somehow ineffective. 8RR

Mikkelsen under the Articles of Incorporation. *See* Ex. 9 (unconditional tender included $28,500 for redeeming 300 shares at $95 per share (par value), $21,070.48 in unpaid dividends, $15,977.76 in interest, and $50,000 in attorneys' fees). So, even if the 2006 redemption was invalid, the 2013 redemption and tender made Mikkelsen whole. *See infra* Section IV (demonstrating that maximum amount of recoverable attorneys' fees is less than $40,000, and thus less than the amount provided for in the 2013 tender).

In attempting to convince the trial court that the 2013 redemption was invalid, Mikkelsen made erroneous arguments that this Court should reject.

First, Mikkelsen argued at the hearing on Defendants' post-judgment motions that "[w]e still have serious questions about . . . whether the Mikkelsens were the only preferred shareholders" in 2013. 15RR 14:23-25. That conclusory assertion is contradicted by the record and Mikkelsen's own testimony at trial. *See* 8RR 151:2-5. Moreover, while Mikkelsen may be attempting to call into question whether the other preferred shareholders were properly converted in 2006 before the redemption, he has no standing to make such a claim and cannot undermine the validity of the conversion, especially considering he was not eligible to convert his shares and he was not a third-party beneficiary to the conversion offer. *See S. Tex. Water Auth. v.*

---

152:13-153:2. Mikkelsen lacks standing to make such an assertion, and the trial court never invalidated the 2006 conversion. *See infra* Section II.B.1.

*Lomas*, 223 S.W.3d 304, 306 (Tex. 2007) (noting that courts presume that a noncontracting third party has no justiciable interest in a contract); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999) (noting presumption against conferring third-party-beneficiary status on noncontracting parties). In any event, there was no evidence at trial that any other preferred shareholder complained about the 2006 conversion or redemption, or challenged the validity of either. 8RR 159:24-163:15. In fact, Mikkelsen conceded at trial that he is "not complaining about what happened to anybody else" during 2006 and affirmed that his only complaint is that he should have been given the option to obtain common stock. 8RR 163:16-23; *see also supra* Section II.A. (explaining that Mikkelsen had no right to convert his shares under the Articles of Incorporation).

Second, Mikkelsen's suggestion that the 2006 conversion and redemption somehow prevent the 2013 redemption from being valid is wrong. 15RR 14:19-23 (asserting that the 2013 redemption "was really sort of an extension of the invalid 2006 redemption"). As an initial matter, the trial court never called into question the validity of the 2006 conversion or redemption as regards other shareholders (or otherwise, set those transactions aside), meaning that any alleged invalidity of the 2006 conversion or redemption does not prevent the 2013 redemption from being valid. Moreover, Mikkelsen cannot point to any authority to support the proposition that an invalid redemption of stock taints a subsequent redemption such that the

stock ***never*** can be redeemed. In fact, the case cited time and again by Mikkelsen at trial—*Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687 (Tex. App.—Fort Worth 2006, pet. denied), *overruled by Ritchie*, 443 S.W.3d 856, stands for the opposite proposition and confirms that the validity of a subsequent redemption does not depend on whether a prior redemption was effective. *Id.* at 704 (considering the validity of a subsequent redemption independently from the validity of a prior redemption, and holding that the second redemption was void ***only because*** the purported shareholder did not receive proper notice).

Because (1) all former preferred shareholders (other than the Mikkelsens) were converted or redeemed in 2006, (2) those conversions and redemptions (except as to Mikkelsen) never were invalidated by the trial court, and (3) Mikkelsen lacks standing to challenge them, the 2013 redemption necessarily is separate from the 2006 redemption, and Mikkelsen cannot use any alleged invalidity related to the 2006 redemption to undermine the 2013 redemption. The 2013 redemption was valid and complied with the Articles of Incorporation. The trial court erred in deciding to the contrary as a matter of law and/or fact. For the foregoing reasons, the trial court's findings are not supported by legally or factually sufficient evidence.

*2. The 2013 Tender Is Valid.*

Mikkelsen claims that the 2013 tender is invalid or otherwise not sufficient, but his arguments are belied by the record. The 2013 tender was for $115,548.24,

which more than covered the value of Mikkelsen's preferred shares, unpaid dividends, interest, and attorneys' fees related to the breach of contract claim. The trial court erred to the extent it held, as a matter of law and/or fact, that the 2013 tender was invalid, and its findings are not supported by legally or factually sufficient evidence. At the very least, there are fact issues related to the tender that a jury should decide.[11]

Mikkelsen asserts that the 2013 tender cannot be effective because Herring Bancorp sent Mikkelsen a cashier's check instead of depositing funds in an escrow/deposit account. *See* 15RR 15:1-17. This formalistic argument about the mechanics of payment, however, does not call into question the validity of the tender. *See* 1CR437. The Articles of Incorporation ***do not require*** Herring Bancorp to redeem preferred shares by depositing funds in an escrow/deposit account; the Articles of Incorporation only specify that depositing funds in an escrow/deposit account is an acceptable method of effectuating a redemption. Ex. 5, art. IV(d). The Articles also state that shares can be redeemed "by paying in cash," which is the equivalent of a cashier's check. *Id.*, art. IV(c); *see Dilling v. Nationsbank, N.A.*, 897 S.W.2d 451, 457 (Tex. App.—Waco 1995), *rev'd on other grounds*, 922 S.W.2d 950 (Tex. 1996) (calling a cashier's check "a cash equivalent"); *Ex parte Ellis*, 279

---

[11] As noted, even though the trial court denied Defendants' motion for summary judgment on this issue, it refused to instruct and to ask the jury about the 2013 redemption and tender. *See supra* Facts Section V; *see also* 11RR 14:9-17:12; Ex. 10.

S.W.3d 1, 25 (Tex. App.—Austin 2008), *aff'd*, 309 S.W.3d 71 (Tex. Crim. App. 2010) (same).

As these provisions suggest, the key language in the Articles of Incorporation is that the transfer of funds/payment associated with a redemption be "irrevocable" and "available" to the preferred shareholder on the redemption date. Ex. 5, art. IV(c)-(d). The 2013 tender (in the form of a cashier's check) met those criteria, and thus was an effective mechanism of payment. *See Jensen v. Covington*, 234 S.W.3d 198, 206 (Tex. App.—Waco 2007, pet. denied) (noting that a tender is an unconditional offer); *Staff Indus., Inc. v. Hallmark Contracting, Inc.*, 846 S.W.2d 542 (Tex. App.—Corpus Christi 1993, no writ).

Mikkelsen also incorrectly claims that the tender is invalid because the cashier's check is payable to both Mikkelsen and his brother, Mallory, even though Mallory Mikkelsen purportedly assigned his shares to John Mikkelsen in 2008. *See* 15RR 15:2-10. As an initial matter, Mikkelsen is wrong that the purported assignment of Mallory Mikkelsen's shares was effective as to Herring Bancorp. The tender correctly listed both John Mikkelsen and Mallory Mikkelsen because that was how the shares were listed on Herring Bancorp's books. *See* 4RR 37:3-7; 10RR 158:18-22 (Jack Hall, Herring Bank's CFO, testifying that John and Mallory Mikkelsen were both shareholders of record in 2013, assuming the 2006 redemption was invalid). Under Herring Bancorp's Bylaws, "[s]hares of stock of the

Corporation ***shall be transferable only on the books of the Corporation*** by the shareholders thereof . . . . Upon surrender to the Corporation . . . of a certificate representing shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Corporation . . . shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books." 12RR, PX-3, § 7.05 (emphasis added). Mikkelsen never properly presented the purported assignment to Herring Bancorp, never surrendered any stock certificates to Herring Bancorp, and never received any new stock certificates from Herring Bancorp.[12] Thus—assuming that Mikkelsen and his brother remained shareholders after 2006—the purported assignment was not effective, and the old certificates remained valid under the Articles of Incorporation. Herring Bancorp was required to make the tender based on its books and records, meaning that the tender was effective regardless of any purported assignment. In any event, Mikkelsen has never argued (and has put forward no evidence to suggest) that his brother is unwilling to sign the cashier's check, or that Mikkelsen is prevented in any way from negotiating the tender.

Finally, to the extent that Mikkelsen argues that the tender amount is insufficient, that argument is wrong. There never has been a dispute about the

---

[12] Nothing in the Bylaws suggests that producing a purported certificate of assignment in litigation is sufficient to comply with Section 7.05.

amount paid for the shares or the amount of unpaid dividends, which means that the 2013 tender was sufficient to redeem Mikkelsen's shares. *See* 12RR, PX-16 (showing Mikkelsen's calculations).[13] Accordingly, the only contested issue is whether the tender covers any remaining amounts owed to Mikkelsen.[14]

The only other possible amounts owing to Mikkelsen are attorneys' fees, interest amounts, and damages. The tender more than covers these amounts, assuming the Court finds the 2006 redemption invalid. First, Mikkelsen only incurred about $40,000 in attorneys' fees related to his breach of contract claim, *see infra* Section IV.B., which is $10,000 less than the amount for attorneys' fees provided in the 2013 tender. *See* Ex. 9 at 2.[15] Second, Mikkelsen has put forward no evidence showing that the interest calculation in the 2013 tender is less than what is owed, and the tender includes $10,000 more in interest than the amount of prejudgment interest in the Final Judgment. *See* Ex. 1 at 2; Ex. 9 at 2. Third, the only damages that Mikkelsen was awarded in the Final Judgment "represent[] preferred dividends," which the 2013 tender covered. *See* Ex. 1 at 2; *see also* Ex. 9. Mikkelsen

---

[13] Because Mikkelsen only was entitled to the par value of his shares and any unpaid dividends under the Articles of Incorporation, because those amounts are not in dispute, and because the tender covered those amounts, Mikkelsen has received all amounts necessary to redeem his shares.

[14] If the 2013 redemption and tender are effective, Mikkelsen is not entitled to any dividends after the date of the 2013 redemption. *See infra* note 16.

[15] If the Court finds that the 2006 redemption was valid, Mikkelsen is not entitled to any attorneys' fees because he will not have prevailed on his breach of contract claim, *see infra* Section IV.A., and the Court will not need to decide whether the 2013 redemption and tender are valid.

has not disputed Defendants' dividend calculation in the 2013 tender, and the tender even covers the extra $2,041.52 awarded for unpaid dividends in the Final Judgment[16] because the tender included more than $10,000 in excess attorneys' fees and an excess amount of interest. *See infra* Section IV.B.; *compare* Ex. 1 at 2 (awarding $23,112.00 in damages based on unpaid dividends and $5,222.25 in prejudgment interest), *with* Ex. 9 at 1 (tender includes $21,070.48 in unpaid dividends and $15,997.26 in interest). While Mikkelsen appears to have resisted accepting the 2013 tender because it did not include all damage amounts he originally sought, 8RR 137:6-9, the jury was not asked to award and did not award any actual damages above the amounts of unpaid dividends, *see* Ex. 2 at 12-30. Moreover, the jury failed to find "malice" and did not award any punitive damages. Ex. 2 at 13-16, 20-23, 27-30. And, for the reasons stated in Sections I and III, Mikkelsen's tort claims fail as a matter of law. Thus, the tender covers all damages owed to Mikkelsen.

For these reasons, the tender is effective both to redeem Mikkelsen's shares and to cover all amounts he is owed. This Court should reverse the trial court's finding that the 2013 redemption was invalid, hold that the 2013 tender redeemed Mikkelsen's shares and sufficiently covered all amounts owed to Mikkelsen, and

[16] The unpaid dividend amount in the Final Judgment is slightly higher than in the tender because more dividends accrued between November 2013 and June 2015.

render judgment in favor of Defendants. Alternatively, there is, at the very least, a fact issue related to whether the amount of the tender is sufficient, requiring a new trial on the declaratory judgment claims. *See* Ex. 10.

### *3. The Trial Court Abused its Discretion by Refusing to Instruct and Ask the Jury About the 2013 Redemption and Tender.*

As noted, the trial court denied Defendants' summary judgment motion, motions for directed verdict, and post-judgment motions related to the 2013 redemption and tender. *See supra* Section II.B. While the record shows no motion or request from Mikkelsen that the trial court issue a directed verdict in his favor about the validity of the 2013 redemption and tender, the trial court appears to have issued such a ruling, 11RR 16:20-17:8; 2CR294, and refused to let the jury decide these issues, Ex. 10.

To the extent a fact issue prevents this Court from rendering judgment in Defendants' favor, it should conclude that the trial court's findings are not supported by legally or factually sufficient evidence, as argued *supra* in Sections II.B.1.-2., and that the trial court erred and abused its discretion by not submitting instructions and questions to the jury about the 2013 redemption and tender. Defendants' requested questions and instructions were substantially correct. *See supra* Section II.B.2; Ex. 10. The trial court's failure to ask the jury about the 2013 redemption and tender is reversible error because it prevented the jury from rendering a proper verdict and because it probably caused the rendition of an improper judgment. *See Tex.*

*Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 911 (Tex. 2000); Tex. R. App. P. 44.1(a).

C.    Regardless of the Validity of the Two Redemptions, Mikkelsen Cannot Show Any Damages Resulting from Defendants' Actions.

Mikkelsen has received payment for all he is owed for any breach of the Articles of Incorporation. *See supra* Sections II.A.-B. In 2006, Herring Bancorp deposited in escrow the par value of Mikkelsen's preferred shares plus any unpaid dividends. 13RR, DX-26 at 2; 13RR, DX-32. In 2013, Herring Bancorp sent Mikkelsen a tender, in the form of a cashier's check (No. 120987), for $115,548.24, which included $28,500 for redeeming 300 shares at $95 per share (par value), $21,070.48 in unpaid dividends, $15,977.76 in interest, and $50,000 in attorneys' fees. *See* Ex. 9. If the 2006 redemption is valid, then Mikkelsen is entitled to the amount in escrow; if the 2006 redemption is invalid, then Mikkelsen is entitled to the tender amount paid in 2013. Either way, Mikkelsen has received payment for the value of his preferred shares and any unpaid dividends, which means that he no longer is a shareholder of Herring Bancorp. Ex. 5, art. IV(c)-(d). And, as explained, the tender also included amounts for interest and attorneys' fees which, to the extent those amounts are required, more than cover what Mikkelsen is owed. *See supra* Section II.B.2.; *see infra* Section IV.B. Mikkelsen thus cannot show any damages to support his breach of contract claim.

### D. Even Assuming a Breach, Mikkelsen Is Not Entitled to Remain a Shareholder in Perpetuity; He Only Is Entitled to the Par Value of His Preferred Shares Plus Unpaid Dividends.

Mikkelsen has asserted that, because he considers the 2006 redemption invalid, Herring Bancorp is incapable of redeeming his preferred shares, and he can hold those shares and exercise his alleged rights to inspect the corporate books and records in perpetuity. That argument finds no support in the Articles of Incorporation or in Texas law.

Regardless of the validity of the 2006 redemption, Herring Bancorp has the right to redeem and/or repurchase Mikkelsen's shares at any time, and Mikkelsen only is entitled to the value of his shares plus any unpaid dividends. Specifically, Article IV of the Articles of Incorporation allows Herring Bancorp to redeem all preferred shareholders at any time, and Article XII allows Herring Bancorp to "purchase, directly or indirectly, its own shares" at any time and without submitting that decision to a shareholder vote. Ex. 5, art. IV, XII.

Herring Bancorp redeemed Mikkelsen's shares twice (in 2006 and 2013). The trial court erroneously held that the 2006 redemption was invalid, and Mikkelsen convinced the trial court to deny summary judgment on the 2013 redemption and to take this issue away from the jury based on the incorrect assertion that the 2013 redemption was improper simply because Mikkelsen did not "think the [2006] redemption was proper." 4RR 36:4-19. Mikkelsen already has received what he was

owed under the Articles of Incorporation—both in 2006 through the amount deposited in escrow and in 2013 through the tender. *See supra* Section II.C. Accordingly, even if the Court determines that Herring Bancorp breached the Articles of Incorporation, it must reverse the Final Judgment insofar as it declared that Mikkelsen remains a preferred shareholder with the right to inspect Herring Bancorp's books and records. At a minimum, and to the extent the redemptions and tender were invalid, this Court should reverse and remand the action for the trial court to determine the proper amount that Herring Bancorp must pay Mikkelsen to redeem his shares.

## III. Defendants Are Entitled to Judgment on Mikkelsen's Breach of Fiduciary Duty Claim Against C.C. Burgess for an Additional Reason Than the One Found by the Jury.

The jury found that only C.C. Burgess breached fiduciary duties he allegedly owed to Mikkelsen but awarded no damages based on that finding. Ex. 2 at 17-23. The jury's breach of fiduciary duty finding was not specifically incorporated into the Final Judgment, which denied all relief "not expressly herein granted." Ex. 1 at 3. The trial court correctly did not award relief on the jury's breach of fiduciary duty finding in the Final Judgment because no damages were awarded on that claim. Additionally, there should have been no liability finding as to C.C. Burgess because (1) directors, officers, and majority shareholders of a corporation do not owe fiduciary duties to minority shareholders as a matter of law, and (2) the evidence at

trial was not legally or factually sufficient to show that C.C. Burgess violated any alleged fiduciary duty to Mikkelsen. Defendants address why the jury's finding that C.C. Burgess breached his fiduciary duties is wrong as a matter of law and fact only out of an abundance of caution.

### A. C.C. Burgess Owes No Fiduciary Duties to Mikkelsen Under Texas Law.

Texas law is clear that officers and directors do not owe formal fiduciary duties to individual shareholders—including minority shareholders; the only fiduciary duties they owe are to the corporation as a whole. *See, e.g.*, *Somers ex rel. EGL, Inc. v. Crane*, 295 S.W.3d 5, 11 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("A director's fiduciary duty runs only to the corporation, not to individual shareholders or even to a majority of the shareholders." (citation omitted)); *Grinnell v. Munson*, 137 S.W.3d 706, 718 (Tex. App.—San Antonio 2004, pet. denied). Texas law also is clear that shareholders in closely held corporations do not owe fiduciary duties to other shareholders, even where the relevant relationship is between a majority and minority shareholder. *See Opperman v. Opperman*, No. 07-12-00033-CV, 2013 WL 6529228, at *4 (Tex. App.—Amarillo Dec. 9, 2013, no pet.); *Pabich v. Kellar*, 71 S.W.3d 500, 504 (Tex. App.—Fort Worth 2002, pet. denied). Thus, under well-established Texas law, C.C. Burgess owed no formal fiduciary duties to Mikkelsen.

While courts have, on occasion, held that an informal fiduciary relationship can arise from "a moral, social, domestic or purely personal relationship of trust and confidence," *Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998), such relationships are not inferred or created "lightly," *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 176-77 (Tex. 1997); *see also Jones v. Thompson*, 338 S.W.3d 573, 583 (Tex. App.—El Paso 2010, pet. denied) ("Texas courts are reluctant to recognize informal fiduciary relationships."). Indeed, "[t]o impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement [underlying] the suit." *Associated Indemnity Corp.*, 964 S.W.2d at 288. Here, Mikkelsen has not pleaded, let alone shown, the existence of any special relationship with C.C. Burgess that would create an informal fiduciary relationship between the two of them. *See* 2CR153-61. And there is no evidence in the trial record to support the existence of such a relationship.

Despite these precedents, the trial court erred and instructed the jury that majority shareholders owe fiduciary duties to minority shareholders as a matter of law. Ex. 2 at 17-18; *see also* 11RR 20:1-22:9 (objecting to instructions regarding fiduciary duties). This instruction was erroneous under the authorities cited above. The jury's "$0.00" damage finding justified the trial court's denial of the relief Mikkelsen requested on his breach of fiduciary duty claim. Because C.C. Burgess

owed no fiduciary duties to Mikkelsen as a matter of law, the Court should render judgment in favor of Defendants on the breach of fiduciary duty claim for this additional reason. Certainly, the trial court's erroneous jury instruction and question prevents the rendition of judgment against C.C. Burgess on this claim, as does the insufficiency of the evidence discussed below.

B. Alternatively, the Evidence Was Not Legally or Factually Sufficient to Show That C.C. Burgess Violated Any Purported Fiduciary Duties.

Even if C.C. Burgess somehow owed Mikkelsen a fiduciary duty (which he did not), insufficient evidence was introduced at trial for the jury to conclude that C.C. Burgess breached any such duty. C.C. Burgess's involvement (as relevant here) was limited to his participation on the Herring Bancorp Board subcommittee that selected the two neutral criteria for deciding which preferred shares could be converted and which shares would be redeemed—*i.e.*, whether the preferred shareholder had a banking relationship with Herring Bank, and whether the preferred shareholder would own at least 50 shares of common stock after the conversion, 13RR, DX-19 at 1. Formulating these criteria cannot form the basis of a breach of fiduciary duty claim because the evidence at trial showed that these criteria were adopted because the Herring Bancorp Board believed that they were in the best interests of the Corporation. *See* 9RR 27:17-30:5 (C.C. Burgess stating that the reason for adopting the 50-share threshold was the concern that as the bank grew, new shareholders would need to be attracted and the bank needed "to maintain as

many openings . . . for inviting those shareholders to join the bank"); 10RR 121:15-122:18 (Todd Clark testifying that, in his view, "[y]ou want people to have a reasonable investment in the bank, be customers in the bank if they are going to own shares in the bank"). In any event, Defendants presented unrefuted evidence at trial that these criteria were not developed to affect Mikkelsen, or otherwise breach any purported fiduciary relationship with Mikkelsen. *See* 9RR 28:3-6 ("Q. Did [the 50-share threshold] have anything to do with the number of shares [Mikkelsen] would have after a conversion . . . . ? A. Absolutely not."); 9RR 33:4-11 ("It was never our intent to ostracize Mr. Mikkelsen in any way."); 10RR 91:18-94:2 (Susan Couch discussing that the two criteria were approved by outside legal counsel); 10RR 107:22-108:16 (Todd Clark testifying that he did not know whether Mikkelsen met the two criteria until this lawsuit was filed).

In sum, Mikkelsen failed to introduce legally or factually sufficient evidence at trial to justify the jury's liability finding on the breach of fiduciary duty claim as to C.C. Burgess. In the unlikely event that the Court reverses the Final Judgment on this claim, at least a new trial is warranted for the reasons stated above.

## IV. The $127,442 Fee Award Should Be Reversed.

### A. Because Mikkelsen Cannot Prevail on His Breach of Contract Claim, He Is Not Entitled to an Attorneys' Fee Award.

As explained, *see supra* Section II, Mikkelsen should not have prevailed on his breach of contract claim that the trial court decided on summary judgment in

2011. And because the breach of contract claim was the basis for Mikkelsen's fee award, *see* 10RR at 54:17-19 (basing claimed fee amount on "the contract claim"), reversing the trial court's Final Judgment on the breach of contract claim requires this Court to reverse the fee award as well and render judgment in favor of Defendants. *See, e.g., Harrison v. Williams Dental Grp., P.C.*, 140 S.W.3d 912, 918 (Tex. App.—Dallas 2004, no pet.) ("[W]e have reversed the trial court's judgment as to the breach of contract claim, so we cannot uphold the award of attorney's fees based on that claim.").

B. Alternatively, if Mikkelsen Is Entitled to Some of His Fees, the $127,442 Award Cannot Stand Because It Is Unsupported and Because Mikkelsen Did Not Segregate His Attorneys' Fees Properly.

Texas law is clear that, in order to recover attorneys' fees, a party must establish the amount of time/expenses incurred pursuing claims which allow for attorneys' fees, and must segregate that time/expense from the time/expense incurred pursuing claims which do not allow for attorneys' fees. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). While Mikkelsen's attorney generally stated at trial that 80% of his time and expenses should be recoverable because they were "tied" with the contract claim, this generalized claim is not sufficient for segregation purposes and is belied by the record. *See* 10RR 53:6-58:7.

First, under *Long v. Griffin*, 442 S.W.3d 253 (Tex. 2014), a ballpark percentage guess about the amount of time spent pursuing a specific claim is not sufficient for segregation purposes; the party seeking its fees must present "evidence of the time spent on specific tasks" to show proper segregation. *Id.* at 255; *see also Enzo Invs., LP v. White*, 468 S.W.3d 635, 652 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (holding that attorney's statement that 95% of the attorney time in a case was attributable to a breach of contract claim was insufficient evidence of segregation). While Mikkelsen may claim that he provided more evidence than a ballpark percentage guess because his fee invoices were admitted into the record, a review of those invoices demonstrated that the 80% ballpark guess was not accurate. In fact, Defendants' trial counsel conducted an "audit-like" review of Mikkelsen's invoices and, based on that review, he testified at trial that Mikkelsen's reasonable and necessary attorneys' fees related to the breach of contract claim were at most $39,545.87. *See* 10RR 180:12-183:24. Thus, far from an 80% ballpark guess, an accurate, audit-like review showed that Mikkelsen only incurred about $40,000 in attorneys' fees pursuing the breach of contract claim—roughly 25% of the total fees incurred. *Id.*

Second, while Mikkelsen's counsel suggested that 80% of his fees could not be segregated because the claims at issue were "inextricably intertwined," 10RR 54:25-55:19, this assertion is contradicted by binding authority. The Texas Supreme

Court has held that segregation between claims is not required "***only when legal services advance*** both recoverable and unrecoverable claims . . . ." *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007) (citing *Tony Gullo*, 212 S.W.3d at 313-14) (emphasis added); *see also 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 509 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("If any of the component tasks relate solely to a cause of action for which legal fees are not recoverable, the claimant must segregate the fees."). Since Mikkelsen's contract claim was decided on summary judgment in 2011—almost four years before trial—time and expenses incurred after that claim was decided as a matter of law cannot have "advanced" that claim, and thus Mikkelsen's contract claim is not "inextricably intertwined" with his tort claims that proceeded to trial. When Mikkelsen's contract claim was decided as a matter of law in 2011, Mikkelsen had incurred less than $50,000 in attorneys' fees litigating this case. *See* 12RR, PX-50. While it is possible that 80% of those fees were spent pursuing the contract claim (which would comport with the "audit-like" review of Mikkelsen's invoices, *see* 10RR 180:12-183:24), that same percentage cannot hold for the remaining fees that Mikkelsen incurred from 2011 through trial, almost four years after the contract claim was decided on summary judgment. Indeed, even a cursory review of Mikkelsen's invoices demonstrates that the fees and expenses incurred after 2011 did not relate to the breach of contract claim. *See, e.g.*, 12RR,

PX-50 at MIK0087 (time entries for motion to compel not related to breach of contract claim); *id.* at MIK0107-0108 (time entries related to Defendants' Third Motion for Summary Judgment on tort claims only).[17]

In sum, Mikkelsen failed to segregate his fees properly, and the record demonstrates that the fee award is unsupported by legally or factually sufficient evidence. Under *Tony Gullo*, should this Court affirm the trial court's finding on Mikkelsen's breach of contract claim, it must reverse the fee award and remand for a new trial on that issue.

### C. Defendants Are Entitled to Their Reasonable Attorneys' Fees Spent Pursuing Their Declaratory Judgment Claim.

As explained, the trial court erred in denying Defendants' declaratory judgment claim on the 2013 redemption and tender. *See supra* Section II.B.2. Under Tex. Civ. Prac. & Rem. Code § 37.009, Defendants are entitled to their reasonable and necessary attorneys' fees spent pursuing this claim—specifically, $5,500 in reasonable and necessary attorneys' fees through trial plus $12,500 in conditional

[17] To the extent Mikkelsen asserts that his fee award is based on the cross-declaratory judgment claims as well as the contract claim, that argument is belied by the record. *See* 10RR 55:17-19 (asserting that 80% of the time is "tied with the contract claim"). Further, even if Mikkelsen's fee claim relates to his cross-declaratory judgment claim as well, Mikkelsen never accounted for the large gap of time between when the contract claim was decided on summary judgment in 2011 and when he pleaded his cross-declaratory judgment claim in 2015. *See* 2CR158. While Mikkelsen may attempt to claim that the fees he incurred defending against Defendants' declaratory judgment are rightfully included in a fee award, it is telling that Defendants sought only $5,500 in fees based on that claim. 10RR 186:25-191:6. Finally, Mikkelsen fails to account for the fact that several time entries on his attorneys' invoices from late 2013 through trial had nothing to do with the contract claim or cross-declaratory judgment claims. *See, e.g.*, PX-50 at MIK0107-0108.

appellate fees. *See* 10RR 186:25-191:6. Accordingly, if this Court agrees with Defendants that the 2013 redemption and tender are valid, then it should award Defendants the attorneys' fees they spent pursuing their declaratory judgment claim, or alternatively, remand for further proceedings on these fees.

## V. To the Extent the Court Does Not Render Judgment in Favor of Defendants, a New Trial Also Is Warranted Because the Trial Court Impermissibly Commented on the Weight of the Evidence When It Instructed the Jury That Herring Bancorp Had Breached its Articles of Incorporation as a Matter of Law.

As Defendants have argued, judgment should be rendered in their favor on all of the issues raised in this appeal. All of Defendants' arguments about new trial and remand are alternative arguments and apply only if the Court finds that it cannot render judgment in Defendants' favor. To the extent the Court finds that Defendants are not entitled to judgment as a matter of law on the contract or tort claims, a new trial also is required given the trial court's prejudicial comment on the weight of the evidence in its jury instructions.

As noted, Mikkelsen presented this case to the jury as a breach-of-contract dispute. *See supra* Facts Section V. Yet, when the jury received its instructions, the trial court erred and abused its discretion and told the jury that it already had determined the breach-of-contract claim as a matter of law in Mikkelsen's favor. Ex. 2 at 7 ("You are instructed that the Court has previously determined, as a matter of law, that Defendant Herring failed to comply with the Articles of Incorporation of

Herring Bancorp when it purported to involuntarily redeem Mikkelsen's preferred shares in 2006."). The trial court gave this instruction over repeated objections, *see* 8RR 203:20-220:8; 11RR 9:22-13:11; 2CR259, and this prejudicial statement infected the jury charge with error and probably caused the rendition of an improper judgment. *See* Tex. R. Civ. P. 277; *Redwine v. AAA Life Ins. Co.*, 852 S.W.2d 10, 14 (Tex. App.—Dallas 1993, no writ) ("Reversal is required if an improper comment on the weight of the evidence is one that was calculated to cause and probably did cause the rendition of an improper judgment."); *Seymore v. Dorsett*, No. 07-03-0175-CV, 2005 WL 2849061, at *3 (Tex. App.—Amarillo Oct. 31, 2005, no pet.).

Several appellate courts have reversed judgments where the trial court gave similar "instructions" that amounted to improper comments on the weight of the evidence. For example, in *Redwine*, the Dallas Court of Appeals explicitly held that, "[a]lthough the assumption of an uncontroverted fact in the jury charge is generally not held to be a comment on the weight of the evidence, we cannot conclude that the instructions given in the instant case concerning issues decided as a matter of law . . . were not comments on the weight of the evidence." 852 S.W.2d at 16. In reaching this conclusion, the *Redwine* court reviewed the holdings of other courts of appeals and noted that those "courts held that jury instructions concerning issues decided as a matter of law were improper comments on the weight of the evidence because they

suggested to the jury how the remaining issues should be resolved." *Id.* Similarly, in *American Bankers Insurance Co. v. Caruth*, 786 S.W.2d 427 (Tex. App.—Dallas 1990, no writ), the court held that instructing the jury about a prior ruling was an improper comment on the weight of the evidence, was not "helpful to the jury in answering any of the questions in the court's charge," and "tended to imply to the jury that the trial judge thought the law and the facts were in favor" of one party over the other. *Id.* at 435; *see also First Nat'l Bank of Amarillo v. Jarnigan*, 794 S.W.2d 54, 61-62 (Tex. App.—Amarillo 1990, writ denied) ("[A]nything which does not aid the jury in answering the jury questions submitted . . . must be excluded from the charge."); *Mader v. Aetna Casualty & Surety Co.*, 683 S.W.2d 731, 733 (Tex. App.—Corpus Christi 1984, no writ) ("The trial court, in effect, informed the jury on a finding which it had made as a matter of law. This was error. . . . [W]e believe that the instruction strongly suggested to the jury that [it] should answer the accompanying issue [in favor of one party] . . . . We can see no useful purpose for the instruction other than to steer the jury . . . . As such, we find that the instruction was an impermissible comment on the evidence . . . ."); *Bd. of Regents v. Denton Constr.*, 652 S.W.2d 588, 594-95 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.) ("We are at a loss to determine why this instruction was included in the charge. . . . [T]his instruction was not explanatory of anything, except that the court had [made a ruling] as a matter of law . . . . We think this tended to imply to the jury that the court

thought the law and the facts were with the appellee, and as such, the instruction was erroneously prejudicial.").

These cases demonstrate that comments about prior rulings do not aid the jury and can improperly influence the jury's deliberations. That is especially true where, as here, Mikkelsen framed the trial such that the breach-of-contract claim was the focus. *See* 7RR 16:12-14 ("[T]his case is about the breach of a covenant."); 7RR 22:2-5 ("If they had been all redeemed, we would not be here today because that complied with the covenant, the Articles of Incorporation."); 11RR 32:23-34:2 ("I told you in our opening that I believe the evidence would show that the covenant, the Articles of Incorporation had been broken . . . . Now, in our closing arguments, this is our chance to summarize for you what we think the evidence has shown. . . . First and foremost in this charge, on page seven, is the following: Finding by the Court that the Articles of Incorporation were violated."). Indeed, where the entire trial is framed as a question about whether the Articles of Incorporation were breached, and then the Court instructs the jury that it previously found that the Articles were breached, it is difficult to imagine a more prejudicial instruction. This erroneous instruction likely had spillover effects and affected the jury's deliberations regarding the minority oppression and breach of fiduciary duty claims (despite the trial court's addition that "failure to comply with the Articles of Incorporation, standing alone, is

not sufficient to constitute minority oppression or breach of fiduciary duty"). Ex. 2 at 7.

The trial court's instruction regarding its prior ruling on Mikkelsen's summary judgment motion was erroneous and likely caused the rendition of an improper judgment. To the extent the Court determines that it cannot render judgment in Defendants' favor, the Court should reverse the Final Judgment and remand for a new trial for this additional reason.

## CONCLUSION AND PRAYER

For the reasons stated, Defendants respectfully pray that this Court reverse the trial court's Final Judgment and render judgment in favor of Defendants. Alternatively, Defendants respectfully pray that this Court reverse the Final Judgment insofar as it awards Mikkelsen relief and remand the case for a new trial to resolve any disputed fact issues. Defendants also pray for any further relief to which they are justly entitled.

Respectfully submitted,

*/s/ Thomas S. Leatherbury*

Cornell D. Curtis
State Bar No. 24007069
CORNELL D. CURTIS, P.C.
1716 Main Street
Vernon, Texas 76384
940.552.9100
940.552.2655 (facsimile)
vernonlaw@sbcglobal.net

Thomas S. Leatherbury
State Bar No. 12095275
Manuel G. Berrelez
State Bar No. 24057760
Stephen S. Gilstrap
State Bar No. 24078563
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
214.220.7700
214.999.7792 (facsimile)
tleatherbury@velaw.com
mberrelez@velaw.com
sgilstrap@velaw.com

*Attorneys for Appellants Herring Bancorp, Inc.; C.C. Burgess; and C. Campbell Burgess*

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. P. 9.4(i)(3), the undersigned hereby certifies that the foregoing Brief of Appellants complies with the applicable word count limitation because it contains 12,940 words, excluding the parts exempted by Tex. R. App. P. 9.4(i)(1). In making this certification, the undersigned has relied on the word-count function in Microsoft Word 2010, which was used to prepare this brief.

*/s/ Thomas S. Leatherbury*
Thomas S. Leatherbury

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon the following counsel of record via electronic filing on November 20, 2015:

Lee F. Christie
Michael L. Atchley, II
Pope, Hardwicke, Christie, Schell, Kelly & Ray, LLP
500 West 7th Street, Suite 600
Fort Worth, Texas 76102
817.332.3245
817.877.4781 (facsimile)
lfchristie@popehardwicke.com
matchley@popehardwicke.com

*/s/ Thomas S. Leatherbury*
Thomas S. Leatherbury

## INDEX OF APPENDIX MATERIALS

(1) Final Judgment (June 16, 2015) (2CR472-507)

(2) Jury Verdict (January 30, 2015) (2CR228-58)

(3) Orders Denying Defendants Post-Judgment Motions (August 19, 2015) (2CR409-10)

(4) Order Granting Plaintiff's Motion for Partial Summary Judgment (August 4, 2011) (1CR306-07)

(5) Herring Bancorp Articles of Incorporation (13RR, DX-1)

(6) October 31, 2006 Notice of Redemption (13RR, DX-18)

(7) Acceptance of Subchapter S Status by IRS (13RR, DX-31)

(8) October 30, 2013 Notice of Redemption (13RR, DX-33)

(9) November 22, 2013 Tender (13RR, DX-35)

(10) Refused Jury Instructions Related to 2013 Redemption/Tender (January 30, 2015) (2CR260-61, 2CR267)

(11) *Cent. Austin Apartments, LLC v. UP Austin Holdings, LP*, No. 03-13-00080-CV (Tex. App.—Austin Dec. 8, 2014) (op. withdrawn on February 6, 2015 based on settlement of parties)

US 3776991

# EXHIBIT 1



CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | WILBARGER COUNTY, TEXAS |
| | § | |
| HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS, | § | |
| | § | |
| Defendants. | § | 46TH JUDICIAL DISTRICT |

FILED The 16 day of June 2015 At 1:30 o'clock P M Brenda Peterson Clerk Dist. Court Wilbarger Co. By Deputy

## FINAL JUDGMENT

On January 30, 2015, this cause came on to be heard, and John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust, Plaintiff, appeared in person and by attorney of record and announced ready for trial, and Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess, Defendants, appeared in person or by attorney of record and announced ready for trial, and a jury having been previously demanded, a jury consisting of 12 qualified jurors was duly empaneled and the case proceeded to trial.

The Court, by granting Plaintiff's Motion for Partial Summary Judgment on August 4, 2011, granted Plaintiff's breach of contract claim in Count One of Plaintiff's First Amended Original Petition, and the Order granting Plaintiff's Motion, which is copied and attached hereto as Exhibit "A," is incorporated herein. With respect to Count Four of Plaintiff's First Amended Original Petition, which alleged that an October 2006 purported redemption of Plaintiff's preferred shares in Herring Bancorp, Inc. constituted unlawful oppression of a minority shareholder, the Court submitted said issue to the jury, and the jury returned its verdict in accordance with the instructions of the Court. The charge of the Court and the verdict of the jury are copied and

attached hereto as Exhibit "B" and incorporated for all purposes by reference. Because the Court found for Plaintiff and it appears to the Court that the verdict of the jury was for the Plaintiff and against Defendant Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess, the Court finds that judgment should be rendered as herein provided. It is, therefore,

ORDERED, ADJUDGED, and DECREED that Plaintiff John Mikkelsen have and recover from this Court a declaratory judgment whereby this Court declares, pursuant to the Texas Declaratory Judgments Act and the jury's verdict, that the purported October 2006 and November 2013 redemptions of the preferred shares of Plaintiff John Mikkelsen were void and of no force or effect, and did not deprive Plaintiff of his status as a preferred shareholder of Herring Bancorp, Inc. Accordingly, Plaintiff at all times had and has the right to inspect the books and records of Herring Bancorp, Inc. The Court further finds that Defendant Herring Bancorp, Inc. breached its Articles of Incorporation and that Defendants C.C. Burgess and C. Campbell Burgess wrongfully engaged in oppressive conduct towards Plaintiff, as found by the jury. In connection therewith, the Court further finds, and it is ORDERED, ADJUDGED, and DECREED that the Plaintiff remains a preferred shareholder of said Herring Bancorp, Inc., is entitled to have and recover of and from Defendant Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess, jointly and severally, judgment in the amount of $23,112.00, representing preferred dividends on Plaintiff's preferred shares in Herring Bancorp, Inc. from and after October 31, 2006, through December 31, 2014, plus prejudgment interest thereon through the date of judgment rendered herein in the amount of $5222.25. It is further

ORDERED, ADJUDGED, and DECREED that Plaintiff John Mikkelsen should have and recover of and from the Defendant Herring Bancorp, Inc. judgment for his reasonable and necessary attorneys' fees, as awarded by the jury, in the amount of $127,442.00 for preparation

and trial of this cause, and the additional sum of $25,000.00 for an appeal to the Court of Appeals, $10,000.00 for representation at the petition for review stage in the Supreme Court of Texas, $10,000.00 for representation at the merit briefing stage in the Supreme Court of Texas, and $10,000.00 for representation through oral argument and completion of proceedings in the Supreme Court of Texas. It is further

ORDERED, ADJUDGED, and DECREED that all costs of court should be and hereby are taxed jointly and severally against Defendants Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess. It is further

ORDERED, ADJUDGED, and DECREED that the contract award of $23,112.00 shall bear interest from the date this Judgment is signed at the rate of ten percent (10%) per annum until paid. It is further

ORDERED, ADJUDGED, and DECREED that the other monetary awards shall bear interest from the date this Judgment is signed at the rate of five percent (5%) per annum until paid. It is further

ORDERED, ADJUDGED, and DECREED that all relief not expressly herein granted is denied, and this is intended to be a final, appealable judgment.

SIGNED this 16 day of June, 2015.

DAN MIKE BIRD, DISTRICT JUDGE

P:\Mikkelson\Pleadings\Proposed Final Judgment.docx

FILED
The 4 day of Aug 2011
At 9:00 o'clock A M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By [signature] Deputy

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust, Plaintiff, | § | IN THE DISTRICT COURT |
| v. | § | WILBARGER COUNTY, TEXAS |
| HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS, Defendants. | § | 46TH JUDICIAL DISTRICT |

**ORDER**

Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") and Defendants' Cross-Motion for Summary Judgment ("Defendants' Motion") came on for hearing on April 18, 2011. The Court finds Plaintiff's Motion was timely filed and that notice of Plaintiff's Motion and the hearing thereon was duly and properly given. The Court also finds that Defendants' Motion was timely filed and served by agreement of the parties, and hereby grants leave to file and serve the Motion on less than 21-days' notice prior to the hearing. The Court also finds that Plaintiff's Response to Defendants' Motion was timely filed and served by agreement of the parties, and hereby grants Plaintiff leave to file and serve the Response and the evidence attached thereto, including discovery products, within seven days of the hearing. After considering Plaintiff's Motion and the Response thereto, and after considering Defendants' Motion and the Response thereto, and after considering the admissible summary judgment evidence and the arguments of counsel, the Court finds that Plaintiff's Motion should be granted and Defendants' Motion should be denied.

EXHIBIT A

IT IS THEREFORE ORDERED that Defendants' Cross-Motion for Summary Judgment is denied in its entirety.

IT IS FURTHER ORDERED that Defendants' Special Exceptions and Plea in Abatement are overruled and denied.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is granted in all respects.

The Court further finds as a matter of law that (1) the purported redemption of Plaintiff's 300 shares of preferred stock of Herring Bancorp, Inc. (the "Company") was undertaken in violation of the Company's Articles of Incorporation and is void and (2) that Plaintiff is, and continues to be, the holder of 300 shares of the Company's preferred stock, and has all the rights appurtenant thereto, including the right to inspect the Company's books and records.

SIGNED on the 4 day of Aug, 2011.

Judge Presiding

Approved as to form:

Lee F. Christie, Counsel for Plaintiff

James W. Bowen, Counsel for Defendants

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, Acting Solely in his Capacity as Trustee of the John Mikkelsen Trust, | § | IN THE 46TH DISTRICT COURT |
| Plaintiff/Counter Defendant, | § | |
| v. | § | IN AND FOR |
| HERRING BANCORP., INC., C.C. BURGESS and C. CAMPBELL BURGESS, | § | |
| Defendants/Counter-Plaintiffs. | § | WILBARGER COUNTY, TEXAS |

## CHARGE TO THE JURY

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this Jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

I.

Do not let bias, prejudice or sympathy play any part in your deliberations.

II.

In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court; that is, what you have seen and heard in this courtroom, together with the law as given you by the Court.

EXHIBIT B

4784784784784784

In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

III.

Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

IV.

You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

V.

You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figure and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

VI.

You may render your verdict upon the vote of ten or more members of the jury. The same ten or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority or any other vote of less than ten jurors. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict,

those jurors who agree to all findings shall each sign the verdict.

VII.

These instructions are given to you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

VIII.

The presiding juror or any other who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

IX.

When words are used in this charge in a sense which varies from the commonly understood meaning, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

X.

Answer by checking "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." If the question directs you to give an answer other than "Yes" or "No," you must still base your answers on a preponderance of the evidence with respect to each matter inquired about in the question. Preponderance of the evidence means the greater weight and degree of credible testimony or evidence introduced before you and admitted in evidence in this case.

XI.

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud together with the accompanying instructions and then you will deliberate upon your answers to the questions asked in the verdict form. It is the duty of the presiding juror to:

(1) Preside during your deliberations.

(2) See that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge.

(3) Write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the Judge.

(4) Conduct voting on each question.

(5) Write your answers to the questions in the spaces provided.

(6) Certify to your verdict in the space provided for the presiding juror's signature, or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

XII.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, or your home, or elsewhere, please inform the Judge of this fact.

XIII.

When you have answered all the questions you are required to answer under the instructions of the Judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury

room that you have reached a verdict, and then you will return into Court with your verdict.

SIGNED this 30 day of January, 2015.

HONORABLE DAN MIKE BIRD
46th District Court Judge

Filed 1/30/15
at 9:40 AM
by DMB Judge

Returned 1/30/15
at 5:00 PM
by DMB Judge

DEFINITIONS AND INSTRUCTIONS

You are instructed that when words are used in the Questions in a sense which varies from the meaning commonly understood, you will be given in this Charge a proper legal definition which you are bound to accept in the place of any other definition or meaning. In answering the Questions you shall give the following terms the following meanings:

1. The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true. A fact may be established by direct evidence or by circumstantial evidence, or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

2. A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

3. "Mikkelsen" means Plaintiff John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

4. "Herring Bancorp" means Herring Bancorp, Inc., and its agents, attorneys, employees, officers, directors, and representatives acting in the course and scope of their agency or employment.

5. "C.C. Burgess" means C.C. Burgess and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

6. "Campbell Burgess" means C. Campbell Burgess and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

7. The "Articles of Incorporation" means and refers to the Articles of Incorporation of Herring (Plaintiff's Exhibit "2").

INSTRUCTION REGARDING BREACH OF ARTICLES OF INCORPORATION

You are instructed that the Court has previously determined, as a matter of law, that Defendant Herring failed to comply with the Articles of Incorporation of Herring Bancorp when it purported to involuntarily redeem Mikkelsen's preferred shares in 2006. However, this failure to comply with the Articles of Incorporation, standing alone, is not sufficient to constitute minority oppression or breach of fiduciary duty.

QUESTION NO 1:

What is a reasonable fee for the necessary services of Mikkelsen's attorney in connection with the failure of Herring Bancorp to comply with the Articles of Incorporation?

In answering this Question, you are to consider the attorney's fees and expenses incurred and reasonably anticipated to be incurred by Mikkelsen in enforcing his rights in this action and any appeal thereof. In determining the amount of attorney's fees and expenses, you are to consider the following:

- the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;
- the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;
- the fee customarily charged in the locality for similar legal services;
- the amount involved and the results obtained;
- the time limitations imposed by the client or the circumstances;
- the nature and length of the professional relationship with the client;
- the experience, reputation, and ability of the lawyer or lawyers performing the services; and
- whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

a. For preparation in the trial court.

ANSWER: $127,442.00

b. For representation through appeal to the Court of Appeals.

ANSWER: 25,000.00

c. For representation at the petition for review stage in the Supreme Court of Texas.

ANSWER: 10,000.00

d. For representation at the merits briefing stage in the Supreme Court of Texas.

ANSWER: 15,000.00

e. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

ANSWER: 10,000.00

QUESTION NO. 2:

Do you find that C. C. Burgess engaged in oppressive conduct toward Mikkelsen?

"Oppressive conduct" means burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

It also means unfair treatment of minority shareholders by the directors or those in control the corporation.

Answer "yes" or "no."

Answer: yes

QUESTION NO. 3:

Do you find that Campbell Burgess engaged in oppressive conduct toward Mikkelsen?

"Oppressive conduct" means burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

It also means unfair treatment of minority shareholders by the directors or those in control of the corporation.

Answer "yes" or "no."

Answer: yes

If you answered "Yes" to # 2 or 3 answer #4, otherwise do not answer #4.

QUESTION NO. 4:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that proximately resulted from such oppressive conduct, if any, you have found?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $ 23,314.80

QUESTION NO. 5:

Answer the following question only if you unanimously answered "yes" to Question No. 2. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: No

QUESTION NO. 6:

Answer the following question only if you unanimously answered "yes" to Question No. 3. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: No

QUESTION NO. 7:

Answer the following question only if you unanimously answered "yes" to Question No. 5. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C.C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 2?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of C.C. Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of C.C. Burgess.

Answer in dollars and cents, if any.

Answer: $______________

4924924924924924

QUESTION NO. 8:

Answer the following question only if you unanimously answered "yes" to Question No. 6. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 3?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of Campbell Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $_______________

JURY QUESTION NO. 9:

Do you find that C. C. Burgess used his personal control of Herring Bancshares to breach fiduciary duties owed to Mikkelsen?

In connection with the foregoing question, you are instructed that a majority shareholder of a corporation owes fiduciary duties to a minority shareholder and to show compliance with those duties must show he acted fairly and equitably, in the utmost good faith with the most scrupulous honesty, fully and fairly disclosing all important information to a minority shareholder such as Mikkelsen.

Answer "yes" or "no."

Answer: yes

4944944944944944

QUESTION NO. 10:

Do you find that Campbell Burgess used his personal control of Herring Bancshares to breach fiduciary duties owed to Mikkelsen?

In connection with the foregoing question, you are instructed that a majority shareholder of a corporation owes fiduciary duties to a minority shareholder and to show compliance with those duties must show he acted fairly and equitably, in the utmost good faith with the most scrupulous honesty, fully and fairly disclosing all important information to a minority shareholder such as Mikkelsen.

Answer "yes" or "no."

Answer: N/A

If you answered "Yes" to #9 or 10 answer #11, otherwise do not answer #11

QUESTION NO. 11:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that proximately resulted from such breaches of fiduciary duties, if any you have found?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $ 0.00

QUESTION NO. 12:

Answer the following question only if you unanimously answered "yes" to Question No. ~~10~~ 9. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: No

QUESTION NO. 13:

Answer the following question only if you unanimously answered "yes" to Question No. 10. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: ________________

4984984984984984

QUESTION NO. 14:

Answer the following question only if you unanimously answered "yes" to Question No. 12. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C. C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 9?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of C. C. Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of C. C. Burgess.

Answer in dollars and cents, if any.

Answer: $ _______________

QUESTION NO. 15:

Answer the following question only if you unanimously answered "yes" to Question No. 13. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 10?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of Campbell Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $________________

QUESTION NO. 16:

Answer the following Question only if you have answered "yes" to Questions 2 or 9.

Was C. C. Burgess part of a conspiracy to wrongfully deprive Mikkelsen of his preferred shares in Herring Bancorp?

To be part of a conspiracy, C. C. Burgess and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to Mikkelsen. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Answer "yes" or "no."

Answer: No

QUESTION NO. 17:

Answer the following Question only if you had answered "yes" to Questions 3 or 10.

Was Campbell Burgess part of a conspiracy to wrongfully deprive Mikkelsen of his preferred shares in Herring Bancorp?

To be part of a conspiracy, Campbell Burgess and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to Mikkelsen. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Answer "yes" or "no."

Answer: No

502502502502502

If you answered "yes" to # 16 or #17, answer # 18, otherwise do not answer # 18.

QUESTION NO. 18:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that were proximately caused by such conspiracy?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $_______________

QUESTION NO. 19:

Answer the following question only if you unanimously answered "yes" to Question No. 16. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: ________________

**QUESTION NO. 20:**

Answer the following question only if you unanimously answered "yes" to Question No. 17. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: ________________

QUESTION NO. 21:

Answer the following question only if you unanimously answered "yes" to Question No. 19. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C. C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 16?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of C. C. Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of C. C. Burgess. .

Answer in dollars and cents, if any.

Answer: $_______________

506506506506506

QUESTION NO. 22:

Answer the following question only if you unanimously answered "yes" to Question No. 20. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 17?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of Campbell Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $_______________

**JUROR CERTIFICATE**

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

[signature]
PRESIDING JUROR

(To be signed by those rendering the verdict if not unanimous.)

# EXHIBIT 2

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, Acting Solely in his Capacity as Trustee of the John Mikkelsen Trust,<br><br>Plaintiff/Counter Defendant, | § § § § § § | IN THE 46TH DISTRICT COURT |
| v. | § § § | IN AND FOR |
| HERRING BANCORP., INC., C.C. BURGESS and C. CAMPBELL BURGESS,<br><br>Defendants/Counter-Plaintiffs. | § § § § | WILBARGER COUNTY, TEXAS |

## CHARGE TO THE JURY

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

**I.**

Do not let bias, prejudice or sympathy play any part in your deliberations.

**II.**

In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court; that is, what you have seen and heard in this courtroom, together with the law as given you by the Court.

In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

**III.**

Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

**IV.**

You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

**V.**

You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figure and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

**VI.**

You may render your verdict upon the vote of ten or more members of the jury. The same ten or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority or any other vote of less than ten jurors. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict,

those jurors who agree to all findings shall each sign the verdict.

VII.

These instructions are given to you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

VIII.

The presiding juror or any other who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

IX.

When words are used in this charge in a sense which varies from the commonly understood meaning, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

X.

Answer by checking "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." If the question directs you to give an answer other than "Yes" or "No," you must still base your answers on a preponderance of the evidence with respect to each matter inquired about in the question. Preponderance of the evidence means the greater weight and degree of credible testimony or evidence introduced before you and admitted in evidence in this case.

XI.

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud together with the accompanying instructions and then you will deliberate upon your answers to the questions asked in the verdict form. It is the duty of the presiding juror to:

(1) Preside during your deliberations.

(2) See that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge.

(3) Write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the Judge.

(4) Conduct voting on each question.

(5) Write your answers to the questions in the spaces provided.

(6) Certify to your verdict in the space provided for the presiding juror's signature, or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

**XII.**

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, or your home, or elsewhere, please inform the Judge of this fact.

**XIII.**

When you have answered all the questions you are required to answer under the instructions of the Judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury

room that you have reached a verdict, and then you will return into Court with your verdict.

SIGNED this 30 day of January, 2015.

HONORABLE DAN MIKE BIRD
46th District Court Judge

Filed 1/30/15
at 9:40 AM
by DMB Judge

Returned 1/30/15
at 5:00 PM
by DMB Judge

## DEFINITIONS AND INSTRUCTIONS

You are instructed that when words are used in the Questions in a sense which varies from the meaning commonly understood, you will be given in this Charge a proper legal definition which you are bound to accept in the place of any other definition or meaning. In answering the Questions you shall give the following terms the following meanings:

1. The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true. A fact may be established by direct evidence or by circumstantial evidence, or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

2. A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

3. "Mikkelsen" means Plaintiff John Mikkelsen, acting solely in his capacity as Trustee of the John Mikkelsen Trust and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

4. "Herring Bancorp" means Herring Bancorp, Inc., and its agents, attorneys, employees, officers, directors, and representatives acting in the course and scope of their agency or employment.

5. "C.C. Burgess" means C.C. Burgess and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

6. "Campbell Burgess" means C. Campbell Burgess and his agents, attorneys, and representatives acting in the course and scope of their agency or employment.

7. The "Articles of Incorporation" means and refers to the Articles of Incorporation of Herring (Plaintiff's Exhibit "2").

## INSTRUCTION REGARDING BREACH OF ARTICLES OF INCORPORATION

You are instructed that the Court has previously determined, as a matter of law, that Defendant Herring failed to comply with the Articles of Incorporation of Herring Bancorp when it purported to involuntarily redeem Mikkelsen's preferred shares in 2006. However, this failure to comply with the Articles of Incorporation, standing alone, is not sufficient to constitute minority oppression or breach of fiduciary duty.

QUESTION NO 1:

What is a reasonable fee for the necessary services of Mikkelsen's attorney in connection with the failure of Herring Bancorp to comply with the Articles of Incorporation?

In answering this Question, you are to consider the attorney's fees and expenses incurred and reasonably anticipated to be incurred by Mikkelsen in enforcing his rights in this action and any appeal thereof. In determining the amount of attorney's fees and expenses, you are to consider the following:

- the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;
- the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;
- the fee customarily charged in the locality for similar legal services;
- the amount involved and the results obtained;
- the time limitations imposed by the client or the circumstances;
- the nature and length of the professional relationship with the client;
- the experience, reputation, and ability of the lawyer or lawyers performing the services; and
- whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

a. For preparation in the trial court.

ANSWER: $127,448.00

b. For representation through appeal to the Court of Appeals.

ANSWER: 25,000.00

c. For representation at the petition for review stage in the Supreme Court of Texas.

ANSWER: 10,000.00

d. For representation at the merits briefing stage in the Supreme Court of Texas.

ANSWER: 15,000.00

e. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

ANSWER: 10,000.00

QUESTION NO. 2:

Do you find that C. C. Burgess engaged in oppressive conduct toward Mikkelsen?

"Oppressive conduct" means burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

It also means unfair treatment of minority shareholders by the directors or those in control the corporation.

Answer "yes" or "no."

Answer: yes

QUESTION NO. 3:

Do you find that Campbell Burgess engaged in oppressive conduct toward Mikkelsen?

"Oppressive conduct" means burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

It also means unfair treatment of minority shareholders by the directors or those in control of the corporation.

Answer "yes" or "no."

Answer: yes

If you answered "Yes" to # 2 or 3 answer #4, otherwise do not answer #4.

QUESTION NO. 4:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that proximately resulted from such oppressive conduct, if any, you have found?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $ 23,314.80

QUESTION NO. 5:

Answer the following question only if you unanimously answered "yes" to Question No. 2. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: No

QUESTION NO. 6:

Answer the following question only if you unanimously answered "yes" to Question No. 3. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: No

QUESTION NO. 7:

Answer the following question only if you unanimously answered "yes" to Question No. 5. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C.C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 2?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of C.C. Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of C.C. Burgess.

Answer in dollars and cents, if any.

Answer: $__________________

QUESTION NO. 8:

Answer the following question only if you unanimously answered "yes" to Question No. 6. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 3?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of Campbell Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $____________________

JURY QUESTION NO. 9:

Do you find that C. C. Burgess used his personal control of Herring Bancshares to breach fiduciary duties owed to Mikkelsen?

In connection with the foregoing question, you are instructed that a majority shareholder of a corporation owes fiduciary duties to a minority shareholder and to show compliance with those duties must show he acted fairly and equitably, in the utmost good faith with the most scrupulous honesty, fully and fairly disclosing all important information to a minority shareholder such as Mikkelsen.

Answer "yes" or "no."

Answer: yes

QUESTION NO. 10:

Do you find that Campbell Burgess used his personal control of Herring Bancshares to breach fiduciary duties owed to Mikkelsen?

In connection with the foregoing question, you are instructed that a majority shareholder of a corporation owes fiduciary duties to a minority shareholder and to show compliance with those duties must show he acted fairly and equitably, in the utmost good faith with the most scrupulous honesty, fully and fairly disclosing all important information to a minority shareholder such as Mikkelsen.

Answer "yes" or "no."

Answer: No

If you answered "Yes" to #9 or 10 answer #11, otherwise do not answer #11

QUESTION NO. 11:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that proximately resulted from such breaches of fiduciary duties, if any you have found?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $ 0.00

QUESTION NO. 12:

Answer the following question only if you unanimously answered "yes" to Question No. ~~10~~. 9 Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: No

QUESTION NO. 13:

Answer the following question only if you unanimously answered "yes" to Question No. 10. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: ____________________

QUESTION NO. 14:

Answer the following question only if you unanimously answered "yes" to Question No. 12. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C. C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 9?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of C. C. Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of C. C. Burgess.

Answer in dollars and cents, if any.

Answer: $__________________

QUESTION NO. 15:

Answer the following question only if you unanimously answered "yes" to Question No. 13. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 10?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of Campbell Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $__________________

QUESTION NO. 16:

Answer the following Question only if you have answered "yes" to Questions 2 or 9.

Was C. C. Burgess part of a conspiracy to wrongfully deprive Mikkelsen of his preferred shares in Herring Bancorp?

To be part of a conspiracy, C. C. Burgess and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to Mikkelsen. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Answer "yes" or "no."

Answer: No

QUESTION NO. 17:

Answer the following Question only if you had answered "yes" to Questions 3 or 10.

Was Campbell Burgess part of a conspiracy to wrongfully deprive Mikkelsen of his preferred shares in Herring Bancorp?

To be part of a conspiracy, Campbell Burgess and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to Mikkelsen. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Answer "yes" or "no."

Answer: No

If you answered "yes" to #16 or #17, answer #18, otherwise do not answer #18.

QUESTION NO. 18:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mikkelsen for his damages, if any, that were proximately caused by such conspiracy?

Consider the following elements of damages, if any, and none other: The lost dividend income on Mikkelsen's preferred shares from November 21, 2006 until January 26, 2015.

Answer in dollars and cents.

Answer: $________________

QUESTION NO. 19:

Answer the following question only if you unanimously answered "yes" to Question No. 16. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by C.C. Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: ____________________

QUESTION NO. 20:

Answer the following question only if you unanimously answered "yes" to Question No. 17. Otherwise, do not answer the following question.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Mikkelsen resulted from malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Campbell Burgess to cause substantial injury or harm to Mikkelsen.

Answer "yes" or "no."

Answer: ____________________

256256256256256256

QUESTION NO. 21:

Answer the following question only if you unanimously answered "yes" to Question No. 19. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against C. C. Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 16?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of C. C. Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of C. C. Burgess.

Answer in dollars and cents, if any.

Answer: $__________________

QUESTION NO. 22:

Answer the following question only if you unanimously answered "yes" to Question No. 20. You must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, paid now in cash, should be assessed against Campbell Burgess and awarded to Mikkelsen as exemplary damages, if any, for the conduct found in response to Question 17?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to be considered in awarding exemplary damages, if any, are—

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of Campbell Burgess.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of Campbell Burgess.

Answer in dollars and cents, if any.

Answer: $__________________

**JUROR CERTIFICATE**

We, the jury, havef answered the above and foregoing questions as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

Patsy Bachman
PRESIDING JUROR

(To be signed by those rendering the verdict if not unanimous.)

# EXHIBIT 3

FILED
The 19 day of Aug 2015
At 1:55 o'clock p M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By [signature] Deputy

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| v. | § | WILBARGER COUNTY, TEXAS |
| HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS, | § | |
| Defendants. | § | 46TH JUDICIAL DISTRICT |

**ORDER DENYING MOTION FOR NEW TRIAL, FOR REMITTUR AND TO MODIFY, CORRECT AND/OR REFORM THE JUDGMENT**

CAME ON FOR HEARING on August 19, 2015 the Motion of Defendant/Counter-Plaintiffs Herring Bancorp, Inc., C. C. Burgess and C. Campbell Burgess for a New Trial, for Remittur, and to Modify, Correct and/or Reform the Judgment. The Court, having considered the Motion and the arguments of counsel, finds that the Motion should be DENIED.

It is so ORDERED.

SIGNED on the 19 day of Aug, 2015.

[signature]
Dan Mike Bird, Judge Presiding

P:\Mikkelsen\Pleadings\Order Denying New Trial.Doc

410410410410410

FILED
The 19 day of Aug 2015
At 1:55 o'clock p M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By [signature] Deputy

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust,<br><br>Plaintiff,<br><br>v.<br><br>HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br>WILBARGER COUNTY, TEXAS<br><br>46th JUDICIAL DISTRICT |

**ORDER DENYING DEFENDANTS/COUNTER-PLAINTIFFS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND ADDITIONAL MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT**

Came on for consideration Herring Bancorp, Inc., C.C. Burgess, and C. Campbell Burgess's Motion for Judgment Notwithstanding the Verdict and Additional Motion for Judgment Notwithstanding the Verdict (the "Motions"). The Court, having reviewed and considered the Motions, any related responses, and the arguments of counsel, is of the opinion that the Motions should be **DENIED**.

**IT IS THEREFORE ORDERED** that the Motion for Judgment Notwithstanding the Verdict is hereby **DENIED**.

**IT IS THEREFORE FURTHER ORDERED** that the Additional Motion for Judgment Notwithstanding the Verdict is hereby **DENIED**.

SIGNED this, the 19 day of Aug, 2015.

[signature]
HON. DAN MIKE BIRD, DISTRICT JUDGE

ORDER DENYING DEFENDANTS/COUNTER-PLAINTIFFS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND ADDITIONAL MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT—PAGE 1

410

# EXHIBIT 4

FILED
The 4 day of Aug 2011
At 9:00 o'clock A M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By [signature] Deputy

CAUSE NO. 24,955

| | | |
|---|---|---|
| JOHN MIKKELSEN, acting solely in his capacity as Trustee of the John Mikkelsen Trust, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| v. | § | WILBARGER COUNTY, TEXAS |
| HERRING BANCORP, INC.; C.C. BURGESS; and C. CAMPBELL BURGESS, | § | |
| Defendants. | § | 46TH JUDICIAL DISTRICT |

**ORDER**

Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") and Defendants' Cross-Motion for Summary Judgment ("Defendants' Motion") came on for hearing on April 18, 2011. The Court finds Plaintiff's Motion was timely filed and that notice of Plaintiff's Motion and the hearing thereon was duly and properly given. The Court also finds that Defendants' Motion was timely filed and served by agreement of the parties, and hereby grants leave to file and serve the Motion on less than 21-days' notice prior to the hearing. The Court also finds that Plaintiff's Response to Defendants' Motion was timely filed and served by agreement of the parties, and hereby grants Plaintiff leave to file and serve the Response and the evidence attached thereto, including discovery products, within seven days of the hearing. After considering Plaintiff's Motion and the Response thereto, and after considering Defendants' Motion and the Response thereto, and after considering the admissible summary judgment evidence and the arguments of counsel, the Court finds that Plaintiff's Motion should be granted and Defendants' Motion should be denied.

IT IS THEREFORE ORDERED that Defendants' Cross-Motion for Summary Judgment is denied in its entirety.

IT IS FURTHER ORDERED that Defendants' Special Exceptions and Plea in Abatement are overruled and denied.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is granted in all respects.

The Court further finds as a matter of law that (1) the purported redemption of Plaintiff's 300 shares of preferred stock of Herring Bancorp, Inc. (the "Company") was undertaken in violation of the Company's Articles of Incorporation and is void and (2) that Plaintiff is, and continues to be, the holder of 300 shares of the Company's preferred stock, and has all the rights appurtenant thereto, including the right to inspect the Company's books and records.

SIGNED on the 8 day of Aug, 2011.

Judge Presiding

Approved as to form:

Lee F. Christie, Counsel for Plaintiff

James W. Bowen, Counsel for Defendants

# EXHIBIT 5

FILED
In the Office of the
Secretary of State of Texas
DEC 1 9 1983
Clerk E
Corporations Section

# ARTICLES OF INCORPORATION
# OF
# HERRING BANCORP, INC.

I, the undersigned natural person of the age of eighteen (18) years or more, acting as an incorporator of a corporation (hereinafter called the "Corporation") under the Texas Business Corporation Act, do hereby adopt the following Articles of Incorporation for the Corporation:

## ARTICLE ONE: NAME

The name of the Corporation is Herring Bancorp, Inc.

## ARTICLE TWO: DURATION

The Corporation's period of duration is perpetual.

## ARTICLE THREE: PURPOSE

The purpose or purposes for which the Corporation is organized are:

(a) To act as a bank holding company;

(b) To transact any and all lawful business for which corporations may be incorporated under the Texas Business Corporation Act;

(c) To do each and every thing necessary, suitable, or proper for the accomplishment of any of the purposes or for the attainment of any one or more of the objects herein enumerated or which at any time appear conducive to or expedient for the protection or benefit of the Corporation.

The foregoing clauses shall be construed as powers as well as objects and purposes, and the matter expressed in each clause shall, unless herein otherwise expressly provided, be in nowise limited by reference to or inference from the terms of any other clause, but shall be regarded as independent objects, purposes and powers, and shall not be construed to limit or restrict in any manner the meaning of the general terms or the general powers of the Corporation.

## ARTICLE FOUR: STOCK

The Corporation is authorized to issue two classes of shares to be designated respectively "preferred" and "common." The total number of shares which the Corporation is authorized to issue is 125,000 shares. The number of

Defendants'
Exhibit
1

preferred shares authorized is 25,000 shares, and the par value of each such share is $95.00. The number of common shares authorized is 100,000 shares, and the par value of each such share is $20.00.

(a) The holders of the preferred shares shall be entitled to receive dividends, out of any funds legally available therefor, at the rate of ten percent (10.0%) per annum of the par value thereof, and no more, payable in cash semi-annually, or at such intervals as the Board of Directors may from time to time determine. Such dividends shall accrue from the date of issuance of the respective preferred shares and shall be deemed to accrue from day to day whether or not earned or declared.

Such dividends shall be payable before any dividends shall be paid, declared, or set apart for the common shares, and shall be cumulative so that if for any dividend period such dividends on the outstanding preferred shares at the rate of ten percent (10.0%) per annum of the par value thereof are not paid or declared and set apart therefor, the deficiency shall be fully paid or declared and set apart for payment, without interest, before any distribution, by dividend or otherwise, shall be paid on, declared, or set apart for the common shares.

(b) On any voluntary or involuntary liquidation of the Corporation, the holders of the preferred shares shall receive an amount equal to the par value of such shares plus any dividends declared and unpaid thereon, and no more, before any amount shall be paid to the holders of the common shares. If the assets of the Corporation should be insufficient to permit payment to the preferred shareholders of their full preferential amounts as herein provided, then such assets shall be distributed ratably among the outstanding preferred shares. Subject to such preferential rights, the holders of the common shares shall receive, ratably, all remaining assets of the Corporation. A consolidation or merger of the Corporation with or into any other corporation or a sale of all or substantially all of the assets of the Corporation shall not be deemed a liquidation, dissolution, or winding up of the Corporation within the meaning of this paragraph.

(c) The Corporation, at the option of the Board of Directors, may at any time redeem the whole, or from time to time redeem any part, of the preferred shares outstanding by paying in cash therefor the sum of $95.00 per share, plus all dividends declared but unpaid thereon as provided in this Article Four to and including the date of redemption, hereinafter referred to as the "redemptive price," and by giving to each preferred shareholder of record at his last known address, as shown on the records of the Corporation, at least twenty (20), but not more than fifty (50), days' prior notice personally or in writing, by mail, postage prepaid, stating the class or series or part of the class or series of shares to be redeemed and

HERR 000076

the date and plan of redemption, the redemptive price, and the place where the shareholders may obtain payment of the redemptive price on surrender of their respective share certificates, hereinafter called the "redemption notice." Should only a part of the outstanding preferred shares be redeemed, such redemption shall be effected by lot, or pro rata, as prescribed by the Board of Directors. On or after the date fixed for redemption, each holder of shares called for redemption shall surrender his certificate for such shares to the Corporation at the place designated in the redemption notice and shall thereupon be entitled to receive payment of the redemptive price. Should less than all the shares represented by any surrendered certificate be redeemed, a new certificate for the unredeemed shares shall be issued. If the redemption notice is duly given and if sufficient funds are available therefor on the date fixed for redemption, then, whether or not the certificates evidencing the shares to be redeemed are surrendered, all rights with respect to such shares shall terminate on the date fixed for redemption, except for the right of the holders to receive the redemption price, without interest, on surrender of their certificate therefor.

(d) If, on or prior to any date fixed for redemption of preferred shares as herein provided, the Corporation deposits with any bank or trust company in Texas, or any bank or trust company in the United States duly appointing and acting as transfer agent for the Corporation, as a trust fund, a sum sufficient to redeem, on the date fixed for redemption thereof, the shares called for redemption, with irrevocable instructions and authority to the bank or trust company to publish the notice of redemption thereof, or to complete such publication if theretofore commenced, and to pay, on and after the date fixed for redemption or prior thereto, the redemptive price of the shares to their respective holders on surrender of their share certificates, then from and after the date of the deposit, even though such date may be prior to the date fixed for redemption, the shares so called shall be deemed to be redeemed and dividends on those shares shall cease to accrue after the date fixed for redemption. The deposit shall be deemed to constitute full payment of the shares to their holders and from and after the date of the deposit, the shares shall be deemed to be no longer outstanding, and the holders thereof shall cease to be shareholders with respect to such shares and shall have no rights with respect thereto, except the right to receive from the bank or trust company payment of the redemptive price of the shares, without interest, on surrender of their certificates therefor.

(e) Shares redeemed by the Corporation shall be restored to the status of authorized but unissued shares of the Corporation.

(f) Except where otherwise provided in these Articles of Incorporation or by law, the holders of the common shares shall have the

HERR 000077

exclusive voting rights and powers, including the exclusive right to notice of shareholders' meetings.

## ARTICLE FIVE: PREEMPTIVE RIGHTS DENIED

No holder of any shares of common stock or preferred stock shall have any preemptive or preferential right to receive, purchase, or subscribe to (a) any unissued or treasury shares of any class of stock (whether now or hereafter authorized) of the Corporation, (b) any obligations, evidences of indebtedness, or other securities of the Corporation convertible into or exchangeable for, or carrying or accompanied by any rights to receive, purchase, or subscribe to, any such unissued or treasury shares, (c) any right of subscription to or right to receive, or any warrant or option for the purchase of, any of the foregoing securities, or (d) any other securities that may be issued or sold by the Corporation.

## ARTICLE SIX: COMMENCING BUSINESS

The Corporation will not commence business until it has received consideration for the issuance of its shares amounting to One Thousand Dollars ($1,000.00) in value and consisting of money, labor done, or property actually received.

## ARTICLE SEVEN: CUMULATIVE VOTING

Cumulative voting for the election of directors is prohibited.

## ARTICLE EIGHT: VOTING

Except where otherwise provided in these Articles of Incorporation or the bylaws of the Corporation, the holders of the common stock shall have the exclusive voting rights and powers, including the exclusive right to notice of shareholders' meetings.

## ARTICLE NINE: ADOPTION OF BYLAWS

The Board of Directors of the Corporation shall adopt the initial bylaws of the Corporation and may thereafter alter, amend, or repeal the bylaws of the Corporation or may adopt new bylaws, subject to the shareholders' concurrent right to alter, amend, or repeal the bylaws or to adopt new bylaws. The shareholders may provide that any or all bylaws altered, amended, repealed, or adopted by the shareholders shall not be altered, amended, reenacted, or repealed by the Board of Directors of the Corporation.

HERR 000078

## ARTICLE TEN: INTERESTED PARTIES

A contract or transaction between the Corporation and any other Person (as used herein the term "Person" means an individual, firm, trust, partnership, joint venture, association, corporation, political subdivision or instrumentality, or other entity) shall not be affected or invalidated by the fact that (a) any director, officer, or security holder of the Corporation is also a party to, or has a direct or indirect interest in, such contract or transaction; or (b) any director, officer, or security holder of the Corporation is in any way connected with such other Person or with any of its officers or directors.

Every person who may become a director of the Corporation is hereby relieved from any liability that might otherwise exist from contracting with the Corporation for the benefit of himself or of any Person in which he has any interest, whether or not the interested director's presence at a meeting or his vote or votes were necessary to obligate the Corporation in such transaction, if such interest shall have been disclosed to, or known to, the Corporation's directors or shareholders who shall have approved such transaction.

## ARTICLE ELEVEN: INDEMNIFICATION

Section A. The Corporation shall indemnify any person who was or is a party or is threatened with being made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (all such actions, suits, and proceedings and accompanying modifiers being comprehended by the term "Proceeding") (excluding actions by, or in the right of, the Corporation), by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another Person. Such indemnification may be made only against those expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding if (i) he is successful on the merits or otherwise; or (ii) he acted in the transaction which is the subject of the Proceeding in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Corporation, and, with respect to any criminal Proceeding, he had no reasonable cause to believe his conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interest of the Corporation, nor, with respect to any criminal Proceeding, that he had reasonable cause to believe that his conduct was unlawful.

Section B. The Corporation shall indemnify any person who was or is a party or is threatened with being made a party to a Proceeding by or in the right of the Corporation by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another Person. Such indemnification may be made against expenses (including attorneys' fees) actually and reasonably

incurred by such person in connection with the defense or settlement of such Proceeding if (i) he is successful on the merits or otherwise; or (ii) he acted in the transaction which is the subject of the Proceeding in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Corporation. However, no indemnification may be made in respect of any claim, issue, or matter in relation to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of his duty to the Corporation. Notwithstanding the foregoing exception, indemnification may be made to the extent that the court in which such Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnification for such expenses as the court of appropriate jurisdiction shall deem proper.

Section C. Any indemnification under Section A or Section B of this Article (other than one ordered by a court) may be made by the Corporation only upon a determination that indemnification of such person is proper in the circumstances because he has met the applicable standard of conduct set forth in such Section. Such determination shall be made by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such Proceeding; or, if such a quorum is not obtainable (or, even if obtainable, if a quorum of disinterested directors so directs), by independent legal counsel in a written opinion, or by the shareholders of the Corporation; or through such procedures as shall be authorized in the bylaws of the Corporation.

Section D. Expenses incurred in defending a civil or criminal Proceeding may be paid by the Corporation in advance of the final disposition of such Proceeding as authorized by the Board of Directors or other appropriate body or party in the manner provided in Section C of this Article only when the Corporation has received an undertaking by or on behalf of the person who is to receive such payment to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Corporation as authorized in this Article.

Section E. In determining whether the standard of conduct set forth in Section A or Section B has been met, it may be determined that a person has met the standard as to some matters but not as to others, and the amount of indemnification may be accordingly prorated.

Section F. The indemnification provided by Sections A through E shall not be exclusive of any other rights to which a person may be entitled by law, bylaw, agreement, vote of shareholders, or otherwise.

Section G. The indemnification provided by Sections A through E shall inure to the heirs, executors, and administrators of any person entitled to indemnification under this Article.

Section H. The Corporation may purchase and maintain insurance on any person who is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, or agent of

HERR 000080

another Person against any liability incurred by him in any such position, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under Sections A through E.

## ARTICLE TWELVE: REPURCHASE OF STOCK

The Corporation is authorized to purchase, directly or indirectly, its own shares to the extent of the aggregate of the unrestricted capital surplus and unrestricted reduction surplus available therefor, without submitting such purchase to a vote of the shareholders of the Corporation.

## ARTICLE THIRTEEN: AUTHORITY TO BORROW

The Board of Directors is expressly authorized, without the consent of the stockholders, except so far as such consent is herein or by law provided, to issue and sell or otherwise dispose of, for any purpose, the Corporation's bonds, debentures, notes or other securities or obligations, upon such terms and for such consideration as the Board of Directors shall deem advisable and to authorize and cause to be executed mortgages, pledges, charges and liens upon all or part of the real and personal property rights, interest and franchise of the Corporation, including contract rights, whether at the time owned or thereafter acquired.

## ARTICLE FOURTEEN: INITIAL OFFICE AND AGENT

The address of the initial registered office of the Corporation is 1900 Pease Street, Vernon, Texas, and the name of its initial registered agent at such address is H. W. Dozier.

## ARTICLE FIFTEEN: INITIAL DIRECTORS

The number of directors constituting the initial Board of Directors of the Corporation is five and the names and addresses of the persons who are to serve as directors until the first annual meeting of shareholders, or until their respective successors are elected and qualified, are:

| NAME | ADDRESS |
|---|---|
| Robert Belew | 2603 Mansard Street<br>Vernon, Texas 76384 |
| C. C. Burgess | Suite 1000<br>Amarillo National Bank Bldg.<br>Amarillo, Texas 79101 |
| H. W. Dozier | 1102 Hillcrest Drive<br>Vernon, Texas 76384 |

| NAME | ADDRESS |
| --- | --- |
| Curtis D. Johnson | 2230 Hilltop<br>Vernon, Texas 76384 |
| John Mikkelsen | 2801 Gordon Street<br>Vernon, Texas 76384 |

ARTICLE SIXTEEN: INCORPORATOR

The name and address of the incorporator is:

| NAME | ADDRESS |
| --- | --- |
| Tonia T. Kittelson | 4700 InterFirst Two<br>Dallas, Texas 75270 |

IN WITNESS WHEREOF, I have executed this document as of the 16th day of December, 1983.

Tonia T. Kittelson

Tonia T. Kittelson

STATE OF TEXAS §
§
COUNTY OF DALLAS §

I, Jenay K Goebel, a Notary Public, hereby certify that on this 16th day of December 1983, personally appeared before me Tonia T. Kittelson, who, being first duly sworn by me, declared that he is the person who signed the foregoing document as incorporator and that the statements contained therein are true.

JENAY K GOEBEL, Notary Public
in and for the State of Texas
My commission expires Feb 19, 1986

Jenay K Goebel

Notary Public in and for Texas

# EXHIBIT 6



# HERRING BANCORP, INC.

C. C. Burgess
*Chairman of the Board*

## Notice of Redemption

*2201 Civic Circle, Suite 1001*
*Amarillo, TX 79109*
*P. O. Box 9900*
*Amarillo, TX 79105-5900*

*(806) 373-3921 Phone*
*(806) 372-8230 Fax*
*ccburgess@herringbank.com*

October 31, 2006

Dear Preferred Stock Shareholder:

This letter is to notify you that the board of directors (the "Board") of Herring Bancorp, Inc. (the "Company") has called for the redemption (the "Redemption") of your outstanding shares of Preferred Stock (the "Preferred Stock") of the Company on November 20, 2006.

As you know on July 26, 2006, our Board approved taking the necessary acts for the Company to become an "S corporation" under the Internal Revenue Code of 1986, as amended. In order to become eligible to make the Subchapter S election, the Company is only allowed to have one class of outstanding capital stock, and voting rights between shares of stock are disregarded for determining whether a company has more than one class of stock. At the current time, the Company has a number of outstanding classes of stock, which include your Preferred Stock shares, as well as Class A Nonvoting Common Stock, Class A-Series 2 Nonvoting Common Stock, and Class B Nonvoting Common Stock (collectively, the "Nonvoting Shares"). Therefore, we must currently consolidate our Nonvoting Shares into one class. The Class A Nonvoting Common Stock and the Class B Nonvoting Common Stock will be allowed to exchange their shares for Common Stock-Series A, and the Class A-Series 2 Nonvoting Common Stock will be converted into a subordinated debenture. As a result of this process, the Board appointed a committee to recommend the criteria for determining which Preferred Stock shareholders would be offered to exchange their shares for the Company's common stock (the "Common Stock"), the nonvoting Common Stock-Series A (the "Common Stock-Series A") or to have their shares redeemed. The Board's criteria for making this determination included whether the Preferred Stock shareholder had a banking relationship with Herring Bank (the "Bank"), and whether they would own at least 50 shares of Common Stock upon the conversion. If these criteria were met, the Board offered the Preferred Stock shareholders the option to exchange their shares for the Common Stock. If the Preferred Stock shareholder did not meet these criteria, the Board determined the Preferred Stock shareholders would be redeemed. Additionally, if the Preferred Stock shareholder did not have a banking relationship with the Bank, we would offer them the option of either exchanging their shares for the nonvoting Common Stock-Series A or having their shares redeemed. From our

conversations with you and the Board's determinations regarding our classes of stock, your Preferred Stock will be redeemed.

The Redemption will take place after 5:00 p.m. on November 20, 2006 (the "Redemption Date"). The price to be paid for each share of Preferred Stock will be $95.00 per share, plus an amount equal to all dividends accrued and unpaid thereon, whether or not declared, pro rata to the date fixed for the redemption (the "Redemptive Price"). As a result of the Redemption, the Company will pay you $95.00, in cash, for the shares of Preferred Stock you hold that will be redeemed.

Prior to or at the open of business after 5:00 p.m. on November 20, 2006, the Company will deposit with Herring Bank, Amarillo, Texas (hereinafter the "Transfer Agent"), as a trust fund, an amount necessary to pay the aggregate Redemptive Price, together with irrevocable instructions and authority to the Transfer Agent to pay, on or after the Redemption Date, the Redemptive Price to the holders of the Preferred Stock upon the Transfer Agent's receipt of the duly surrendered certificates representing their Preferred Stock. As a result of the Company's deposit of funds with the Transfer Agent, you will cease to be a holder of shares of Preferred Stock as of the Redemption Date and will only be entitled to the receipt of the Redemptive Price.

In order to receive the Redemptive Price, you should deliver to the Transfer Agent the following: (i) a duly executed Letter of Transmittal, a copy of which is enclosed herewith, and (ii) the stock certificate(s) representing your shares of Preferred Stock. The address of the Transfer Agent is Herring Bank, P.O. Box 9900, Amarillo, Texas 79105. The telephone number of the Transfer Agent is (806) 355-0153.

Please follow carefully the Instructions to the Letter of Transmittal when completing it. Assuming the Transfer Agent receives the applicable documents from you prior to the Redemption Date (and assuming there is no problem with these documents), the Transfer Agent will hold them in escrow for you until the Redemption Date, at which time you will receive payment for your shares. The Company will pay the Redemptive Price by check of same day funds. Please refer to the Letter of Transmittal provided herewith for further instructions on how to surrender certificates and receive delivery of the Redemptive Price.

You may obtain additional copies of the Letter of Transmittal from the Company. Also, if any of your Preferred Stock certificates have been lost, stolen or misplaced, or if any of your shares are pledged or encumbered, you will need to make additional arrangements in order to receive the Redemptive Price for your shares. Please contact the Transfer Agent for further details.

Assuming that the Transfer Agent has received these documents from you on or before 5:00 p.m. on November 20, 2006 (and that there are no problems with your documents), you will be able to receive payment for your shares on the Redemption Date. You may pick up your check on the Redemption Date at Herring Bank, 2201 Civic Circle, Amarillo, Texas during regular business hours. If you will not be available to pick up your check in person at that time, please contact the Transfer Agent so that you can arrange an alternate method of delivery of the Redemptive Price for your Preferred Stock. If you do not pick up your check on the Redemption Date or contact the Transfer Agent to make other arrangements, the Transfer Agent will mail your check to you at the close of business on the Redemption Date. If your documents are not in order so that your check is not available on the Redemption Date, your check will be mailed to you as soon as possible after your documents are received and approved.

Please remember that the Redemption of your Preferred Stock may be a taxable transaction for federal income tax purposes. There also may be state, local or foreign income or other tax consequences to the Redemption. You should consult your own tax advisor to determine the precise tax consequences of this transaction.

If you should have any questions in connection with any aspect of this letter, please feel free to call C.C. Burgess at (806) 373-3921.

Very truly yours,

HERRING BANCORP, INC.

C.C. Burgess

C.C. Burgess
Chairman of the Board

# EXHIBIT 7

1L 00 000000 200729 068750 7525 79109 IRS USE ONLY 29953-593-01343-7 A0081993 261 751922006 SB S

Department of the Treasury
Internal Revenue Service
P.O. BOX 249
MEMPHIS, TN 38101-0249

For assistance, call:
1-800-829-0115

**Notice Number:** CP261
**Date:** July 30, 2007

**Taxpayer Identification Number:**
75-1922006
**Tax Form:**
**Tax Period:**

051880.406213.0215.005 1 AB 0.341 530

HERRING BANCORP INC
2201 CIVIC CIR
AMARILLO TX 79109-1817016

051880

## Notice of Acceptance as an S Corporation

We have accepted your election to be treated as an S corporation beginning January 1, 2007. Your accounting period will end in December.

We would also like to take this opportunity to inform you of your tax obligations related to the payment of compensation to shareholder-employees of S corporations

When a shareholder-employee of an S corporation provides services to the S corporation, reasonable compensation generally needs to be paid. This compensation is subject to employment taxes.

Tax practitioners and subchapter S shareholders need to be aware that Revenue Ruling 74-44 states that the Internal Revenue Service (IRS) will re-characterize small business corporation dividends paid to shareholders as salary when such dividends are paid to the shareholders in lieu of reasonable compensation for services

The IRS may also re-characterize distributions other than dividend distributions as salary. This position has been supported in several recent court decisions

If you have any questions about this notice or the action we have taken, please call us at the telephone number listed above. If you prefer, you may write to us at the address shown at the top of this notice. If you write to us, please provide your telephone number and the most convenient time for us to call so we can resolve your inquiry. ~~Please return the bottom part~~ of this notice to help us identify your case.

For tax forms, instructions and information visit www.irs.gov. (Access to this site will not provide you with your specific taxpayer account information.)



Seq. No.: A0087995 CP: 261
TIN: 75-1922006 Form: Tax Period:

051880

CUT HERE

Return this voucher with your payment or correspondence.

Your Telephone Number: ( )_____-__________

Best Time to Call: _____AM_____PM

☐ Correspondence enclosed:
- Write your Taxpayer Identification Number, tax period and tax form number on your inquiry or correspondence

SB 200729 29953-593-01343-7

261 Internal Revenue Service
P.O. BOX 249
MEMPHIS, TN 38101-0249

HERRING BANCORP INC
2201 CIVIC CIR
AMARILLO TX 79109-1817016

751922006 IL HERR 00 2 000000

# EXHIBIT 8



# HERRING BANCORP, INC.

C. C. Burgess
*Chairman of the Board*

October 30, 2013

**Notice of Redemption**

John Mikkelsen and John Mikkelsen Trust
c/o Lee Christie
POPE, HARDWICKE, CHRISTIE, SCHELL, KELLY & RAY, LLP
306 West 7th Street, Suite 901
Fort Worth, TX 76102

*Via Overnight Mail*

Dear Preferred Stock Shareholder:

This letter is to notify you that the Board of Directors (the "Board") of Herring Bancorp, Inc. (the "Company") has called for the redemption (the "Redemption") of all shares of Preferred Stock (the "Preferred Stock") of the Company on November 22, 2013.

The Redemption will take place after 3:00 p.m. on November 22, 2013 (the "Redemption Date"). The price to be paid for each share of Preferred Stock will be $95.00 per share, plus an amount equal to all dividends accrued and unpaid thereon, whether or not declared, pro rata to the date fixed for the redemption (the "Redemptive Price"). As a result of the Redemption, the Company will pay you $95.00, in cash, for the shares of Preferred Stock you hold that will be redeemed.

Please remember that the Redemption of your Preferred Stock may be a taxable transaction for federal income tax purposes. There also may be state, local or foreign income or other tax consequences to the Redemption. You should consult your own tax advisor to determine the precise tax consequences of this transaction.

If you should have any questions in connection with any aspect of this letter, please feel free to call C.C. Burgess at (806) 373-3921.

Very truly yours,

HERRING BANCORP, INC.

C.C. Burgess
Chairman of the Board

DEPOSITION EXHIBIT 14

Defendants' Exhibit 33

*2201 Civic Circle, Suite 1001, Amarillo, TX 79109*
*P.O. Box 9900, Amarillo, TX 79105-5900*
*(806) 373 3921 Phone (806) 372.8230 Fax*
*ccburgess@herringbank.com*



# HERRING BANCORP, INC.

C. C. Burgess
*Chairman of the Board*

October 30, 2013

**Notice of Redemption**

Mallory Mikkelsen
c/o Lee Christie
POPE, HARDWICKE, CHRISTIE, SCHELL, KELLY & RAY, LLP
306 West 7th Street, Suite 901
Fort Worth, TX 76102

*Via Overnight Mail*

Mallory Mikkelsen
3912 Winter Park Road
Addison, Texas 75001

*Via Overnight Mail*

Dear Preferred Stock Shareholder:

This letter is to notify you that the Board of Directors (the "Board") of Herring Bancorp, Inc. (the "Company") has called for the redemption (the "Redemption") of all shares of Preferred Stock (the "Preferred Stock") of the Company on November 22, 2013.

The Redemption will take place after 3:00 p.m. on November 22, 2013 (the "Redemption Date"). The price to be paid for each share of Preferred Stock will be $95.00 per share, plus an amount equal to all dividends accrued and unpaid thereon, whether or not declared, pro rata to the date fixed for the redemption (the "Redemptive Price"). As a result of the Redemption, the Company will pay you $95.00, in cash, for the shares of Preferred Stock you hold that will be redeemed.

Please remember that the Redemption of your Preferred Stock may be a taxable transaction for federal income tax purposes. There also may be state, local or foreign income or other tax consequences to the Redemption. You should consult your own tax advisor to determine the precise tax consequences of this transaction.

If you should have any questions in connection with any aspect of this letter, please feel free to call C.C. Burgess at (806) 373-3921.

Very truly yours,

HERRING BANCORP, INC.

C.C. Burgess
Chairman of the Board

*2201 Civic Circle, Suite 1001, Amarillo, TX 79109*
*P.O. Box 9900, Amarillo, TX 79105-5900*
*(806) 373.3921 Phone (806) 372.8230 Fax*
*ccburgess@herringbank.com*



# EXHIBIT 9



# HERRING BANCORP, INC.

C. C. Burgess
*Chairman of the Board*

November 22, 2013

John Mikkelsen Trust
c/o Lee Christie
Pope, Hardwicke, Christie, Schell, Kelly & Ray, LLP
306 West 7th Street, Suite 901
Fort Worth, Texas 76102

Mallory Mikkelsen
c/o Lee Christie
Pope, Hardwicke, Christie, Schell, Kelly & Ray, LLP
306 West 7th Street, Suite 901
Fort Worth, Texas 76102

Mallory Mikkelsen
3912 Winter Park Road
Addison, Texas 75001

Dear Mr. John Mikkelsen and Mr. Mallory Mikkelsen:

Herring Bancorp, Inc. is making the following unconditional tender in the amount of $115,548.24 ("Tender Amount"). The Tender Amount is calculated as follows and is shown on the attached worksheet:

| | | |
|---|---|---|
| **Preferred Stock Redemption Price** | | **$28,500.00** |
| [$95/share X 300 shares] | | |
| **Unpaid Dividends** | | **$21,070.48** |
| [($95/share X 300 shares) X 10%] ÷ 365 = $7.80/day | | |
| Unpaid for 2006 Prior to November 21, 2006 | $1,112.67 | |
| November 21, 2006 – December 31, 2006 | $ 312.33 | |
| (40 Days X $7.80) | | |
| January 1, 2007 – December 31, 2007 | $2,850.00 | |
| January 1, 2008 – December 31, 2008 | $2,850.00 | |
| January 1, 2009 – December 31, 2009 | $2,850.00 | |
| January 1, 2010 – December 31, 2010 | $2,850.00 | |
| January 1, 2011 – December 31, 2011 | $2,850.00 | |
| January 1, 2012 – December 31, 2012 | $2,850.00 | |
| January 1, 2013 – November 22, 2013 | $2,545.48 | |
| (326 Days X $7.80) | $21,070.48 | |

Defendants'
Exhibit
35

*2201 Civic Circle, Suite 1001, Amarillo, TX 79109*
*P.O. Box 9900, Amarillo, TX 79105-5900*
*(806) 373.3921 Phone (806) 372.8230 Fax*
*ccburgess@herringbank.com*

| | |
|---|---|
| **Interest** | **$15,977.76** |
| [5% per annum from the date due, compounded annually] | |
| **Attorney's Fees** | **$50,000.00** |
| [Billing Statements Produced in the Lawsuit plus an additional amount] | |
| **TOTAL** | **$115,548.24** |

We are enclosing a cashier's check made payable to the order of John Mikkelsen Trust and Mallory Mikkelsen. The actual check is being placed in the envelope delivered to Mr. Christie.

Very truly yours,

HERRING BANCORP, INC.

C.C. Burgess

Chairman of the Board

Preferred Redemption

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rate | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | | |
| Days | | | 40 | | | | | | | 326 | | |
| | | | Int 2006 | Int 2007 | Int 2008 | Int 2009 | Int 2010 | Int 2011 | Int 2012 | Int 2013 | Total | Total Int |
| Preferred Stock | | 28,500.00 | 156.16 | 1,432.81 | 1,504.45 | 1,579.67 | 1,658.65 | 1,741.59 | 1,828.67 | 1,714.94 | 40,116.94 | 11,616.94 |
| Dividends | Days | | | | | | | | | | | |
| January 1, 2006- December 31, 2006 | | 2,850.00 | | | | | | | | | | |
| Less November 21, 2006-December 31, 2006 | | (312.33) | | | | | | | | | | |
| Less paid Distributions Paid | | (1,425.00) | | | | | | | | | | |
| Unpaid 2006 | | 1,112.67 | 27.82 | 57.02 | 59.88 | 62.87 | 66.01 | 69.31 | 72.78 | 68.25 | 1,596.61 | 483.94 |
| November 21, 2006-December 31, 2006 | 40 | 312.33 | 1.71 | 15.70 | 16.49 | 17.31 | 18.18 | 19.09 | 20.04 | 18.79 | 439.64 | 127.31 |
| January 1, 2007- December 31, 2007 | | 2,850.00 | | 71.25 | 146.06 | 153.37 | 161.03 | 169.09 | 177.54 | 166.50 | 3,894.84 | 1,044.84 |
| January 1, 2008- December 31, 2008 | | 2,850.00 | | | 71.25 | 146.06 | 153.37 | 161.03 | 169.09 | 158.57 | 3,709.37 | 859.37 |
| January 1, 2009- December 31, 2009 | | 2,850.00 | | | | 71.25 | 146.06 | 153.37 | 161.03 | 151.02 | 3,532.73 | 682.73 |
| January 1, 2010- December 31, 2010 | | 2,850.00 | | | | | 71.25 | 146.06 | 153.37 | 143.83 | 3,364.51 | 514.51 |
| January 1, 2011- December 31, 2011 | | 2,850.00 | | | | | | 71.25 | 146.06 | 136.98 | 3,204.29 | 354.29 |
| January 1, 2012- December 31, 2012 | | 2,850.00 | | | | | | | 71.25 | 130.46 | 3,051.71 | 201.71 |
| January 1, 2013- November 22, 2013 | 326 | 2,545.48 | | | | | | | | 92.12 | 2,637.60 | 92.12 |
| Distributions | | 21,070.48 | 29.53 | 143.97 | 293.68 | 450.86 | 615.90 | 789.20 | 971.16 | 1,066.52 | 25,431.30 | 4,360.82 |
| Legal Fees | | 50,000.00 | | | | | | | | | 50,000.00 | |
| Total | | | | | | | | | | | 115,548.24 | 15,977.76 |

| | Summary |
|---|---|
| Preferred Redemption | 28,500.00 |
| Unpaid Dividends | 21,070.48 |
| Legal | 50,000.00 |
| 5% interest from 11-21-2006 | 15,977.76 |
| | 115,548.24 |

HERR_3281

# CASHIER'S CHECK - CUSTOMER COPY

MA3 November 22, 2013 **120987**

Purchaser: HERRING BANCORP **$115,548.24**

MIKKELSEN

# NON NEGOTIABLE

PAY TO THE ORDER OF:

JOHN MIKKELSEN TRUST AND MALLORY MIKKELSEN

Notice to Customer
If this check is lost, destroyed, or stolen, the bank will not accept a replacement request on the check until 90 days after the issue date and then only with the issuance of a "Declaration of Loss" certification.

WARNING: THIS DOCUMENT CONTAINS MULTIPLE SECURITY FEATURES. READ REVERSE SIDE FOR FULL DISCLOSURE.

## CASHIER'S CHECK

HERRING BANK
Member FDIC
2201 Civic Circle • Amarillo, TX • 79109
(806) 677-7000

Notice to Customer
If this check is lost, destroyed, or stolen, the bank will not accept a replacement request on the check until 90 days after the issue date and then only with the issuance of a "Declaration of Loss" certification.

MA3 November 22, 2013 **120987**

Purchaser: HERRING BANCORP **$115,548.24**

MIKKELSEN

One Hundred Fifteen Thousand Five Hundred Forty Eight Dollars And 24/100*************

PAY TO THE ORDER OF: JOHN MIKKELSEN TRUST AND MALLORY MIKKELSEN

Must have 2 signatures

Authorized Signature

THIS AREA CONTAINS A DISAPPEARING BACKGROUND. RUB TO AUTHENTICATE.

⑈120987⑈ ⑆111302846⑆ ⑈7045328⑈

# EXHIBIT 10

If you answered "Yes" to Question No. 1, then answer Question No. 2. Otherwise, proceed to Question No. 4.

**QUESTION NO. 2**

Did Herring Bancorp. make a full tender to John Mikkelsen on November 22, 2013?

You are instructed that a full tender is an unconditional offer by Herring Bancorp., the debtor, to pay John Mikkelsen, the creditor, a sum of money not less than the sum due Mikkelsen at the time the tender is made.

Answer "Yes" or "No"

Answer:____________

**Authority:** *Jensen v. Covington,* 234 S.W.3d 198, 206 (Tex. App.–Waco 2007, pet denied)(citing *Baucum v. Great Am. Ins. Co.,* 370 S.W.2d 863, 866 (Tex. 1963)); *Staff Indus., Inc. v. Hallmark Contracting, Inc.,* 846 S.W.2d 542 (Tex. App.–Corpus Christi 1993, no writ).

Given ☐ Given as modified ☐ Refused ☑

1/30/15
Date

Honorable Dan Mike Bird
46th District Court Judge

FILED
The 30 day of Jan 2015
At 3:00 o'clock P M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By [signature] Deputy

261261261261261261

If you answered "Yes" to Question No. 1, then answer Question No. 2. Otherwise, proceed to Question No. 4.

## QUESTION NO. 2

Did Herring Bancorp. make a full tender to John Mikkelsen on November 22, 2013?

You are instructed that a full tender is an unconditional offer by Herring Bancorp., the debtor, to pay John Mikkelsen, the creditor, a sum of money not less than the sum due Mikkelsen at the time the tender is made.

Answer "Yes" or "No"

Answer:____________

**Authority:** *Jensen v. Covington,* 234 S.W.3d 198, 206 (Tex. App.–Waco 2007, pet denied)(citing *Baucum v. Great Am. Ins. Co.,* 370 S.W.2d 863, 866 (Tex. 1963)); *Staff Indus., Inc. v. Hallmark Contracting, Inc.,* 846 S.W.2d 542 (Tex. App.–Corpus Christi 1993, no writ).

Given ☐ Given as modified ☐ Refused ☑

1/30/15
Date

FILED
The 30 day of Jan 2015
At 3:00 o'clock P M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By [signature] Deputy

[signature]
Honorable Dan Mike Bird
46th District Court Judge

DEFENDANTS' FIRST AMENDED PROPOSED CHARGE, QUESTIONS, AND INSTRUCTIONS WITH ANNOTATIONS PAGE 9 OF 26
L:\Terri\Herring Bank-5998\Pleadings\Jury Charge1a.wpd

261

If you answered "No" to Question No. 2, then answer Question No. 3. Otherwise, do not answer Question No. 3.

## QUESTION NO. 3

Do you find that all sums due to John Mikkelsen under the Articles of Incorporation have been tendered or paid in full by Herring Bancorp?

Answer "Yes" or "No"

Answer:_____________

**Authority:** *See Pierce v. Baker,* 238 S.W. 699, 699 (Tex. Civ. App.–Texarkana 1922, no writ).

Given ☐ Given as modified ☐ Refused ☒

1/30/15
Date

FILED
The 30 day of Jan 2015
At 3:00 o'clock P M: o'clock
Brenda Peterson
Clerk Dist. Court Wilbarger Co.
By [signature] Deputy

[signature]
Honorable Dan Mike Bird
46th District Court Judge

# Exhibit 11

## TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

**NO. 03-13-00080-CV**

**Appellants, Central Austin Apartments, LLC; UP-32nd Street, LLC; and UP-32nd Street Hospitality, LLC// Cross-Appellants, East Avenue Property Owners' Association, Inc. and UP Austin Holdings, LP and UP Austin Land Holdings, LP**

**v.**

**Appellees, UP Austin Holdings, LP; UP Austin Land Holdings, LP; and East Avenue Property Owners' Association, Inc.// Cross-Appellees, Central Austin Apartments, LLC; UP-32nd Street, LLC; and UP-32nd Street Hospitality, LLC**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT**
**NO. D-1-GN-11-003367, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

### MEMORANDUM OPINION

The principal issue in this case is whether East Avenue Property Owners' Association, Inc. (the POA) had authority to levy a special assessment to complete basic infrastructure for a multi-million dollar property development that the original developer abandoned after becoming insolvent before the infrastructure was finished. The POA issued a $2.99 million special assessment to complete part of the essential infrastructure work, which was then allocated to the property owners pro rata based on property value. UP Austin Holdings, LP, which at that time owned one of the few developed lots in the project, and UP Austin Land Holdings, LP, a related entity that owned several undeveloped lots (collectively, UP Austin), sued for a declaration that the assessment was invalid and void and sought appointment of a receiver for the POA. *See* Tex. Bus.

Orgs. Code § 11.404 (appointment of receiver for domestic entity). UP Austin also sued other property owners who had voted to approve the assessment—Central Austin Apartments, LLC (CAA), UP-32nd Street, LLC (the Owner Declarant), and UP-32nd Street Hospitality, LLC (Hospitality) (collectively, the Owners)—seeking damages and attorney's fees under a minority-oppression theory.

Following a bench trial, the trial court (1) concluded that the POA lacked the power and authority, under the development's amended Covenants, Conditions, and Restrictions (Amended CCRs), to levy assessments for construction of original subdivision infrastructure and that the special assessment was therefore *ultra vires* and void *ab initio*; (2) nullified two subsequent amendments to the Amended CCRs and permanently enjoined the Owner Declarant from further amending the CCRs to increase its voting power or extend its control period without UP Austin's prior consent; (3) declined to appoint a receiver for the POA because nullifying the Amended CCRs and issuing a related permanent injunction were adequate alternative remedies; (4) found that the Owners oppressed UP Austin by using their control of the POA to levy the special assessment; (5) found that the Owner Declarant oppressed UP Austin with respect to the second and third amendments to the CCRs; and (6) denied UP Austin's request for prejudgment attorney's fees but conditionally granted UP Austin post-judgment and appellate attorney's fees. The trial court further denied (1) UP Austin's requests for actual and exemplary damages, (2) the POA's counterclaims to compel payment of the special assessment and for attorney's fees, and (3) the Owners' counterclaim for attorney's fees and cross-claims for reimbursement of the sums they had paid to the POA pursuant to the void special assessment. All of the parties challenge the trial court's judgment in numerous

respects, but they predominantly challenge the invalidation of the special assessment and the award and denials of attorney's fees. We will affirm in part, reverse and render in part, and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

The dispute in this case involves a multi-million dollar mixed-use redevelopment plan for the former Concordia University campus in Austin, Texas. In 2007, 2008, and 2009, the Austin City Council approved three site plan components of a planned unit development (PUD) for the site, which was then known as East Avenue and is now called University Park. A PUD is intended for large or complex developments that are under unified control and are planned as a single continuous project.[2] Once a unified site plan has been approved, the City will not issue permits or a permanent certificate of occupancy (CO) to any lot owner within the subdivision until all requirements of the unified site plan are satisfied, in addition to requirements specific to each

---

[1] The complicated factual and procedural background of this case is well known to the parties and will not be repeated at length in this opinion.

[2] The City of Austin's frequently-asked-planning-questions page explains,

> A [PUD] is intended for large or complex developments under unified control planned as a single continuous project, to allow single or multi-use projects within its boundaries and provide greater design flexibility for development proposed within the PUD. Use of a PUD district should result in development superior to that which would occur using conventional zoning regulations. PUD zoning is appropriate if the PUD enhances preservation of the natural environment; encourages high quality and innovative design and ensures adequate public facilities and services for development within the PUD.

austintexas.gov website (http://www.austintexas.gov/faq/planned-unit-development-pud-what-it) (accessed Oct. 30, 2014).

owner's individual lot. Until permanent COs are issued, temporary COs may be periodically issued if certain requirements are met.

After the PUD was approved, the original developer, East Avenue IG LP, organized the POA, enacted the Bylaws and original CCRs, and was named the "declarant" in the CCRs. The CCRs allow the declarant to exercise control over the direction and processes of the subdivision and POA until a time certain (the Declarant Control Period), at which point control will transition to the POA. The Declarant Control Period afforded East Avenue IG an opportunity to complete construction of the project and its infrastructure and amenities while protecting its investment in the development, which is typical and anticipated for the development of a PUD. Indeed, it is undisputed that the developer intended to fully fund and complete the original subdivision infrastructure for the University Park development. Unfortunately, East Avenue IG became insolvent before completing a significant portion of the essential infrastructure—including streets, drainage, sidewalks, and utilities—and without posting adequate fiscal security with the City of Austin to ensure its completion.

When the original developer pulled out, the development consisted of several individually owned condominium units, an office building on Lot 4 that was operating under a temporary CO (Lot 4), partially completed infrastructure, and several undeveloped lots. The cost to complete critical infrastructure was estimated to be $5.5 million.

On January 29, 2010, a series of transactions were consummated in which (1) the CCRs were amended to assign the declarant's rights and obligations to the Owner Declarant (the

Amended CCRs),[3] (2) several lots were transferred to the POA along with existing construction permits and materials, and (3) several undeveloped commercial lots were acquired by the Owner Declarant, CAA, and Hospitality, entities that were affiliated with Cypress Real Estate Advisors, Inc. (Cypress).[4] As part of the asset transfer, East Avenue assigned to the POA "[a]ll of [its developer's] rights pertaining to development of [the common area lots transferred to the POA] arising under Governmental Approval [permits, PUD ordinance, site plans, etc.] relating to or concerning all [or] any portion of the land." The sale of property to the Owners was "a transfer of assets only and no liabilities or obligations." In purchase and sale documents, the Owners also expressly disclaimed any responsibility for the sellers' general obligations, and correspondingly, the sellers warranted that they had not made any commitments to third parties that would obligate the Owners "to construct, install, or maintain any improvements . . . on or off [the land conveyed to the Owners]." Contemporaneously with the sales transactions, principals or persons affiliated with Cypress became Board members of the POA.[5]

Following the preceding transactions, Lot 4 remained in the hands of an entity affiliated with the original developer. In June 2010, however, the lender foreclosed on Lot 4 and

---

[3] Under section 9.06 of the original CCRs and the Amended CCRs, the declarant "may, by written instrument, assign, in whole or in part, any of its privileges, exemptions, rights and duties under this Declaration to any person or entity and may permit the participation, in whole, in part, exclusively, or non-exclusively, by any other person or entity in any of its privileges, exemptions, rights and duties [under the CCRs]."

[4] According to the record, Cypress, a non-party, manages a real-estate investment fund under which the Owners are organized.

[5] Under the Amended CCRs, the Owner Declarant has "the absolute right to appoint members of the Board" during the Declarant Control Period, which lasts at least until December 31, 2020, but may assign or delegate its rights and powers to the POA, the board, or any other entity.

subsequently paid more than $370,000 to complete remaining infrastructure in common areas adjacent to that lot. The following year, UP Austin acquired Lot 4 from the lender. At the time of its acquisition, UP Austin knew that the Lot 4 office building lacked a permanent CO, that site-specific infrastructure was required for it to obtain a permanent CO, and that other infrastructure not directly benefiting Lot 4 was required under the site plan. Subsequent to the Lot 4 transaction, UP Austin also procured additional undeveloped lots in the University Park development.

The foregoing transactions resulted in fragmented ownership of property subject to site plans for a PUD, which might be described colloquially as an "all for one, one for all" endeavor. The resulting lack of unified control, coupled with the divergent and intertwined interests of the property owners, is the genesis of the underlying lawsuit, which principally concerns the various parties' rights and obligations with respect to completing the infrastructure required under the approved site plans.[6]

Both before and after UP Austin acquired its interests in University Park, the property owners engaged in negotiations in an attempt to find a solution to their mutual infrastructure problems. Due to issues about correlative rights, obligations, and needs, the property owners reached what appeared to be an impasse as to the means, manner, and timing of funding and completing the outstanding infrastructure. Due to the apparent stalemate, the POA, purporting to exercise its assessment power under the Amended CCRs, levied a $2.99 million special assessment to complete some of the outstanding infrastructure, much of which was offsite or partially offsite in the public

[6] For example, UP Austin cannot obtain a permanent CO for the Lot 4 office building without construction of a water-quality pond on Lot 1, which is owned by CAA and is not within the common area.

right-of-way assessment and did not include some of the work necessary for UP Austin to obtain a permanent CO for Lot 4.[7]

The Owners all voted in favor of the assessment, and UP Austin opposed it.[8] In accordance with the assessment formula provided in the Amended CCRs, the special assessment was then allocated pro rata to each lot owner based on each lot's appraised value.[9] Because UP Austin owned the only lot that had been commercially developed, this formula resulted in $1.65 million of the special assessment (55%) being allocated to UP Austin, which owned only 27% of the non-exempt acreage. With respect to Lot 4 specifically, that tract represented less than 10% of the non-

---

[7] The POA had previously issued a more limited special assessment that precipitated the initial lawsuit filing, but that assessment was amended in December 2011, and it is the amended assessment that is presently at issue. Neither a regular nor special assessment had ever been levied by the POA prior to the disputed special assessment.

[8] As the declarant under the Amended CCRs, the Owner Declarant had enough voting power to approve the special assessment without the agreement of any other member. The trial court found, however, that CAA, Hospitality, the Owner Declarant, and the POA were under common control by Cypress or individuals associated with Cypress and therefore concluded that they acted collusively with one another to approve the special assessment.

[9] The Amended CCRs provide the following formula for allocating a special assessment among the property owners:

> The Declarant, for each Lot owned within the Property, hereby covenants, and each Owner by acceptance of a deed to a Lot (but excluding Common Area Lots) . . . is deemed to covenant and agree to pay to the Association . . . special assessments as hereafter provided, each based on the Pro-Rata Share of each Owner. The 'Pro-Rata Share' of each of the Lots will be a fraction, the numerator of which is the TCAD value of the Lot (with Improvements) and the denominator of which is the TCAD value of all of the Lots (with Improvements) subject to this Declaration, excluding the Common Area Lots. The TCAD value will mean and refer to the market value determined by the Travis Central Appraisal District (or its successors) for ad valorem tax purposes for the calendar year previous to the year for which the Association's assessment is made and without regard to special use designations, exemptions or pending judicial appeals of appraised value.

exempt acreage, but was allocated nearly 54% of the special assessment because it had the highest appraised value.

Although there were other issues and conflicts among the parties, the special assessment appears to have been the tipping point for the underlying litigation. The Owners paid their allocated portion of the special assessment, and the Owner Declarant paid the condominium owners' share because the individual owners of those units would not be significantly benefitted by the completion of the outstanding infrastructure. UP Austin, which would be directly benefitted by some of the special-assessment work but only generally benefitted by a significant portion of it, refused to pay the assessment and was issued a delinquency notice for the outstanding balance.

In lieu of paying the special assessment, UP Austin filed suit seeking a declaration, among other claims, that the Owner Declarant was responsible for completing that infrastructure at its own expense.[10] It eventually abandoned or settled several of its initially asserted claims.[11]

---

[10] Pertinent to the issues on appeal, the Amended CCRs specify that the declarant has the right but not the obligation to develop the property as follows:

> It is contemplated that the Property will be developed pursuant to a coordinated plan, which may, from time to time, be amended or modified. Declarant reserves the right, but will not be obligated, to create and/or designate Lots, Special Common Areas and Common Areas and to subdivide with respect to any of the Property pursuant to the terms of this *Section 8.05*, subject to any limitations imposed on portions of the Property by any applicable plat. These rights may be exercised with respect to any portions of the Property. As each area is developed or dedicated, Declarant may designate the use, classification and such additional covenants, conditions and restrictions as Declarant may deem appropriate for that area.

[11] The trial court found that UP Austin had asserted and abandoned the following claims:

> UP Austin sought injunctive relief against the [Owners] relating to their obligations under the Amended CCRs, but [UP Austin] abandoned those claims. [UP Austin] sought temporary and permanent injunctions against the [Owners], ordering them to:

Ultimately, UP Austin's main claims sought to invalidate the special assessment for both offsite and common-area construction of initial infrastructure, to have a receiver appointed for the POA pursuant to section 11.404 of the Texas Business Organizations Code, and to recover actual and exemplary damages from the Owners based on a theory of minority oppression. The POA asserted a counterclaim against UP Austin for failing to pay the special assessment and sought attorney's fees; the Owners asserted a counterclaim against UP Austin for attorney's fees and a cross-claim against the POA to recover the amounts each of them paid pursuant to the special assessment if it was held to be void.[12]

Shortly before the lawsuit was filed, the Owner Declarant exercised its unilateral right to amend the CCRs in the following pertinent ways:[13] (1) extending the Declarant Control period

---

> (i) keep the property free of rubbish and debris; (ii) keep the property free from improperly screened construction materials; (iii) provide proper care for the mature trees and other vegetation; (iv) complete the Common Area infrastructure already begun; and (v) complete the other unfinished construction; or (vi) alternatively, return the affected portions of the lots to their pre-construction, re-vegetated condition; claims which [UP Austin] abandoned at or before trial. Plaintiffs also pled, then abandoned, a request for "a declaration under the Texas Uniform Declaratory Judgments Act that [the Owner Declarant] is required to complete the infrastructure begun by [East Avenue IG] included in the disputed special assessment. (Second alteration in original).

UP Austin does not dispute this fact finding, but explains that some of the claims were "abandoned" only because they appeared to have been resolved by a Rule 11 agreement that was substantially performed before the trial court determined that it was unenforceable by specific performance and had been conditioned on the right to seek reimbursement after performance.

[12] The Owner Declarant paid $515,792; CAA paid $291,972; and Hospitality paid $279,701.

[13] Section 9.05 of the Amended CCRs provides: "Notwithstanding the provisions of *Section 9.03* above, during the Declarant Control Period, the Declarant may amend this Declaration without the joinder or consent of any person."

until "neither Declarant, nor any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with Declarant, owns any Lots within the Property"; (2) increasing its voting power from seven votes per owned acre of land to seven votes per acre *plus* two votes for every one vote exercisable by the non-declarant property owners; and (3) deleting a cap[14] on the amount of special assessments, which could be overridden only by a majority member vote (second amended CCRs). While the lawsuit was pending, the Owner Declarant amended the CCRs a third time by adding a provision requiring the POA to reimburse an owner for the amount of any remitted assessment, plus interest, if the assessed amount is determined by the board to be in excess of the owner's allocated share or by a court to have been improperly levied (third amended CCRs).

It was essentially undisputed that initial infrastructure for a PUD is usually completed and funded by the developer rather than by the property owners' association while the property is under the developer's control. It is further undisputed that the developer usually deposits sufficient funds with the city to secure completion of the infrastructure. In this case, however, neither of the customary practices occurred. Indeed, all the parties to the dispute agree that the circumstances presented are unique; the witnesses at trial testified that none had encountered another commercial real-estate transaction in which the original developer became insolvent before completing the initial infrastructure under a unified site plan, ownership of the property had been divided among several

---

[14] "No special assessment which (together with all prior special assessments levied in the same calendar year) would exceed 25% of the current year's regular assessment may be made until the same is approved by a vote of the Members holding at least 51 percent of the votes in the Association." Amended CCRs § 4.04.

parties, and the controlling documents did not expressly obligate any party to complete the infrastructure. The POA and the Owners pointed out that these circumstances, however, were known to UP Austin when it acquired its land interests at University Park. They also took the position that, although the circumstances were unanticipated, the language of the dedicatory instruments was broad enough to permit the POA to levy an assessment to resolve the impasse and, given that authority, the POA had discretion as to which improvements to include in the special-assessment work.

The overriding issue was thus whether the POA's dedicatory instruments—the Amended CCRs and the Bylaws—permitted the POA to issue a special assessment to complete new construction of initial site infrastructure.

After a lengthy bench trial, the trial court made three principal liability findings:[15] (1) the POA lacked authority to make a special assessment for the purpose of constructing initial site infrastructure; (2) the Owners, acting together, oppressed UP Austin "by levying a special assessment through the Cypress-controlled POA that would disproportionately impose the costs of initial infrastructure on UP Austin (and selecting infrastructure that would not permit UP Austin to get its [permanent CO])";[16] and (3) the Owner Declarant oppressed UP Austin by enacting the

[15] The trial court made a number of alternative holdings that are challenged on appeal but which we do not reach.

[16] The trial court found the special assessment oppressive on the basis that the Owners "aimed to minimize, if not eliminate, any benefit to UP Austin and the Lot 4 office building from the special assessment work," "expected only one of the twenty-two special assessment projects . . . to assist UP Austin in obtaining a permanent [CO]," and excluded construction of a water-quality pond on CAA's property from the special assessment knowing that UP Austin could not get a permanent CO for Lot 4 unless and until that work was completed. Underlying these findings is the trial court's conclusion of common control among the Owners and the POA, which the Owners challenge on the basis of insufficient pleadings and evidence.

second and third amended CCRs. Based on these determinations, the trial court declared the special assessment void, invalidated the second and third amended CCRs, and permanently enjoined the Owner Declarant from further amending any of its dedicatory instruments for the purpose of increasing its voting power or extending the Declarant Control period without UP Austin's prior written consent. *See* Tex. Prop. Code § 202.001 (defining "dedicatory instrument"). The court, however, denied appointment of a receiver, concluding that nullification of the second and third amended CCRs and the related permanent injunction were sufficient alternative remedies.[17] *See* Tex. Bus. Orgs. Code § 11.404(b)(3) (court may only appoint receiver if all other available legal and equitable remedies are inadequate). The court further denied UP Austin's requests for actual and exemplary damages, but ordered the return of $1.6 million that UP Austin had deposited into the court's registry as its pro rata share of the disputed assessment for Lot 4.

With regard to the parties' attorney-fee requests, the court concluded that (1) it would be equitable and just for each party to bear its own attorney's fees in the trial court; (2) UP Austin prevailed on some of its claims against the POA and the Owners, but not others; (3) not all of the claims on which UP Austin prevailed authorized an award of attorney's fees; (4) the attorney's fees could be segregated, and not all legal tasks on each claim were inextricably intertwined; (5) UP Austin failed to segregate attorney's fees despite numerous requests and opportunities to do so; (6) UP Austin's failure to segregate fees was "a willful decision"; (7) UP Austin failed to

[17] It does not appear that UP Austin specifically complained about the enactment of the second and third amended CCRs or requested the remedies the trial court granted. The trial court, however, determined that "[s]uch relief was consistent with the Court's power under UP Austin's general prayer."

present competent evidence that its prejudgment attorney's fees were reasonable and necessary; and (8) UP Austin was the prevailing party on the threshold declaratory-judgment claim (invalidation of the special assessment), the POA was not the prevailing party on that claim, and the Owners were not the prevailing party on that claim because they approved the special assessment through their control of the POA. Based on these holdings, the trial court denied the POA's and the Owners' claims for attorney's fees and denied UP Austin's claim for prejudgment attorney's fees, but generally granted UP Austin conditional appellate attorney's fees.

The court denied all other claims, including the Owners' requests for reimbursement of remitted assessment fees under theories of "money had and received," negligent misrepresentation, and unjust enrichment. Underlying the court's minority-oppression findings and denial of the Owners' cross-claims were various fact findings to the effect that the Owners and the POA were under the common control of Cypress and had colluded to levy the special assessment in a manner disadvantageous to UP Austin, both in its allocation and in the selection of infrastructure to be completed.[18]

All parties filed notices of appeal attacking, in multiple respects, the judgment, findings of fact, and conclusions of law. The parties also seek to recover their own attorney's fees while opposing liability for any other party's attorney's fees.

---

[18] The Owners concede that they are each related to Cypress, a non-party that manages an investment fund overseeing those entities, but they contend there is no or insufficient evidence of common control. They further assert that UP Austin failed to plead and prove any theories based on alter-ego, veil piercing, or vicarious liability and expressly disclaimed any intent to assert an alter-ego theory of liability, which the court acknowledged at the final-judgment hearing.

## DISCUSSION

### A. Validity of Special Assessment for Construction of Initial Subdivision Infrastructure

The threshold issue presented is whether the POA had authority to issue a special assessment for the purpose of constructing original subdivision infrastructure.[19] The POA has the powers and authority enumerated in its dedicatory instruments. *See Pine Trail Shores Owners' Ass'n, Inc. v. Aiken*, 160 S.W.3d 139, 146 (Tex. App.—Tyler 2005, no pet.). The POA bears the burden of proving its authority to levy the special assessment. *Id.*; *see Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 691 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("A party seeking enforcement of a deed restriction always has the burden at trial to demonstrate the enforceability of the restriction."); *Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 308 (Tex. App.—Fort Worth 2001, no pet.) (party seeking enforcement of restrictive covenant bears burden of proving validity and enforceability of covenants).

The Amended CCRs include a number of provisions pertinent to our resolution of this issue:

> 3.06 Duties of the Association. . . . The Association . . . shall have and perform each of the following duties, as necessary:
>
> . . . .
>
> (e) Collection of Assessments. The Association shall levy and collect assessments to provide for the operation, maintenance, repair, replacement,

---

[19] The parties do not dispute that the POA has some assessment authority, but they disagree as to the extent to which it is constrained by the plain language of the CCRs as opposed to being limited solely by the POA's reasonable discretion. Because the POA has no discretion in the absence of authority, we must first ascertain the extent of the POA's assessment authority as a threshold matter.

preservation, and protection of the Common Area, and as otherwise necessary for the performance of the functions of the Association, in accordance with Article IV of this Declaration.

. . . .

3.07 Powers and Authority of the Association. The Association shall have the powers of a Texas non-profit corporation, subject only to such limitations upon the exercise of such powers as are expressly set forth in this Declaration. It shall further have the power to do and perform any and all acts which may be necessary or proper for or incidental to the exercise of any of the express powers granted to it by the laws of Texas or by this Declaration. Without in any way limiting the generality of the two preceding sentences, the Association shall have the power and authority at all times as follows:

. . . .

(f) Construction. The Association may construct new Improvements in the Common Area as may be reasonably required to protect the value and desirability of the Property and subject to the approval of the Owner on whose Lot any such Improvements may be located, which approval shall not be unreasonably withheld or delayed.[20]

. . . .

4.02. Purpose of Assessments. The assessments levied by the Association will be used exclusively for protection of the health, safety and welfare of the Owners; the protection of the value and desirability of the Property; the operation, maintenance, repair, replacement, preservation and protection of the Common Area; and the performance of the functions of the Association pursuant to this Declaration.

. . . .

---

[20] Section 1.11 of the Amended CCRs defines "Improvement" as "every structure and all appurtenances thereto of every type and kind" along with a non-exclusive list of illustrative examples that includes wells, tanks, reservoirs, pipes, lines, and all facilities used in connection with utilities. The term "Property" is defined in section 1.15 to include all of the lots that the parties stipulated were part of the East Avenue Subdivision.

4.04 Special Assessments. If the Board, at any time, or from time to time, determines that the regular assessment for any year is insufficient to provide for the performance of the functions of the Association, or to provide for timely payment of its bills, or for the operation, maintenance, repair, [or] replacement of the Common Area for which the Association is responsible, then the Board shall have the authority to levy such special assessments as it shall deem necessary to provide for the same. . . . .

. . . .

9.13. Approvals. In each instance where any . . . assessment, . . . expenditure . . . or any other act is granted, withheld, exercised, established, made, imposed or otherwise taken by any of the Declarant, the Association, the Board and/or the Architectural Committee pursuant to this Declaration, such . . . shall serve to protect the value and desirability of the Property and the health, safety and welfare of the Owners, [and] shall be non-discriminatory and applied consistently to all Owners (including Declarant) . . . .

Courts construe dedicatory instruments, like the Amended CCRs and the Bylaws, as any other contract. *See, e.g.*, *Marzo Club, LLC v. Columbia Lakes Homeowners Ass'n*, 325 S.W.3d 791, 798 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Mitchell v. LaFlamme*, 60 S.W.3d 123, 128 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Herbert v. Polly Ranch Homeowners Ass'n.*, 943 S.W.2d 906, 908 (Tex. App.—Houston [1st Dist.] 1996, no writ); *see also Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998) ("[R]estrictive covenants are subject to the general rules of contract construction."). A contract is unambiguous if, after appropriate rules of construction have been applied, the covenant can be given a definite or certain legal meaning. *Pilarcik*, 966 S.W.2d at 478. The interpretation of an unambiguous contract is a question of law for the court. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014).

In construing a written contract, we seek the true intentions of the parties as expressed in the instrument. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). We must

examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* Moreover, unless the agreement shows the parties used a term in a technical or different sense, the terms bear their plain, ordinary, and generally accepted meanings. *Moayedi*, 438 S.W.3d at 7.

While parol evidence of the parties' intent is not admissible to create an ambiguity, the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists. *Balandran*, 972 S.W.2d at 741. If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981); *see also Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 n.25 (Tex. 2011). Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. *Sun Oil*, 626 S.W.2d at 731. The rule that parol evidence is not admissible to create an ambiguity "'obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction.'" *Id.* at 732 (quoting *Lewis v. East Tex. Fin. Co.*, 146 S.W.2d 977, 980 (1941)). Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous. *See City of Pasadena v. Gennedy*, 125 S.W.3d 687, 693 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

Both parties contend the Amended CCRs are unambiguous and can be construed as a matter of law; however, their interpretations of the language differ significantly. Among other

arguments, UP Austin asserts, and the trial court agreed, that the POA has no authority under the Amended CCRs to make a special assessment for the purpose of building initial infrastructure because:

- In accordance with section 9.13, no assessment can be made unless it would "serve to *protect* the value and desirability of the Property," and there is sufficient evidence that the intent, purpose, and effect of initial infrastructure is to *increase* property value. (Emphasis added.)

- In accordance with section 4.02, any assessment levied by the Association must be used exclusively for limited purposes, including "protection of the value and desirability of the Property" and "performance of the functions of the Association pursuant to the CCRs," but (1) initial infrastructure creates value; (2) the term "functions," given its plain meaning and used in context, refers to the POA's duties, not its powers; and (3) the POA is *empowered* by the CCRs to do some new construction but may only make an assessment if such construction is in discharge of one of the POA's duties under section 3.06 of the CCRs, none of which fairly includes construction of initial subdivision infrastructure within its scope.[21] Construing the Amended CCRs to limit the POA's assessment authority to its duties is consistent with the Bylaws, which state that "the [POA] may *only* levy Assessments (regular or special) to defray costs which are incurred in furtherance of the *duties* of the Association [under law or the dedicatory instruments]." (Emphasis added.)

- Section 4.04, in relevant part, constrains the POA's special-assessment authority to performance of the POA's "functions" (which is limited to its duties not its powers);

---

[21] The POA duties prescribed by section 3.06 of the Amended CCRs include: (1) operation and control of common areas, including improvements located in the common area; (2) repair and maintenance of the common area; (3) payment of all property taxes and other assessments levied on the common areas; (4) payment of all reasonable charges for utilities, maintenance, repair, landscaping, gardening, garbage removal, security, and other services used in connection with operation and maintenance of the common area; (5) levy and collect assessments to provide for the operation, maintenance, repair, replacement, preservation, and protection of the common area; (6) levy and collect assessments as necessary to perform the POA's functions; (7) obtain and maintain policies of insurance adequate to carry out the POA's functions; (8) removal and appointment of Architectural Committee members after expiration of the Declarant Control Period; (9) carry out and enforce the Declaration; and (10) keep records and books of the POA's affairs.

paying bills (which is not implicated here); and "operation, maintenance, repair, [or] replacement of the Common Area" (terms which do not reasonably include new construction of initial subdivision infrastructure).

- Even if the POA has authority under sections 4.02 or 4.04 to levy an assessment for new construction under section 3.07(f), the construction must be "reasonably required" "to protect the value and desirability of the Property" and located "in the Common Area"; in the present case, the evidence sufficiently established that the special assessment was for initial infrastructure work, which enhances, rather than maintains, the value of the property.[22]

- UP Austin's construction of the CCRs as not authorizing a special assessment for initial infrastructure is consistent with the circumstances existing when the document was created, at which point the obvious intent and plan for the development was for the original developer to construct the infrastructure, not the POA. The relevant provisions also were not changed when the Amended CCRs were adopted.

---

[22] Section 1.06 of the Amended CCRs defines "Common Area," which is distinguished from "Common Area Lots," as:

> [A]ll ingress and egress easements, access easements, parking easements, drainage easements, water quality easements, landscaping easements, and public utility easements affecting any part of the Property, or referenced on the PUD, or conveyed to the Association by separate recorded instrument; together with all other Improvements of whatever kind and for whatever purpose which may be located in such areas, including, without limitation, stormwater detention ponds and water quality ponds serving the Property, common entryway Improvements, entryway signs and associated landscaping, irrigation systems for Common Area landscaping, any water wells on the Property, water recirculation machinery and systems associated with the Common Areas, and lighting systems associated with the Common Areas; and any other areas or Improvements for which the Association has duly accepted responsibility for operation and maintenance and which are intended for or devoted to the common use and enjoyment of the Owners.

Although many of the special-assessment projects would be located outside the subdivision's boundaries, the POA contends that the work is not unauthorized because the "Common Area" definition broadly encompasses offsite areas "affecting any part of the Property," "referenced on the PUD," "serving the Property," and "associated with the Common Areas." Our disposition of the case, however, obviates the need to address the POA's construction of section 1.06, and we therefore express no opinion as to that matter.

Although the parties agree that the dedicatory instruments were not enacted with the intent that the POA complete the initial subdivision infrastructure, the POA argues that the Amended CCRs' broad language grants it authority to make a special assessment for that purpose and that the Amended CCRs do not expressly prohibit it from doing so, as CCRs sometimes do. The POA's contrary interpretation of the relevant provisions of the Amended CCRs includes that: (1) "functions" must refer to both powers and duties, otherwise the POA would not be able to pay for any of the powers it has been expressly granted, rendering those provisions meaningless;[23] and (2) the POA has the power to construct new improvements in the common area and thus the discretion to determine which improvements to construct.[24] In short, the POA contends that it is not a question of the POA's authority to levy a special assessment for new construction, but rather a matter of the POA's discretion as to how to exercise the authority it has been granted in determining what assessments and construction are reasonably required "to protect the value and desirability of the Property." As to matters within the POA's discretion, it is afforded a statutory presumption of reasonableness. *See* Tex. Prop. Code § 202.004(a) ("An exercise of discretionary authority by a

---

[23] For example, in addition to authorizing the POA to construct new improvements in the common area, section 3.07 of the Amended CCRs empowers the POA to "retain and pay for" a person or firm to manage and operate the association, "retain and pay for" legal and accounting services, enter into contracts for some services, and obtain any and all types of permits and licenses.

[24] The POA further argues as a source of its authority that the Amended CCRs broadly grant it "the powers of a Texas non-profit Corporation," which by statute include the power to "acquire, receive, own, hold, improve, use, and deal in and with property or an interest in property," "make contracts and guarantees," and "take other action necessary or appropriate to further the purposes of the entity." Tex. Bus. Orgs. Code § 2.101(3), (5), (22). The Amended CCRs, however, circumscribe what might otherwise be an expansive grant of authority by the limitations on the POA's powers that are set forth in that document. Accordingly, the grant of authority the POA cites does not authorize it to circumvent the limitations in the Amended CCRs.

property owners' association . . . concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory."); *see also Marmic Props., L.L.C. v. Silverglen Town-Homes Homeowners' Ass'n*, No. 14-12-00312-CV, 2013 WL 4680492, at *3 (Tex. App.—Houston [14th Dist.] Aug. 29, 2013, no pet.) (mem. op.) (statutory presumption applies to assessments). When such a presumption applies, the party opposing the discretionary act bears the burden of producing evidence to rebut the presumption. *Marmic*, 2013 WL 4680492, at *3. The POA intimates that if it has any authority to make an assessment, it has discretion to determine what activities fall within the scope of its assessment authority. The trial court concluded that the issue concerned proper construction of the dedicatory instruments, not the POA's discretionary authority.

We agree with the parties and the trial court that the relevant language of the Amended CCRs is unambiguous; thus we will construe it as a matter of law. When so construed, we conclude that the POA was not authorized to make a special assessment to construct the initial infrastructure under the plain language of the Amended CCRs. Because the CCRs expressly constrain the POA's assessment authority, the threshold issue concerns the POA's authority rather than the exercise of its discretion.

Several terms pertinent to our construction of the CCRs are not specially defined. However, no special or technical meaning is evident from the document as a whole or from the circumstances surrounding its adoption; accordingly, we apply the plain meaning of the undefined terms. The trial court determined, and we agree, that construction designed and intended to create value and desirability does not meet the requirement that the construction be "reasonably required

to protect the value and desirability of the Property," under the plain and ordinary meaning of the term "protect." Accordingly, the POA has no discretion to assess for new construction that does not meet that express limitation on the POA's authority.

To this point, in addition to testimony from UP Austin's witnesses, the POA's corporate representative acknowledged that the purpose of initial subdivision infrastructure is to create rather than protect value, as that term is commonly understood and used in the Amended CCRs, and that the special-assessment projects were anticipated to enhance the property's value. Although there was some evidence of a potential adverse impact on property value if the site plans expire, the trial court was not required to credit that evidence to the exclusion of contrary evidence.

The POA appears to suggest that expiration of a site development plan (SDP) always equates to a loss of property value, and, thus, to avoid certain adverse impact on the property's value, the POA was required to take action to prevent the SDP from expiring when negotiations among the property owners stalled. For that proposition, the POA chiefly relies on *State v. Biggar*, 873 S.W.2d 11 (Tex. 1994), an inverse-condemnation case in which the Texas Supreme Court concluded that the State, with the objective of impairing a desired parcel's value, had intentionally denied a routine easement exchange to thwart development of the property under an SDP that required the easement exchange. *Id.* at 12-13. *Biggar*, however, does not support the broad proposition that expiration of an SDP necessarily reduces the value of property. In *Biggar*, it was undisputed that the SDP envisioned development of the entire tract; the tract could not be developed in the same way after the anticipated partial taking; the approved SDP itself therefore added value to the property because the taking would permanently alter what could be done with the property; and after the SDP expired

due to the State's denial of the easement exchange, the land's value decreased despite revival of the SDP because regulatory changes precluded the property from being developed to the same extent. *Id.* at 12-13 & n.5. In *Biggar*, there was no path to completing the original SDP without the easement exchange; as a result, the land's value decreased drastically when the original SDP expired and could not be resurrected to enable the same degree of development. *Id*. *Biggar* essentially stands for the proposition that *foreclosing* the anticipated development caused an *undisputed reduction* in the value of the property. *See id.* at 14 (evidence established that State used its discretion to deny the easement "to *preclude* development in order to *reduce* the value of the tract" (emphasis added)).

*Biggar* is distinguishable from the present case because there is no evidence here that expiration of the site plans would *permanently* impede development of the property. There is only evidence of time and cost increases to revive approval; the possibility of a permanent loss of site entitlements and grandfathering, the impact of which was speculative as to a loss in the property's value; and a necessary adverse impact on property value *if* there were no clear path to re-entitling the property. This evidence neither conclusively establishes that completing initial subdivision infrastructure under University Park's approved site plans served to "*protect* the value and desirability of the Property" nor negates evidence that the purpose, intent, effect, and expectation of constructing that infrastructure was to *enhance* the value of the property. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241-42 (Tex. 2001) (articulating evidence-sufficiency standards).

In sum, we conclude that (1) the Amended CCRs unambiguously limit the POA's construction authority—and thus any related assessment authority—to activities reasonably required

to protect the value and desirability of the property, and (2) the record supports the trial court's determination that the purpose of constructing initial subdivision infrastructure—generally and as expected in this case—is to create rather than protect the value and desirability of property. Accordingly, the trial court did not err in invalidating the special assessment on that basis. We therefore need not consider the trial court's other factual and legal bases for invalidating the special assessment. *See* Tex. R. App. P. 47.1.

### B. Minority Oppression

The relief afforded in the judgment against the Owners is based on the trial court's legal and factual determinations pertaining to UP Austin's minority-oppression claim. The trial court held the Owners liable to UP Austin for minority oppression based on (1) the Owners' approval of the POA's special assessment, which the court found oppressive for a number of reasons, and (2) the Owner Declarant's enactment of the second- and third- amended CCRs.[25] Based on these findings, the trial court invalidated the second- and third-amended CCRs and entered a permanent injunction prohibiting further similar amendments. Having granted the foregoing relief, the court denied UP Austin's request for appointment of a receiver for the POA under section 11.404 of the

---

[25] The trial court found that

> [n]either the Second Amendment nor the Third Amendment serves to protect the value and desirability of University Park or the health, safety, and welfare of the property owners, and they are both oppressive to owners not affiliated with Cypress. In addition, the Second Amendment and Third Amendment are burdensome and harsh to UP Austin and other owners not affiliated with Cypress, they substantially defeat the objectively reasonable expectations that were central to UP Austin's decision to acquire the property, and their implementation is contrary to good faith and fair dealing to the prejudice of UP Austin.

Texas Business Organizations Code as unnecessary. *See* Tex. Bus. Orgs. Code § 11.404(b)(3) (court may appoint receiver only if other available legal and equitable remedies are inadequate).

In *Ritchie v. Rupe*, the Texas Supreme Court recently held that there is no common law cause of action for minority oppression in Texas and that the only remedy for oppressive conduct is appointment of a receiver under section 11.404, if the statutory requirements are satisfied. 443 S.W.3d 856, 887, 891 (Tex. 2014) ("We . . . decline to recognize a common-law cause of action for 'shareholder oppression.'"); *see also Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 791 (Tex. 2014) (observing that in *Ritchie*, the court had "declined to recognize a common-law cause of action for shareholder oppression and concluded that the only statutory remedy for 'oppressive' actions is a rehabilitative receivership").

UP Austin contends that we may not consider *Ritchie*'s impact on this case because the Owners waived any argument that minority oppression is not a valid common-law cause of action by failing to preserve that claim in this Court or the trial court. On appeal, the Owners have challenged (1) the legal- and factual-sufficiency of the evidence to support the minority-oppression findings and conclusions and (2) the sufficiency of UP Austin's pleadings to support the relief afforded on the basis of that claim. "When the applicable law changes during the pendency of the appeal, the court of appeals must render its decision in light of the change in law." *Blair v. Fletcher*, 849 S.W.2d 344, 345 (Tex. 1993). To the extent that principle applies only to legal challenges that have properly been preserved, we conclude that the Owners' legal-sufficiency challenges, which may be raised for the first time on appeal from a judgment following a non-jury trial, are adequate to preserve the argument that the trial court's judgment against them was based on an invalid

legal theory. *See* Tex. R. App. P. 33.1(d) ("In a nonjury case, a complaint regarding legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief."); *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex. 1999) (defendant sufficiently preserved argument that attorney's fees were not available under applicable statute by asserting nonrecovery in motion for j.n.o.v. because such method is appropriate to preserve legal-sufficiency challenges and claim of nonrecoverability was analogous to legal-sufficiency challenge for error-preservation purposes); *Martinez v. English*, 267 S.W.3d 521, 550 n.6 (Tex. App.—Austin 2008, pet. denied) (no-evidence challenge preserved argument that cause of action was unavailable as matter of law).

Applying *Ritchie*, we reverse the trial court's judgment against the Owners, which is based on an invalid legal theory, and render judgment that the Owners are not liable for minority oppression as alleged.[26] We therefore vacate the permanent injunction and the portion of the judgment nullifying the second- and third-amended CCRs. We remand to the trial court UP Austin's claim for appointment of a receiver for the POA, which was denied based on the availability of the preceding remedies.[27]

---

[26] Because minority oppression does not support the relief the trial court awarded as a matter of law, the court's related findings of fact are immaterial. We therefore do not reach the Owners' challenges to the legal- and factual-sufficiency of the evidence to support those findings.

[27] We decline UP Austin's request that we exercise our discretion to remand "in the interest of justice" for it to pursue unspecified alternative claims against the Owners in light of *Ritchie*'s change in the law. *See Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 792 (Tex. 2014) (remanding for opportunity to pursue derivative action for breach of fiduciary duties). UP Austin has not identified any potentially applicable alternative claims nor explained why it was foreclosed from bringing any such claims by the presumed availability of relief under a minority-oppression theory. The interests of justice are not served by a remand for an unspecified second bite at the apple.

### C. Unjust Enrichment

Although supporting the POA's authority to levy the special assessment, the Owners filed a cross-claim against the POA under various theories seeking reimbursement of their assessment payments in the event the assessment were held to be invalid. The POA did not answer or contest the restitution claim. The trial court, however, generally denied the cross-claim as "collusive in that it impermissibly realigns the [Owners] with UP Austin against, in essence themselves (the Cypress-controlled POA)." The Owners appeal only the denial of their unjust-enrichment theory of restitution, which the trial court denied on the basis that they "failed to show that the POA 'wrongfully secured a benefit or . . . passively received one which it would be unconscionable for [it] to retain.'" (Alteration in original.)

"Unjust enrichment is not an independent cause of action; however, an action for restitution based on unjust enrichment will lie 'to recover money received on a consideration that has failed in whole or in part.'" *Oxford Fin. Cos., Inc. v. Velez*, 807 S.W.2d 460, 465 (Tex. App.—Austin 1991, writ denied). A party seeking restitution "must show not only that the party from whom he is seeking restitution was unjustly enriched, but also that that party 'had wrongfully secured a benefit or had passively received one which it would be unconscionable for him to retain.'" *Id*. Importantly, "a party's right to recover under a theory of unjust enrichment does not depend on the other party's commission of a wrongful act." *Id.*

Because a wrongful act is not required for restitution, the Owners merely had the burden to establish that (1) they paid money to the POA, (2) the purpose of the payment failed in

whole or part, and (3) it would be unconscionable for the POA to retain the money.[28] *See id.* It is undisputed that the Owners paid the amounts levied on their property for the special assessment and that the Owner Declarant also paid the portion of the special assessment allocated to the townhome owners. The trial court found that the POA lacked the authority to make a special assessment to complete initial subdivision infrastructure and that the assessment was therefore void ab initio. We have now affirmed that holding. The only issue, therefore, is whether it would be "unconscionable" for the POA to retain funds paid for an assessment that has been void since its inception.

We conclude that, as a matter of law, it would be unconscionable for the POA to retain the Owners' special-assessment payments, which were not only levied without legal authority but which were also made to secure work that the POA is unable to complete as a matter of law and fact. Although UP Austin contends that allowing the Owners to obtain restitution of an assessment they implemented with their votes and "control" over the POA would permit the Owners to hedge their bets and "to abuse the trial process," there is nothing inconsistent about the Owners' complementary legal positions that the POA had authority under the Amended CCRs to make

---

[28] The voluntary-payment rule, which is an affirmative defense to a restitution claim for unjust enrichment, was not asserted in a responsive pleading by any party or addressed by any party, except by UP Austin in response to the Owners' motion for judgment. The defense, to the extent otherwise applicable, is therefore waived. *See Berryman's South Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 188-89 (Tex. App.—Dallas 2013, pet. denied) (affirming summary judgment on claim for money had and received where voluntary-payment rule was not asserted as defense nor addressed in summary-judgment response). Under the voluntary-payment rule, "'[m]oney voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.'" *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2005) (quoting *Pennell v. United Ins. Co.*, 243 S.W.2d 572, 576 (Tex. 1951)). The voluntary-payment rule does not bar restitution based on mutual mistake of fact. *See id.*

the special assessment, but if it did not, the Owners' had no obligation to pay it, especially when the expectation of its purpose has failed in its entirety. Accordingly, we reverse the trial court's judgment denying the Owners' unjust-enrichment cross-claim and render judgment awarding the Owners restitution of the sums they paid pursuant to the void special assessment.

### D. Attorney's Fees

The remaining issues on appeal, broadly stated are: (1) whether UP Austin is entitled to recover its prejudgment attorney's fees and expenses from the POA and the Owners as a matter of law; (2) whether UP Austin sufficiently segregated and otherwise established that the amount of fees it requested was reasonable; (3) whether the Owners are entitled to recover their attorney's fees from UP Austin as a matter of law; and (4) whether the judgment awarding conditional post-judgment and appellate attorney's fees to UP Austin is defective in failing to clearly identify the parties liable for those fees.[29]

The trial court concluded that UP Austin was the prevailing party on the threshold declaratory-judgment claim, that the POA was not the prevailing party on that claim, and that the Owners were not the prevailing party on that claim because they approved the special assessment through their control of the POA. Based on the latter two findings, the trial court denied the POA's and the Owners' counterclaims for attorney's fees. The trial court also denied UP Austin's claim to recover prejudgment attorney's fees on the basis that (1) UP Austin prevailed on some of its claims against the POA and the Owners, but not others; (2) not all of the claims authorized an award

[29] The POA also appealed the denial of its claim for attorney's fees, but effectively concedes that it cannot recover on that claim if we conclude, as we have, that the special assessment is void.

of attorney's fees; (3) UP Austin's prejudgment attorney's fees could be segregated because not all legal tasks on each claim were inextricably intertwined; (4) UP Austin willfully failed to segregate attorney's fees despite numerous requests and opportunities to do so; and (5) UP Austin failed to present competent evidence that its attorney's fees were reasonable and necessary. Although declining to award prejudgment attorney's fees, the trial court did award UP Austin conditional post-judgment and appellate attorney's fees. The parties are uniformly dissatisfied with the disposition of the claims for attorney's fees. We address their arguments in turn.

UP Austin challenges the trial court's denial of its claim for prejudgment attorney's fees and opposes the Owners' and the POA's counterclaims for their attorney's fees, contending it was the "prevailing party" on the "main issue" in the case, which was to invalidate the POA's special assessment. *See Old HH, Ltd. v. Henderson*, 03-10-00129-CV, 2011 WL 6118570, at *3 (Tex. App.—Austin Dec. 9, 2011, no pet.) (mem. op.) ("prevailing party" refers to "'the party who successfully prosecutes the action or defends against it, prevailing on the main issue, even though not to the extent of its original contention'" (quoting *Johns v. Ram Forwarding, Inc.*, 29 S.W.3d 635, 637-38 (Tex. App.—Houston [1st Dist.] 2000, no pet.))). UP Austin asserts that, as a matter of law, it is entitled to recover more than $1.7 million in prejudgment attorney's fees and $37,606.56 in expenses and was not required to segregate its fees among parties and claims as long as it prevailed on the "main issue" in the litigation. In essence, UP Austin aggregates all of its attorney's fees under the umbrella of its claim against the POA to invalidate the special assessment and asserts that

segregation is not required as to any other claim or party.[30] In the alternative, if segregation was required, UP Austin contends that the appropriate remedy is not the denial of all fees but remand to the trial court for segregation. UP Austin also challenges the zero attorney-fee award on evidence-sufficiency grounds.

Texas law prohibits recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). Even when attorney's fees are recoverable, the general rule is that a party seeking to recover attorney's fees in a suit involving multiple claims or parties has a duty to segregate recoverable and unrecoverable fees. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10-11 (Tex. 1991); *see also Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) ("[A] prevailing party must segregate recoverable from unrecoverable attorney's fees in all cases."); *Tony Gullo*, 212 S.W.3d at 313 (reaffirming "the rule that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees"). A recognized exception to the duty to segregate arises when discrete legal services advance both a recoverable and unrecoverable claim and thus are so intertwined that they need not be segregated.[31] *Tony Gullo*, 212 S.W.3d at 313.

---

[30] UP Austin does not contend that its attorney's fees could not be segregated; it asserts only that it was under no obligation to do so because all of the claims were related to the special-assessment issue, which arose under the Amended CCRs.

[31] Fees incurred to prosecute or defend claims for which attorney's fees are otherwise unrecoverable may nevertheless be recovered if prosecution or defense of those claims was necessary for the party to prevail on a claim for which attorney's fees are authorized. *See Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007). This exception is not implicated in the circumstances presented.

In the present case, both statutory and contractual provisions are at issue: section 5.006 of the Texas Property Code and section 9.01 of the Amended CCRs.[32] The Owners contend, however, that neither provision authorizes UP Austin's recovery of attorney's fees from them because (1) UP Austin did not recover on any claim against them that qualifies under either provision, and (2) given the reversal of the relief that had been awarded against them under a minority-oppression theory, UP Austin did not prevail on any claim against them at all.

Section 5.006(a) of the Texas Property Code provides that "[i]n an action based on breach of a restrictive covenant pertaining to real property, the court shall allow a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim." Tex. Prop. Code § 5.006. An award under section 5.006 is mandatory for a qualifying claim, but the amount awarded must be reasonable. *Gorman v. Countrywood Prop. Owners Ass'n*, 1 S.W.3d 915, 918 (Tex. App.—Beaumont 1999, pet. denied). UP Austin contends that it is not required to segregate its fees because section 5.006 applies to the *entire* "action" that is "based on" breach of a restrictive covenant, regardless of whether a party prevails on all the claims or whether all of the claims actually involve breach of a restrictive covenant. In UP Austin's view of section 5.006(a), all that is required for it to recover 100% of its attorney's fees for the prosecution of all claims

---

[32] The Texas Declaratory Judgments Act also authorizes an award of attorney's fees, but the trial court has discretion under that statute to determine whether it is "equitable and just" to award such fees. Tex. Civ. Prac. & Rem. Code § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."); *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (declaratory judgment statute does not require award of attorney's fee and thus affords trial court discretion in making award). Here, the trial court determined that it was "equitable and just for each party to bear its own attorney's fees in the trial court," and the parties do not challenge this determination.

against all parties is the assertion of and recovery on any qualifying claim, as long as that claim was the "main issue" of the litigation.

Section 9.01 of the Amended CCRs also includes an attorney's fee provision, which provides, in relevant part:

> Declarant, the Association, or any Owner shall have the right to enforce, by proceeding, at law or in equity, for damages or for injunction or both, all restrictions, covenants, conditions, rights and duties imposed, allowed or granted by the provisions of this Declaration. In any such proceeding, *the prevailing parties shall be entitled to recover costs and expenses, including reasonable attorney's fees*.

(Emphasis added.) As worded, section 9.01 is not discretionary as to an award of attorney's fees for a qualifying claim, but is likewise subject to a reasonableness limitation. *Cf. Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) ("Statutes providing that a party 'may recover', 'shall be awarded', or 'is entitled to' attorney fees are not discretionary."). UP Austin similarly contends that it is under no obligation to segregate attorney's fees because section 9.01 provides for mandatory attorney's fees for an entire lawsuit ("proceeding") if it involves a claim "to enforce" any provision in the Amended CCRs. Because UP Austin successfully challenged the special assessment, it contends that it is the prevailing party on the main issue in the case, and as such, it can recover all of its attorney's fees without segregation—even as to fees incurred to prosecute claims on which it did not prevail and on claims that do not require the same elements, research, discovery, proof, or legal expertise as a claim to enforce the Amended CCRs.

Whether the claims at issue fall within the meaning of the applicable statutory and contract provisions and whether attorney's fees must be segregated are questions of law. *See, e.g.*,

*Moayedi*, 438 S.W.3d at 7 (interpretation of unambiguous contract is question of law); *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (statutory construction is question of law); *Tony Gullo*, 212 S.W.3d at 312 (need to segregate attorney's fees is question of law). The extent to which certain claims and fees are capable of being segregated is a mixed question of law and fact. *Tony Gullo*, 212 S.W.3d at 312. In comparison, the reasonableness of attorney's fees is a question of fact. *Bocquet*, 972 S.W.2d at 20. Thus, although the granting of attorney's fees is mandatory upon a showing of entitlement, the amount of such fees is within the trial court's discretion. We will not disturb a trial court's award of attorney's fees absent an abuse of discretion. *See, e.g.*, *Roth v. JPMorgan Chase Bank, N.A.*, 439 S.W.3d 508, 514 (Tex. App.—El Paso 2014, no pet.).

As an initial matter, we do not agree that either section 5.006 or section 9.01 can be read to suggest that a party can recover attorney's fees on any claim against any party merely because it is asserted in an action or proceeding in which enforcement of a restrictive covenant is at issue. When interpreting a contractual or statutory attorney's fee provision in which the "prevailing party" term is left undefined, as is the case here, we presume the term bears its ordinary meaning. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). In that regard,

> [t]o qualify as a prevailing party, a . . . plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment *against the defendant from whom fees are sought*, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff. . . . In short, a plaintiff "prevails" when actual relief on the merits of his claim *materially alters the*

> *legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.*

*Id.* at 654 (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992) (internal citations omitted) (emphases added)). "[T]he plaintiff is required to prove the fees that were incurred against the particular defendant sought to be charged with said fees." *Koch Oil Co. v. Wilber*, 895 S.W.2d 854, 867 (Tex. App.—Beaumont 1995, writ denied). This is required to ensure that the parties from whom attorney's fees are sought are not charged fees for which they are not responsible. *See Sterling*, 822 S.W.2d at 10-11. To hold otherwise would contravene the general rule that attorney's fees are not available unless authorized by statute or contract.

Aggregating claims against multiple parties does not transform claims for which attorney's fees would otherwise be unrecoverable into claims for recoverable fees by their mere association with a claim for which attorney's fees are authorized. Identifying the "main issue" may help identify a "prevailing party"—i.e., *who* can recover attorney's fees—but when recovery against multiple parties and on multiple claims is a mixed bag, the prevailing party remains obligated to segregate fees associated with claims and parties for which attorney's fees are not authorized—i.e., *what* fees can be recovered remains an issue. The "in for a penny, in for a pound" standard UP Austin advocates is fundamentally at odds with well-established fee-shifting limitations and fee-segregation principles. *See Tony Gullo*, 212 S.W.3d at 313 (eliminating exception for attorney's fees incurred solely on separate but arguably intertwined claims; mere commonality of underlying facts does not necessarily make all claims arising therefrom "inseparable" and all legal fees recoverable); *DMC Valley Ranch, L.L.C. v. HPSC, Inc.*, 315 S.W.3d 898, 906

(Tex. App.—Dallas 2010, no pet.) ("'A party seeking attorney fees has a duty to segregate nonrecoverable fees from recoverable fees, *and to segregate the fees owed by different parties*." (emphasis in original) (quoting *Fench v. Moore*, 169 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2004, no pet.)). Unless otherwise nonrecoverable claims are *necessary* to obtain all relief on a covered claim, which is not the case here, a prevailing party must segregate recoverable from unrecoverable attorney's fees "in all cases." *Varner*, 218 S.W.3d at 69 (affirming denial of attorney fees incurred to pursue related claims against third party, but concluding that attorney's fees for defending counterclaim need not be segregated because plaintiffs were required to successfully defend that claim to fully recover on claim for which attorney's fees were authorized).

To the extent UP Austin relies on the breadth of the terms "an action" and "based on" that are used in section 5.006, an award of attorney's fees must be provided by the express terms of the statute in question and may not be supplied by implication. *See Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex.1999); *cf. Owens v. Ousey*, 241 S.W.3d 124, 134 (Tex. App.—Austin 2007, pet. denied) (requiring segregation of fees when plaintiff prevailed on one claim under section 5.006 but not on other claim under same statute); *Freedman v. Briarcroft Prop. Owners, Inc.*, 776 S.W.2d 212, 218 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (party who brought action under section 5.006 for breach of deed restrictions, but did not prevail on that claim, could not recover attorney's fees for successful prosecution of related nuisance claim because that claim was not based in whole or in part on breach of restrictive covenant); *cf. also Radney v. Clear Lake Forest Cmty. Ass'n*, 681 S.W.2d 191, 199 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (allowing recovery of attorney's fees on fraudulent conveyance claim because "in order to obtain

the complete relief to which they were entitled because of the breach [of the restrictive covenant], it was necessary for appellees to have the fraudulent conveyance voided"). The same principle, although not strictly applicable to contracts, informs our reading of the Amended CCRs. It is unreasonable to construe section 9.01 to reach beyond its context to authorize fees that merely bear some relationship to the stated purpose of the provision. *Cf. MRO Sw., Inc. v. Target Corp.*, No. 04-07-00078-CV, 2007 WL 4403912, at *2-3 (Tex. App.—San Antonio Dec. 19, 2007, pet. denied) (mem. op.) (plaintiff not entitled to recover attorney's fees under contract provision authorizing party prevailing in "any legal action or proceeding to enforce any terms of this Agreement [or damages for its alleged breach]"; plaintiff prevailed on one claim that did not meet requirements for recovery and failed to prevail on only claim that did). Both section 5.006 and section 9.01 provide narrow exceptions to the rule prohibiting attorney-fee shifting and do not authorize a recovery for claims that do not meet their terms even if those claims are asserted in the same action or proceeding as ones that could or do.

UP Austin clearly prevailed on its claim against the POA and obtained a declaration that the special assessment was not authorized under the Amended CCRs, and an award of attorney's fees is mandatory for that claim under section 5.006 of the Property Code and section 9.01 of the Amended CCRs. UP Austin was nevertheless required to segregate its fees and expenses because (1) some attorney's fees were incurred analyzing theories and claims that were not applicable to any defendant and others were not applicable to all of the defendants; (2) the claims asserted against the defendants varied; (3) UP Austin did not prevail on all the claims asserted; (4) neither section 5.006 nor section 9.01 authorizes attorney's fees for all of the claims on which UP Austin prevailed;

and (5) the trial court's determination that the fees on the disparate claims could be segregated is unchallenged. UP Austin failed to segregate, however, even after the trial court repeatedly admonished it that the foregoing circumstances were likely impediments to a full fee award.[33]

However willful and ill-considered the refusal to segregate was, the remedy for such failure is not an award of zero attorney's fees, because evidence of unsegregated attorney's fees for the entire case is some evidence of what the segregated amount should be. *Tony Gullo*, 212 S.W.3d at 314. Accordingly, the supreme court has held that the appropriate remedy for failure or refusal to segregate attorney's fees is remand for segregation.[34] *See, e.g.*, *id.*; *Sterling*, 822 S.W.2d at 11-12 (concluding that remand is appropriate "[i]f a party refuses, over objection, to offer evidence segregating attorney's fees among various claims or parties, and an appellate court determines that segregation was required"); *see also DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 197-98 (Tex. App.—Fort Worth 2012, no pet.) (reversing zero attorney's fee award after bench trial based on failure to segregate and remanding for evidence of segregated amount of reasonable and necessary attorney's fees); *compare Dilston House Condo. Ass'n v. White*, 230 S.W.3d 714, 718

---

[33] At trial, UP Austin's counsel explained that no effort had been made to segregate as to individual claims and causes of action "because in the end, everything related to the CCRs" and the owner defendants had all voted for the special assessment, which was the subject of UP Austin's claim against the POA under the Amended CCRs. Although the Owner Declarant had enough votes to pass the special assessment without CAA's or Hospitality's votes, UP Austin's counsel explained that their litigation positions were essentially the same as the Owner Declarant's and, as a result, there were no segregable expenses attributable to only those entities.

[34] The total denial of attorney's fees appears more in the nature of a sanction. No issue concerning the propriety of sanctions is properly presented on appeal; accordingly, we express no opinion as to whether willful refusal to segregate attorney's fees would be sanctionable conduct.

(Tex. App—Houston [14th Dist.] 2007, no pet.) (affirming total denial of attorney's fees due to complete absence of evidence regarding attorney's fees incurred).

In addition to complaining about the lack of segregation between recoverable and unrecoverable fees and expenses, the POA and the Owners objected that UP Austin's attorney-fee rates and attorney staffing were unreasonable and excessive. The trial court agreed and found that UP Austin

> failed to present competent evidence that the hourly rates charged by their attorneys in this matter were reasonable for lawyers in Travis County given the nature of the case. [UP Austin's] counsel testified that a committee at his firm set the rates, but did not present testimony concerning prevailing rates for similar work in Travis County or testimony that the rates set by the committee were reasonable in comparison to rates charged by other counsel with similar skill and experience for similar work in Travis County.

The record supports this finding. There is also evidence that UP Austin's attorney's fees and expenses were more than twice the fees for the POA's and the Owners' attorneys and that the rates UP Austin's counsel charged and the case staffing were excessive for similar cases being prosecuted in Travis County, Texas.

Even so, the trial court's finding does not support an attorney's fee award of zero. Although the trial court could have rationally concluded that reasonable attorney's fees and expenses were less than the $1.8 million UP Austin seeks, "an award of no fees was improper in the absence of evidence affirmatively showing that no attorney's services were needed or that any services provided were of no value." *Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 740 (Tex. 2009). Because there is no evidence to support an award of zero

attorney's fees and some evidence that fees were incurred, we remand the case to the trial court to determine a reasonable amount of fees.[35] *Id.*

On remand, the trial court must also determine whether UP Austin prevailed on claims against the Owners for which attorney's fees are recoverable. The Owners contend there are none and that they should be awarded their attorney's fees in the amount of $358,472.33 as a matter of law under section 9.01.[36] UP Austin asserts that it remains a prevailing party with respect to the Owners because it obtained comparable relief by virtue of a Rule 11 agreement that was substantially completed before the trial court ruled that it could not be enforced by specific performance. A plaintiff may be considered the prevailing party if it has secured a direct benefit by virtue of a settlement that modified the defendant's behavior in a way that directly benefits the plaintiff. *KB Home*, 295 S.W.3d at 654. The trial court here did not pass on this argument. The trial court's finding that the Rule 11 agreement was not enforceable by specific performance and was conditioned on a reservation of the right to seek reimbursement after performance is not dispositive of whether UP Austin secured a benefit at the time of the agreement. Due to this outstanding issue, which potentially impacts the prevailing-party analysis, and in light of our disposition of UP Austin's minority-oppression claim, we believe it is prudent to remand to the trial court for a prevailing-party

---

[35] On remand, the trial court is free to consider the POA's argument that a zero fee award is appropriate in light of evidence that UP Austin sued after refusing to engage in meaningful pre-suit negotiations. The trial court issued no findings of fact and conclusions of law as to this contention, and none can be presumed.

[36] Section 5.006 authorizes an award of attorney's fees only to the prevailing party "who asserted the action" for breach of a restrictive covenant pertaining to real property, not one who prevailed in defense of such an action. *See* Tex. Prop. Code § 5.006.

determination as to UP Austin's claims against the Owners under the applicable attorney's fee provisions as we have construed them.

The sole remaining challenge to the trial court's judgment concerns the award of conditional post-judgment and appellate attorney's fees, which the POA contends is invalid because the judgment lacks sufficient specificity as to which parties are liable for those fees. We agree.

We cannot affirm the award of appellate attorney's fees because that portion of the judgment fails to identify what party (or parties) the fees are awarded against.[37] The Texas Rules of Civil Procedure require that "the entry of the judgment shall contain the full names of the parties . . . for and against whom the judgment is rendered." Tex. R. Civ. P. 306 (emphasis added); *see City of Austin v. Castillo*, 25 S.W.3d 309, 314-15 (Tex. App.—Austin 2000, pet. denied) (trial court's judgment defective because it failed to dispose of named plaintiff's claim and awarded relief to one not named as plaintiff). In light of multiple trial-court findings to the effect that the POA and the Owners were under common control and acted together to improperly levy the special assessment,

---

[37] The judgment states:

> UP Austin shall recover the following conditional awards of attorneys' fees: (a) $15,000.00 for any post-judgment motion or request for findings of fact and conclusions of law filed by a defendant; (b) $90,000.00 if any defendant files a notice of appeal and does not prevail in such appeal; (c) $25,000.00 if any defendant files a petition for review in the Supreme Court of Texas and the Court dismisses or denies the petition without requesting briefs on the merits; (d) $30,000.00 if the Supreme Court of Texas requests merits briefs and the petitioning defendant does not prevail in such further appeal; and (e) $15,000.00 if the Supreme Court grants the petition for review and hears oral argument, and the petitioning defendant does not prevail in such further appeal.

The judgment does not differentiate among the individual parties with regard to liability for the attorney's fees conditionally awarded or expressly impose joint and several liability for the award.

we might infer that the trial court intended to impose joint and several liability for attorney's fees against them. However, there are several reasons why it would be inappropriate to construe the judgment in that way. First, the judgment expressly imposes joint and several liability against the POA and the Owners for UP Austin's costs of court. The absence of similar language with regard to the attorney-fee award suggests that the trial court did not intend to impose joint and several liability for post-judgment and appellate attorney's fees. Second, it is error to award appellate attorney's fees jointly and severally against multiple parties even if only one of them pursues an unsuccessful appeal. *Zurita v. SVH-1 Partners, Ltd.*, No. 03-10-00650-CV, 2011 WL 6118573, at *10 (Tex. App.—Austin Dec. 8, 2011, pet. denied) (mem. op.).

Ultimately, however, we cannot ascertain with any degree of certainty against whom the award was intended aside from pure speculation. *Cf. Ex parte Acker*, 949 S.W.2d 314, 317 (Tex. 1997) (holding that "decree must set forth the obligation in clear, specific and unambiguous terms"). UP Austin asserts that the award for post-judgment and appellate attorney's fees is conditioned on which party appeals and the result of that appeal; thus, the judgment need not have listed which party would be responsible for attorney's fees in which instance. We do not agree that the judgment can be so clearly construed. The judgment may reasonably be construed as imposing joint and several liability for the amounts stated or, under UP Austin's construction, the amounts stated multiplied by the number of parties appealing. Furthermore, the transcript of the hearing on attorney's fees suggests that the possible intent was to treat CAA, Hospitality, and the Owner Declarant collectively, but separately from the POA for purposes of liability for the amounts stated in the judgment, which would also be consistent with the trial court's findings. Because there

are a number of ways the judgment could be construed, the judgment lacks the specificity required for enforcement. Accordingly, it is necessary to remand for clarification of the judgment. Even if the trial court intended to impose joint and several liability or we could presume the same, we conclude that our disposition of the minority-oppression issue, the related remand for reconsideration of UP Austin's receivership request, and residual issues impacting the prevailing-party analysis support reversing the award of post-judgment and appellate attorney's fees and remanding that matter to the trial court for clarification.

## CONCLUSION

We conclude that the POA did not have authority under its dedicatory instruments to levy a special assessment to pay for initial infrastructure; accordingly, we affirm that portion of the trial court's judgment as well as the portion denying the POA's counterclaims for payment of the special assessment and recovery of attorney's fees. We further hold that the Owners cannot be held liable for minority oppression on the bases found by the trial court and, therefore, reverse the trial court's judgment invalidating the second- and third-amended CCRs and enjoining the Owner Declarant from amending the CCRs in the same manner in the future; we render judgment that UP Austin take nothing on its minority-oppression claim. We likewise reverse the trial court's judgment denying the Owners' unjust-enrichment claims and render judgment that the POA shall refund the amounts the Owners paid pursuant to the invalid assessment as follows: $515,792 to the Owner Declarant; $291,972 to CAA; and $279,701 to Hospitality, plus interest from the date of our judgment. We further reverse and remand to the trial court (1) UP Austin's request for appointment

of a receiver under section 11.404, (2) UP Austin's and the Owners' claims for attorney's fees, and (3) the award of conditional post-judgment and appellate attorney's fees to UP Austin.

__________________________________________

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed: December 8, 2014